No. 25-13187

# In the United States Court of Appeals
# for the Eleventh Circuit

---

LIBERTY MUTUAL FIRE INSURANCE COMPANY,

Plaintiff-Appellant,

*v.*

RED ROOF INNS, INC.; RED ROOF FRANCHISING, LLC; RRI WEST MANAGEMENT, LLC; FMW RRI NC, LLC,

Defendants-Appellees,

JANE DOE #1; JANE DOE #2; JANE DOE #3; JANE DOE #4; W.K.; E.H.; M.M.; R.P.; M.B.; D.P.; A.F.; C.A.; R.K.; K.P.; T.H.; H.B.; AND K.M.,

Nominal Defendants.

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA

---

## BRIEF FOR APPELLANT

---

Latasha L. Scott
BUTLER WEIHMULLER
  KATZ CRAIG LLP
400 N. Ashley Drive, Suite 2300
Tampa, FL 33602
(813) 281-1900

Nancy D. Adams
  *Counsel of Record*
Alec J. Zadek
Mitchell J. Clough
MINTZ, LEVIN, COHN, FERRIS,
  GLOVSKY AND POPEO, P.C.
One Financial Center
Boston, MA 02111
(617) 542-6000

DECEMBER 22, 2025

No. 25-13817, *Liberty Mutual Fire Insurance Co. v. Red Roof Inns, Inc.*

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Eleventh Circuit Rules 26.1-1 through 26.1-3, to Plaintiff-Appellant Liberty Mutual Fire Insurance Company's knowledge, the following persons and entities have an interest in the outcome of this appeal:

Adams, Nancy D.

A.F.[1]

Andersen, Tate, & Carr, P.C.

Baumrind, Michael Rosen

Bendin Sumrall & Ladner, LLC

Birg, Erika C.

Bondurant Mixson & Elmore, LLP

Butler Weihmuller Katz Craig LLP

C.A.

Clough, Mitchell J.

---

[1] The plaintiffs in the actions underlying this insurance-coverage dispute, who were named as nominal defendants, are identified by their initials or as Jane Doe to protect their identities in a manner consistent with that which was employed at the District Court, because they allege they are the victims of sex trafficking.

No. 25-13817, *Liberty Mutual Fire Insurance Co. v. Red Roof Inns, Inc.*

Doe, Jane #1

Doe, Jane #2

Doe, Jane #3

Doe, Jane #4

D.P.

E.H.

Ely, Shattuck

Fellows LaBriola LLP

Floyd, John Earl

FMW RRI, LLC

Gallo-Cook, Alexandra

H.B.

K.M.

K.P.

Liberty Mutual Fire Insurance Company

Liberty Mutual Group Inc.

Liberty Mutual Holding Company, Inc.

LMHC Massachusetts Holdings Inc.

Mesa, Juliana

No. 25-13817, *Liberty Mutual Fire Insurance Co. v. Red Roof Inns, Inc.*

Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.

M.B.

M.M.

Mykkeltvedt, Tiana Scogin

Nelson Mullins Riley & Scarborough LLP

Red Roof Franchising, LLC

Red Roof Inns, Inc.

R.K.

R.P.

RRI West Management, LLC

Rosenzweig, Andrew

Scott, Latasha L.

Seals, Amanda Kay

Spratling, Jonathan

Stoddard, Matthew B.

Swift, Donald L. III

T.H.

The Honorable Leigh Martin May

The Stoddard Firm

No. 25-13817, *Liberty Mutual Fire Insurance Co. v. Red Roof Inns, Inc.*

Varghese, Manoj Sam

W.K.

Zadek, Alec J.

Liberty Mutual Fire Insurance Company states that it is a subsidiary of Liberty Mutual Group Inc. and that no publicly traded corporation owns more than 10% of Liberty Mutual Fire Insurance Company 's stock.

Liberty Mutual Holding Company Inc. owns 100% of the stock of LMHC Massachusetts Holdings Inc.  LMHC Massachusetts Holdings Inc. owns 100% of Liberty Mutual Group Inc.  Liberty Mutual Group Inc. owns 100% of Liberty Mutual Fire Insurance Company.

*/s/ Nancy D. Adams*
Nancy D. Adams

# STATEMENT REGARDING ORAL ARGUMENT

Liberty Mutual Fire Insurance Company respectfully submits that oral argument would be helpful to the disposition of this appeal. This case presents important and novel questions concerning the interpretation of the Trafficking Victims Protection Reauthorization Act and the application of insurance policies to claims alleging violations of that statute.

# TABLE OF CONTENTS

Page

STATEMENT REGARDING ORAL ARGUMENT ...................................i

TABLE OF CONTENTS ...............................................................ii

TABLE OF CITATIONS .............................................................v

STATEMENT OF JURISDICTION ..............................................1

INTRODUCTION.......................................................................1

STATEMENT OF THE ISSUES .................................................4

STATEMENT OF THE CASE ....................................................7

    A.   The Underlying Lawsuits .....................................7

    B.   The Insurance Policies ........................................10

        1.   Coverage A: Bodily Injury and Property Damage Liability ...........................................................10

        2.   Coverage B: Personal and Advertising Injury Liability ...........................................................11

        3.   Exclusions .................................................12

    C.   Procedural History .............................................12

SUMMARY OF ARGUMENT ...................................................14

STANDARD OF REVIEW.........................................................19

ARGUMENT ...........................................................................19

I.   Liberty's Declaratory-Judgment Claims Are Not Moot. ...............19

II.   Liberty Had No Duty to Defend Red Roof Against the
      H.B. Lawsuit. ........................................................................ 25

      A.    H.B.'s allegations do not come within the scope of
            Coverage A. ................................................................ 27

            1.    Volitional conduct is required to violate
                  the TVPRA. ....................................................... 28

            2.    H.B. did not allege "bodily injury" caused by
                  an "occurrence". ................................................ 34

            3.    Even if H.B. alleged "bodily injury" caused by an
                  "occurrence", the Expected or Intended Injury
                  Exclusion bars coverage. .................................. 41

      B.    H.B.'s allegations do not fall within the grant of coverage
            afforded under Coverage B. ...................................... 43

            1.    H.B. did not allege any offense giving rise to
                  "personal and advertising injury". .................. 44

            2.    Any alleged "personal and advertising injury"
                  was inextricably intertwined with H.B.'s alleged
                  "bodily injury". ................................................. 46

            3.    Any alleged "personal and advertising injury" was
                  not caused by an offense arising out of
                  Red Roof's business ........................................ 49

            4.    Even if Coverage B applies, the Knowing Violation
                  of Rights of Another Exclusion bars coverage. ........... 51

      C.    Public policy prohibits providing insurance coverage for
            participation in a sex-trafficking venture. .................. 52

III.  Liberty Has the Right to Recoup Payments Where There Is
      No Coverage. ........................................................................ 54

      A.    Ohio law applies to this case. .................................. 55

B.     Liberty has the right to recoup expenses, both defense and indemnity, under Ohio law. ...........................................59

C.     Even if Georgia law applies, Liberty has the right to recoup indemnity expenses. ..................................................60

CONCLUSION ........................................................................63

CERTIFICATE OF COMPLIANCE.......................................................65

ADDENDUM .........................................................................66

# TABLE OF CITATIONS

Page(s)

**Cases**

*Acuity, A Mut. Ins. Co. v. Siding & Insulation Co.*,
    62 N.E.3d 937 (Ohio Ct. App. 2016) ..................................................... 37

*ALEA London Ltd. v. Woodcock*,
    649 S.E.2d 740 (Ga. Ct. App. 2007) .............................................. 54, 62

*Allstate Indem. Co. v. Messina*,
    No. CV 19-2748, 2021 WL 3080926 (D. Minn. July 21, 2021) ...... 47-49

*Allstate Ins. Co. v. Emp'rs Liab. Assurance Corp.*,
    445 F.2d 1278 (5th Cir. 1971) ............................................................... 21

*Allstate Vehicle & Prop. Ins. Co. v. Inabnitt*,
    Nos. CA2021-10-094, -098, 2022 WL 2208799
    (Ohio Ct. App. June 21, 2022) .......................................................... 42

*Am. Fam. Ins. Co. v. Roach*,
    No. 2008CA00181, 2009 WL 2772552
    (Ohio Ct. App. Aug. 31, 2009) ...................................................... 50-51

*Auto-Owners Ins. Co. v. Todd*,
    547 N.W.2d 696 (Minn. 1996) .................................................. 46, 48-49

*Bistline v. Parker*,
    918 F.3d 849 (10th Cir. 2019) ................................................. 33, 38, 40

*Bloom v. Richards*,
    2 Ohio St. 387 (1853) ...................................................................... 57

*Blue Ridge Ins. Co. v. Jacobsen*,
    22 P.3d 313 (Cal. 2001) ......................................................... 23, 62-63

*Bourgeois v. Peters*,
    387 F.3d 1303 (11th Cir. 2004) ....................................................... 24

\* *Chiquita Brands Int'l, Inc. v. Nat'l Union Ins. Co (Chiquita I),*
   988 N.E.2d 897 (Ohio Ct. App. 2013) .......................... 26-27, 34, 36, 45

*City of Atlanta v. St. Paul Fire & Marine Ins. Co.,*
   498 S.E.2d 782 (Ga. Ct. App. 1998) ................................................... 27

\* *Cole v. State Farm Fire & Cas. Co.,*
   25 F. App'x 791 (10th Cir. 2002) .................................................. 46-48

*Collins Bldg. Servs., Inc. v. United Capitol Ins. Co.,*
   No. 98 CIV 3502, 1999 WL 259519 (S.D.N.Y. Apr. 30, 1999) ........... 47

*Com. Union Ins. Cos. v. Sky, Inc.,*
   810 F. Supp. 249 (W.D. Ark. 1992) .................................................... 47

\* *Cont'l Cas. Co. v. Winder Lab'ys, LLC,*
   73 F.4th 934 (11th Cir. 2023) .................................. 6, 18-19, 60-61, 63

*Coon v. Med. Ctr., Inc.,*
   797 S.E.2d 828 (Ga. 2017) .......................................................... 55-56

\* *Doe #1 v. Red Roof Inns, Inc.,*
   21 F.4th 714 (11th Cir. 2021) ................................. 19, 25, 29-30, 38-39

*Doe 1 v. Apple Inc.,*
   96 F.4th 403 (D.C. Cir. 2024) ....................................................... 31-33

*Doe (T.M.) v. G6 Hosp. LLC,*
   No. 23-cv-2598, 2024 WL 4457563 (N.D. Ga. Sept. 23, 2024) ........... 40

*Drazen v. Pinto,*
   74 F.4th 1336 (11th Cir. 2023) ........................................................... 19

*Edwards v. Sharkey,*
   747 F.2d 684 (11th Cir. 1984) ............................................................ 21

\* *Ellis v. Skinner,*
   218 N.E.3d 197 (Ohio Ct. App. 2023) ............................................ 26-27

*Farm Fam. Cas. Ins. Co. v. Samperi,*
   242 F. Supp. 3d 83 (D. Conn. 2017) ............................................... 47-48

- vi -

*First Acceptance Ins. Co. of Ga. v. Hughes*,
    826 S.E.2d 71 (Ga. 2019) ................................................ 2, 6, 15, 21, 23

\* *G.G. v. Salesforce.com, Inc.*,
    76 F.4th 544 (7th Cir. 2023) .............................. 31-33, 38-39

\* *G.M. Sign, Inc. v. St. Paul Fire & Marine Ins. Co.*,
    768 F. App'x 982 (11th Cir. 2019)................................ 34, 37

*Gearing v. Nationwide Ins. Co.*,
    665 N.E.2d 1115 (Ohio 1996)........................... 26, 34, 36, 52

*Jacobs v. Cable Constructors, Inc.*,
    704 N.W.2d 205 (Minn. Ct. App. 2005) ............................ 63

*Johnson v. Occidental Fire & Cas. Co.*,
    954 F.2d 1581 (11th Cir. 1992)........................................ 55

\* *K.H. v. Riti, Inc.*,
    No. 23-11682, 2024 WL 505063 (11th Cir. Feb. 9, 2024) ........ 30-32, 39

*Kirkland v. Guardian Life Ins. Co. of Am.*,
    352 F. App'x 293 (11th Cir. 2009)..................................... 56

*L.M.H. v. Red Roof Inns*,
    No. 24-cv-1823, 2025 WL 961720 (S.D. Ohio Mar. 31, 2025)............ 40

*Littrell v. Colony Ins. Co.*,
    492 S.E.2d 299 (Ga. Ct. App. 1997)................................... 45

*Maryland Cas. Co. v. Salon Ave. Suite 2*,
    No. 13-cv-3056, 2014 WL 4925623 (N.D. Ga. Sept. 29, 2014) ........... 50

*Meritplan Ins. Co. v. Leverette*,
    552 F. App'x 900 (11th Cir. 2014)................................ 34, 38

*Mt. Hawley Ins. Co. v. E. Perimeter Pointe Apartments*,
    861 F. App'x 270 (11th Cir. 2021)..................................... 56

*Nationwide Prop. & Cas. Ins. Co. v. Renaissance Bliss, LLC*,
    823 F. App'x 815 (11th Cir. 2020)..................................... 24

*Nuvell Nat'l Auto Fin., LLC v. Monroe Guar. Ins. Co.*,
   736 S.E.2d 463 (Ga. Ct. App. 2012)......................................56

*O'Dell v. St. Paul Fire & Marine Ins. Co.*,
   478 S.E.2d 418 (Ga. Ct. App. 1996)...............................26, 34

*O'Neal v. State Farm Mut. Auto. Ins. Co.*,
   533 S.E.2d 781 (Ga. Ct. App. 2000)......................................57

*Otarma v. Miami Twp.*,
   --- N.E.3d ----, 2025 WL 2374827 (Ohio Ct. App. 2025) ....................59

*Owners Ins. Co. v. Endicott Buick-Cadillac, Inc.*,
   No. 2:20-CV-56, 2021 WL 3502468 (S.D. Ga. Aug. 10, 2021) ...........22

*Perry v. State Farm Fire & Cas. Co.*,
   676 S.E.2d 376 (Ga. Ct. App. 2008).......................................26, 34, 35

*Pilkington N. Am., Inc. v. Travelers Cas. & Sur. Co.*,
   861 N.E.2d 121 (Ohio 2006)................................................54

*Richardson v. Ga. Farm Bureau Mut. Ins. Co.*,
   678 S.E.2d 348 (Ga. Ct. App. 2009)......................................42

*Roe v. State Farm Fire & Cas. Co.*,
   376 S.E.2d 876 (Ga. 1989) .............................................35, 43

*Ryder Integrated Logistics, Inc. v. BellSouth Telecommc'ns, Inc.*,
   627 S.E.2d 358 (Ga. Ct. App. 2006)......................................50

*Shafe v. Am. States Ins. Co.*,
   653 S.E.2d 870 (Ga. Ct. App. 2007)......................................45

*State Farm Ins. Co. v. Bruns*,
   942 A.2d 1275 (N.H. 2008)................................................46

*State v. Cleveland & P. R. Co.*,
   113 N.E. 677 (Ohio 1916)................................................57

*Travelers Indem. Co. v. Hood*,
   140 S.E.2d 68 (Ga. Ct. App. 1964)...................................52-53

*Travelers Prop. Cas. Co. of Am. v. Mericle*,
486 F. App'x 233 (3d Cir. 2012) ...................................................... 52

\* *Travelers Prop. Cas. Corp. v. Chiquita Brands Int'l, Inc. (Chiquita II)*,
243 N.E.3d 797 (Ohio Ct. App. 2024) ................................. 35-38, 43, 53

*United Nat'l Ins. Co. v. SST Fitness Corp.*,
309 F.3d 914 (6th Cir. 2002) ...................................................... 59-60

*Velten v. Lippert*,
985 F.2d 1515 (11th Cir. 1993) ........................................................ 56

*Vt. Mut. Ins. Co. v. Malcolm*,
517 A.2d 800 (N.H. 1986) ............................................................... 35

*Walter v. Blue Cross & Blue Shield United*,
181 F.3d 1198 (11th Cir. 1999) ........................................................ 44

*Wells v. Twenty-First St. Realty Co.*,
12 F.2d 237 (6th Cir. 1926) ............................................................. 57

*Westchester Fire Ins. Co. v. Wallerich*,
563 F.3d 707 (8th Cir. 2009) ........................................................... 63

*William Powell Co. v. OneBeacon Ins. Co.*,
162 N.E.3d 927 (Ohio Ct. App. 2020) ............................................ 59-60

*Wolfe v. Wolfe*,
350 N.E.2d 413 (Ohio 1976) ......................................................... 57-58

*World Harvest Church, Inc. v. Guidone Mut. Ins. Co.*,
586 F.3d 950 (11th Cir. 2009) ................................................... 22-23, 62

**Statutes**

18 U.S.C. § 1591 .......................................................................... 29

\* 18 U.S.C. § 1595 ...................................................................... 29, 31

28 U.S.C. § 1291 ............................................................................ 1

28 U.S.C. § 1332 ............................................................................ 1

28 U.S.C. § 2201 ..................................................................... 1

O.C.G.A. § 16-14-4 ............................................... 9, 10, 25, 26

**Legislative Materials**

Pub. L. No. 106-386, 114 Stat. 1464 ...................................... 28

Pub. L. No. 108-193, 117 Stat. 2875 ...................................... 28

William Wilberforce Trafficking Victims Protection
    Reauthorization Act, Pub. L. No. 110-457, 122 Stat. 5044 ............... 29

## STATEMENT OF JURISDICTION

The district court had jurisdiction under 28 U.S.C. §§ 1332 and 2201.  Doc. 79; *see* 11th Cir. Doc. 22.  On September 12, 2025, Liberty timely appealed the judgment in favor of Red Roof[2] entered on August 15, 2025.  Docs. 94, 95.  This Court's jurisdiction rests on 28 U.S.C. § 1291.

## INTRODUCTION

This insurance coverage dispute asks whether commercial general liability policies insure defendants for their alleged participation in sex-trafficking ventures that violate the Trafficking Victims Protection Reauthorization Act ("TVPRA").  They do not.  Red Roof has been sued more than one-hundred times around the country for its alleged participation in sex-trafficking ventures at its hotels.  In response, Red Roof turned to Liberty, demanding that Liberty defend and indemnify it for its alleged participation in such sex-trafficking ventures.  The district court below concluded that Liberty had a duty to defend one of those claims, and dismissed Liberty's remaining claims as moot, not ripe, or

---

[2]      "Red Roof" includes Defendants-Appellees Red Roof Inns, Inc., Red Roof Franchising, LLC, RRI West Management, LLC, and FMW RRI NC, LLC.

barred by Georgia law.  Each of the district court's conclusions conflicts with binding precedent from this Court and others.  The judgment below should be vacated for three reasons.

*First*, Liberty's declaratory-judgment claims are justiciable.  The district court concluded that, as to the duty to indemnify, Liberty's declaratory-judgment claims were not ripe until the Underlying Lawsuits were settled but also that Liberty's declaratory-judgment claims were moot upon settlement, and, for the duty to defend, that an insurer can litigate coverage only during the window when the underlying action remains pending.  The district court's logic effectively eliminates an insurer's ability to litigate coverage when that insurer follows the "proper" course by providing a defense under a reservation of rights and then filing a declaratory-judgment action to determine the availability (or not) of coverage.  Thus, following the district court's logic, to litigate coverage, an insurer must deny coverage outright.  Regardless, contrary to the district court's conclusion, this Court has held that declaratory-judgment claims are not mooted by the settlement of underlying lawsuits.

*Second*, Liberty had no duty to defend the H.B. Lawsuit. Contrary to the district court's understanding, violation of the TVPRA does not constitute a fortuitous loss. A properly pled claim pursuant to the TVPRA requires as an element the defendant's participation in a venture that violates the TVPRA. H.B. alleged just that: Red Roof condoned sex trafficking at the hotel and actively supported her sex traffickers. The natural and probable consequence, or expectation and design, of that "participation" is that victims like H.B. will be sex trafficked. H.B. therefore did not allege "bodily injury" caused by an "occurrence", as Coverage A to the Policies require. Nor did she allege a "personal and advertising injury" as required for the second grant of coverage under Coverage B (a ground Red Roof raised below but which the district court did not reach). H.B. alleged that she was sex trafficked—not falsely imprisoned or detained—and any allegation of false imprisonment is merely part and parcel to her sex trafficking, and thus not covered under Coverage B.

*Third*, Liberty also has the right to seek recoupment of amounts paid on behalf of Red Roof. Ohio law—including Ohio common law— applies to the Policies issued to Red Roof in Ohio. Ohio courts have held

that insurers have the right to seek recoupment of amounts, both defense expenses and settlement payments, if there was no coverage in the first place. But even if Georgia law applied, Liberty would still have the right to recoup the settlement payments it made on Red Roof's behalf for uncovered claims. Concluding otherwise, the district court extended this Court's precedent beyond its terms and created an untenable position for insurers in Georgia. Under the district court's logic, an insurer must pay a reasonable settlement (to avoid the risk of bad faith) without any recourse to litigate whether that settlement was covered.

Because Liberty had no duty to defend any of the claims, or at least has a right to recoup settlement payments if it is later determined that the claims are uncovered, the judgment should be vacated and the case remanded for further proceedings.

## STATEMENT OF THE ISSUES

1.    The district court ruled that the settlement or dismissal of six of the seven Underlying Lawsuits rendered the merits of Liberty's declaratory-judgment claims moot, yet the court also ruled that the same claims as to the sole remaining Underlying Lawsuit were not ripe until settlement or final judgment. The district court's dual decision regarding

the mootness and ripeness of Liberty's declaratory-judgment claims effectively prevents Liberty (or any insurer) from litigating the availability (or not) of coverage.   Are Liberty's declaratory-judgment claims moot?

2.   The district court ruled that Liberty had a duty to defend Red Roof against the then-pending H.B. Lawsuit because it found Red Roof was alleged to be negligent in regard to the TVPRA violations, and thus H.B. alleged an "occurrence" under Coverage A.   Does "bodily injury" resulting from an insured's participation in a venture under the TVPRA, which requires affirmative, volitional conduct in furtherance of that venture, constitute "bodily injury" caused by an "occurrence"?

3.   Even if H.B. alleged "bodily injury" caused by an "occurrence" under Coverage A, was H.B.'s "bodily injury" expected by Red Roof and thus excluded under the Expected or Intended Injury Exclusion?

4.   Red Roof argued that Coverage B was implicated because H.B. alleged "personal and advertising injury" caused by an offense arising out of Red Roof's business.   Do H.B.'s allegations of sex trafficking allege a "personal and advertising injury" sufficient to implicate Coverage B?

5.    Is insurance for Red Roof's participation in a sex-trafficking venture uninsurable as a matter of public policy?

6.    After concluding under a choice-of-law analysis that Georgia law applied, the district court then determined that Georgia law prohibits an insurer from recouping defense expenses and settlement payments that it made on behalf of Red Roof in connection with the Underlying Lawsuits:

>   a.    *First*, did the district court err in applying Georgia law under the state's unique presumption-of-identity rule, even though English common law is merely persuasive in Ohio and Ohio was not one of the original thirteen colonies?

>   b.    *Second*, because Ohio law applies, must the case be remanded for reconsideration of the recoupment issue under Ohio law?

>   c.    *Third*, under Georgia law, did the district court misconstrue this Court's precedent in *Continental Casualty Co. v. Winder Laboratories, LLC*, by concluding that Liberty had no right to seek recoupment of settlement

payments for uncovered claims (as opposed to defense costs)?

## STATEMENT OF THE CASE

### A. The Underlying Lawsuits

The present coverage dispute arises out of seven Underlying Lawsuits in which seventeen plaintiffs allege that they were trafficked for sex at hotels owned or operated by Red Roof in the Atlanta area. Doc. 79, ¶ 3.

Broadly, all plaintiffs in the Underlying Lawsuits allege that, at various times between 2009 and 2018, they were trafficked for sex either as minors or through force, fraud, or coercion at Red Roof Inn locations in Georgia. Doc. 79-1, ¶ 135; Doc. 79-2, ¶ 134; Doc. 79-3, ¶ 126; Doc. 179-4, ¶ 104; ¶ Doc. 79-5, at ¶¶ 14, 20-21, 149; Doc. 79-6, ¶ 1; Doc. 79-7, ¶ 41.e.

The plaintiffs universally alleged that Red Roof "participated in," "facilitated," and "benefitted from" their sex-trafficking. Doc. 79-1, ¶ 108; Doc. 79-2, ¶ 107; Doc. 79-3, ¶ 100; Doc. 79-4, ¶ 75; Doc. 79-5, ¶¶ 448-449; Doc. 79-6, ¶ 5, Doc. 79-7, ¶¶ 38, 52-55. The plaintiffs alleged that hotel employees repeatedly participated in, and were instrumental to,

facilitating the venture that trafficked them for sex. *See, e.g.*, Doc. 79-1, ¶ 31; Doc. 79-2, ¶ 32; Doc. 79-6, ¶ 33. Hotel employees "served as lookouts," "warn[ed] [traffickers] if law enforcement was on-site or en-route," and "solicited [plaintiffs] for sex." Doc. 79-1, ¶ 31; Doc. 79-2, ¶ 32; Doc. 79-6, ¶ 33. Hotel employees helped to conceal sex trafficking at the hotels by renting rooms "that would be used for prostitution and crime on the back side of the hotel." Doc. 79-6, ¶ 42. In one instance, a plaintiff (W.K.) alleged an employee "stood and watched while [her] trafficker choked her in an exterior breezeway of the hotel." Doc. 79-5, ¶ 154. Another plaintiff (H.B.) alleged that, while she was trafficked, she "witnessed one of her traffickers pay employees of the [hotel] cash in exchange for the hotel's facilitation of [her] sex trafficking by permitting the trafficking to occur at the hotel and by acting as lookouts for her traffickers." Doc. 79-6, ¶ 19. Overall, the plaintiffs alleged an atmosphere of "open[] and brazen[]," trafficking activity, *id.* ¶ 20, where Red Roof employees made "no[] attempt to disguise the bustling sex trade taking place" at the hotels, Doc. 79-1, ¶ 33.

The plaintiffs asserted claims against Red Roof for violations of the TVPRA and, in most of the Underlying Lawsuits, the plaintiffs also

asserted claims for violation of the Georgia RICO statute and negligence. *See* Doc. 79-1, at 69-106; Doc. 79-2, at 67-104; Doc. 79-3, at 72-108; Doc. 79-4, at 58-79; Doc. 79-5, at 91-138; Doc. 79-6, at 24-35; Doc. 79-7, at 17. For relief, the plaintiffs sought compensatory damages, punitive damages, and attorneys' fees. *See* Doc. 79-1, at 79-82, 90, 95-96, 98-101, 106, 111; Doc. 79-2, at 77-80, 88, 93-94, 96-99, 103-04, 109; Doc. 79-3, at 83-85, 93, 98, 101-03, 108; Doc. 79-4, at 67-70, 78, 84-85; Doc. 79-5, at 169-70; Doc. 79-6, at 39; Doc. 79-7, at 29-30.

Specific to the H.B. Lawsuit (the lawsuit analyzed by the district court below), H.B. alleged that she was trafficked for sex while she was a minor at a Red Roof Inn in Norcross, Georgia, in January 2012. Doc. 79-6, ¶ 1. H.B. alleged that Red Roof "participated in, and benefitted from, [her] sex trafficking." *Id.* ¶ 5. She alleged that Red Roof participated in the venture that trafficked her for sex by, among other things, employees serving as look outs for the traffickers, alerting the traffickers to law enforcement's presence on the property, employees receiving money in addition to fees for room rentals from traffickers, and renting rooms at the back of the hotel where it would be more difficult for someone to discover the sex trafficking venture. *Id.* ¶¶ 19-20, 33-34, 42.

H.B. asserted claims against Red Roof for violations of the TVPRA and the Georgia RICO statute.  *Id.* at 24-25, 27.

## B.    The Insurance Policies

Liberty issued eight commercial general liability policies (collectively, the "Policies") to Red Roof Inns, Inc. during the period relevant to the Underlying Lawsuits.  Doc. 79 ¶ 110.  Relevant here, the Policies contain two liability coverage parts: Coverage A, Bodily Injury and Property Damage Liability and Coverage B, Personal and Advertising Injury Liability.  *Id.* ¶ 111; *see* Doc. 79-8 at 3-4.[3]

### 1.    Coverage A: Bodily Injury and Property Damage Liability

The Insuring Agreement for Coverage A provides, in relevant part, that Liberty will "pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' . . . to which this insurance applies".  Doc. 79-8 at 3.  The Insuring Agreement further provides that "[t]his insurance applies to 'bodily injury' . . . only if . . . [t]he 'bodily injury' . . . is caused by an 'occurrence'".  *Id.*  The Policies

---

[3]    The policy language relevant to this appeal is substantially identical across all policies.  *See* Doc. 79, ¶¶ 114-124.  Therefore, Liberty refers to the policies collectively and will generally cite to the 2011 Policy, the policy in effect at the time H.B. alleges she was sex trafficked.

define the term "occurrence" to mean "an accident, including continuous or repeated exposure to substantially the same general harmful conditions". *Id.* at 8. Thus, for a claim to fall within the scope of the Insuring Agreement for Coverage A, at a minimum, a claimant must allege "bodily injury" caused by an accident.

## 2. Coverage B: Personal and Advertising Injury Liability

The Insuring Agreement for Coverage B provides, in relevant part, that Liberty will "pay those sums that the insured becomes legally obligated to pay as damages because of 'personal and advertising injury' to which this insurance applies". Doc. 79-8 at 4. The Insuring Agreement further provides that the alleged "personal and advertising injury" must be "caused by an offense arising out of [the named insured's] business". *Id.*

The Polices define "personal and advertising injury" to mean an "injury, including consequential 'bodily injury', arising out of one or more of the following offenses", including, but not limited to, "[f]alse arrest, detention or imprisonment".[4/] *Id.* at 5. Thus, for a claim to fall within

---

[4/] For brevity, only the "offenses" relevant to the arguments on appeal are listed here. The full list of "offenses" can be found at Doc. 79-8 at 5.

the scope of the Insuring Agreement for Coverage B, at a minimum, a claimant must allege "personal and advertising injury" caused by an offense arising out of Red Roof's business.

### 3.    Exclusions

The Policies contain several exclusions, two of which are relevant to this appeal.  First, the Policies contain an Expected or Intended Injury Exclusion, which provides that Coverage A does not apply to "'[b]odily injury' . . . expected or intended from the standpoint of the insured".  Doc. 79-8 at 6.  Second, the Policies contain a Knowing Violation of Rights of Another Exclusion, which provides that Coverage B does not apply to "personal and advertising injury" that is "caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict" such injury.  *Id.* at 4.

### C.    Procedural History

The Underlying Lawsuits were filed at various times between 2019 and 2023.  Doc. 79, ¶¶ 33, 43, 53, 63, 71, 89, 102.  Red Roof tendered each complaint to Liberty, and Liberty agreed to defend Red Roof in each of the Underlying Lawsuits subject to a reservation of rights, including the right to contest the existence of coverage in a declaratory-judgment

action.  *Id.* ¶¶ 132-141.  On May 5, 2023, Liberty filed its lawsuit seeking declarations that the Policies do not afford coverage to Red Roof for the Underlying Lawsuits.  Doc. 1.

On September 26, 2023, Liberty moved for judgment on the pleadings regarding Liberty's duty to defend and indemnify Red Roof against the Underlying Lawsuits.  Doc. 45.  That motion was fully briefed less than a month later, by October 24, 2023.  Doc. 50.  In January 2024, while Liberty's motion for judgment on the pleadings was pending, Red Roof moved for pre-discovery summary judgment.  Doc. 53.

While the dipositive motions were pending, in March 2024, Liberty moved for leave to amend its complaint to reflect the settlement of four of the Underlying Lawsuits and the dismissal of one other.[5/]  Doc. 69-1 at 2.  Five months later, in August 2024, the district court granted Liberty leave to amend and denied the pending motions (for judgment on the pleadings and summary judgment) as moot as a result of the amended complaint.  Doc. 73.  Two weeks later, Liberty again moved to amend to

---

[5/]    The settled Underlying Lawsuits at this point were Jane Doe #1, Jane Doe #2, Jane Doe #3, and Jane Doe #4 ("Jane Doe 1-4 Lawsuits").  Doc. 69-1 at 2.  Red Roof's motion to dismiss the K.M. Lawsuit had been granted, and so there was no settlement of the K.M. Lawsuit.  *Id.*

reflect the settlement of an additional Underlying Lawsuit.[6/]  Doc. 75.  On September 6, 2024, the district court granted Liberty's motion to amend. Doc. 78.  Thereafter, on October 4, 2024, Red Roof moved to dismiss Liberty's second amended complaint.  Docs. 78, 81.  Ten months later, on August 15, 2025, the district court granted Red Roof's motion to dismiss. Doc. 93.

While the parties litigated the declaratory-judgment action, the Underlying Lawsuits proceeded with Red Roof repeatedly demanding that Liberty settle the Jane Doe #1-4 Lawsuits and W.K. Lawsuit or risk a bad faith claim for failure to settle.  *See* Doc. 79, ¶¶ 142-156. Ultimately, against constant threats of bad faith, Liberty contributed to the settlement of those five Underlying Lawsuits subject to a reservation of its right to recoup defense costs and its settlement payments.  *Id.* ¶¶ 149, 151, 156.  The H.B. Lawsuit has since settled with a contribution from Liberty and been dismissed.  Stip. of Dismissal, *H.B. v. Red Roof Inns, Inc.*, No. 1:22-cv-01181 (N.D. Ga. Dec. 2, 2024), ECF No. 225.

## SUMMARY OF ARGUMENT

I.  Liberty's declaratory-judgment claims are not moot.

---

[6/]    Specifically, the W.K. Lawsuit had settled.  Doc. 75 at 2.

If the district court's Article III analysis is correct, then an insurer providing a defense under a reservation of rights has no ability to litigate coverage because the declaratory-judgment claims are either not ripe or moot. This result cannot stand to logic or law. *First*, it is well-settled in this Circuit that the settlement of an underlying lawsuit does not moot claims for declaratory relief. *Second*, the above-described dilemma serves only to encourage insurers to deny defense coverage, which contradicts Georgia's stated interest in encouraging insurers to provide a defense while simultaneously seeking declarations concerning the scope of coverage. *Third*, there remains a live issue in the litigation as to Liberty's recoupment rights—a merits issue part of the present appeal. *Fourth*, the district court's mootness analysis ignores the Article III exception designed to allow adjudication of issues that, though capable of repetition, evade review given their short temporal scope.

II. On the merits, Liberty had no duty to defend Red Roof against the H.B. Lawsuit.

A. The district court concluded that H.B. alleged "bodily injury" caused by an "occurrence", meaning accidental conduct, thereby implicating Liberty's duty to defend under Coverage A. In so finding, the

district court conflated two distinct elements of a TVPRA claim—the constructive-knowledge-of-sex-trafficking element with the participation element. This Court's precedents make clear that the participation-in-a-venture element of a TVPRA claim requires more than negligently observing sex trafficking at a hotel. For this reason, H.B. did not allege "bodily injury" caused by an "occurrence". Further, under both Ohio and Georgia law, injury which was the natural and probable consequence of the insured's volitional or affirmative conduct does not constitute "bodily injury" cause by an "occurrence". Here, H.B. alleged that Red Roof facilitated the traffickers' venture at the hotel, including by serving as lookouts for traffickers and alerting them to the presence of law enforcement. As a result, any injury to H.B. cannot have been the result of a fortuitous event. Moreover, even if H.B. did allege an "occurrence", coverage under Coverage A would be precluded because H.B. alleged that Red Roof expected or intended that H.B. would be injured.

B. The H.B. Lawsuit did not allege a "personal and advertising injury" sufficient to implicate Coverage B. (Although the district court did not reach this argument, this Court can and should address this purely legal issue on appeal in the interest of efficiency.) Based on a few

stray phrases plucked from H.B.'s complaint in isolation, Red Roof argued that H.B. alleged "false imprisonment" and thus alleged a "personal and advertising injury". H.B. did not allege false imprisonment, but even if she had, where such allegations are part and parcel of, or inextricably linked with, her claims for "bodily injury", coverage is dictated by Coverage A (not Coverage B). As a result, Coverage B cannot apply. Moreover, even if H.B. alleged a separate and distinct "personal and advertising injury", to fall within the grant of coverage, such injury must be caused by an offense arising out of Red Roof's business. H.B.'s injury was not. And any coverage under Coverage B would also be precluded by the Knowing Violation of Rights of Another Exclusion because H.B. alleged that Red Roof knew that H.B. was being sex trafficked.

C. Even if there is coverage under either coverage part (there is not), public policy separately bars coverage for Red Roof's conduct alleged here. Georgia and Ohio prevent insureds from seeking coverage for intentional, criminal conduct, and, on that basis, coverage must be precluded for Red Roof's participation in a sex-trafficking venture under the TVPRA.

III.  Liberty has a right to recoup the settlement payments made in the Underlying Lawsuits under Georgia and Ohio law—though Ohio law should apply to this analysis.

A.  As to the choice of law, Ohio law governs the recoupment analysis because Georgia's choice-of-law rule—that Georgia common law trumps the foreign state common law where both states follow the English common law—does not apply when the foreign state in question (Ohio) has not adopted the English common law and was not one of the original thirteen colonies.

B.  Assuming Ohio law applies (as it must), the state law on recoupment is clear: insurers have the right to recoup both defense expenses and settlement payments where the insured's claims were not covered.  This conclusion follows a straightforward theory of restitution.

C.  Were Georgia law to apply (it does not), Liberty nevertheless has the right to recoup settlement payments if there was no coverage for the Underlying Lawsuits.  The district court reached the contrary conclusion by erroneously stretching this Court's precedent in *Winder Laboratories*.  In *Winder*, the Court addressed an insurer's ability to recoup defense expenses and rested its decision on particular concerns

associated with the duty to defend. But *Winder* does not govern the recoupment of settlement payments, which raises different public policy considerations than the duty to defend. The ability to seek recoupment encourages insurers to settle cases when insurance coverage is uncertain.

## STANDARD OF REVIEW

Threshold questions of Article III jurisdiction are reviewed *de novo*. *Drazen v. Pinto*, 74 F.4th 1336, 1342 (11th Cir. 2023). This Court similarly reviews a dismissal for failure to state a claim *de novo*. *Doe #1 v. Red Roof Inns, Inc.*, 21 F.4th 714, 723 (11th Cir. 2021). The Court "must accept all factual allegations in the complaint as true and construe them 'in the light most favorable to the plaintiff,'" here, Liberty. *Id.* (citation omitted).

## ARGUMENT

## I.    Liberty's Declaratory-Judgment Claims Are Not Moot.

The district court's jurisdictional analysis was incorrect. As an initial matter, the district court determined that insurers' declaratory-judgment claims as to their duty to defend are ripe while the underlying lawsuits are pending, but moot as soon as they settle. For insurers' declaratory-judgment claims as to their duty to indemnify, the district court determined those claims are not ripe until the underlying lawsuits

settle—but also moot as soon as they settle.  And, under Georgia law, the district court said insurers have no right to recoup defense expenses or settlement payments.  Distilled, the district court's view is that an insurer never has the right to litigate its duty to indemnify and can litigate its duty to defend only if it can obtain a ruling from a court before the underlying lawsuit settles (however short a period that may be).

Applying its logic here, the district court concluded first that because six of the seven Underlying Lawsuits had settled or were dismissed by the time that the district court ruled on the merits of Liberty's declaratory-judgment claims, those claims were moot.  Doc. 93 at 5-6.  Next, the district court concluded that, for the seventh Underlying Lawsuit (H.B.), because that lawsuit was active, Liberty's declaratory-judgment claim with respect to the duty to indemnify was not ripe.  *Id.* at 7-8.  Finally, the district court held that Liberty had no right under Georgia law to recoup defense expenses or settlement payments made on behalf of Red Roof for any of the Underlying Lawsuits—even if the allegations of those lawsuits were not covered in the first place.  *Id.* at 16-18.

The district court's Article III analysis was based on the application of *Twin City Fire Ins. Co. v. Hartman, Simons & Wood, LLP*, which held that a request for judicial declaration was rendered moot by the settlement of the underlying lawsuit because the declaration "could not have . . . any bearing on the parties' future conduct." 609 F. App'x 972, 979 (11th Cir. 2015) (per curiam); *see* Doc. 93, at 5. The district court's analysis fails for at least four reasons.

*First*, *Twin City Fire* conflicts with this Court's binding precedent. *See Edwards v. Sharkey*, 747 F.2d 684, 686 (11th Cir. 1984) (per curiam); *see also Allstate Ins. Co. v. Emp'rs Liab. Assurance Corp.*, 445 F.2d 1278, 1281 (5th Cir. 1971). In *Edwards*, this Court held that a claim for declaratory relief to determine obligations under insurance policies is not mooted by the settlement of the underlying lawsuits. 747 F.2d at 686. This Court, relying on the Fifth Circuit's opinion in *Allstate*, noted that a contrary ruling "could have harmful effects entirely out of kilter with the equitable purposes underlying the [declaratory action] for it would . . . require companies to place their insureds 'between the upper and nether milestones' of paying or staving off execution on such a judgment while the issue of coverage is fought out." *Id.*; *see Allstate Ins. Co.*, 445 F.2d at

1281 (declaratory-judgment claim not mooted by settlement, noting that if such a claim is not ripe until a judgment has been rendered, then holding it moot upon settlement makes little sense); *Owners Ins. Co. v. Endicott Buick-Cadillac, Inc.*, No. 2:20-CV-56, 2021 WL 3502468, at *2 n.2 (S.D. Ga. Aug. 10, 2021) (applying *Edwards*, concluding insurer's declaratory-judgment claim not mooted by dismissal of underlying lawsuit).

*Second*, and relatedly, the decision creates an impossible situation for insurers. Georgia (like many states) "urge[s]" insurers to "enter upon a defense under a reservation of rights and then proceed to seek a declaratory judgment" "after discovering that coverage is in doubt." *World Harvest Church, Inc. v. Guideone Mut. Ins. Co.*, 586 F.3d 950, 956 n.6 (11th Cir. 2009) (quoting *Richmond v. Ga. Farm Bureau Mut. Ins. Co.*, 231 S.E.2d 245, 247 (Ga. Ct. App. 1976) (calling this the "proper and safe course of action"))). Yet, under the district court's logic, an insurer has no ability to litigate coverage: declaratory-judgment claims are either not ripe or moot. In the event an insurer could somehow litigate coverage and obtain a finding of no coverage, that insurer has no ability to recover

any of the amounts that it paid (whether defense or indemnity) on behalf of that insured.[7/]

If Georgia law mandates this outcome, an insurer's only option is to deny coverage and then file a declaratory-judgment action seeking confirmation of its coverage position. That conflicts with the "proper" course urged by Georgia courts, that an insured accept the duty to defend and then seek a declaratory judgment. *See World Harvest Church, Inc.*, 586 F.3d at 956 n.6. It also conflicts with Georgia's recognition that, when an opportunity to settle arises, an insurer "must give the insured's interests the same consideration that it gives its own" and Georgia's "sound public policy of encouraging settlements." *First Acceptance Ins. Co. of Ga. v. Hughes*, 826 S.E.2d 71, 74, 78 n.8 (Ga. 2019); *see also Blue Ridge Ins. Co. v. Jacobsen*, 22 P.3d 313, 321 (Cal. 2001) (recognizing that "were we to conclude insureds could, as in this case, refuse to assume their own defense, insisting an insurer settle a lawsuit or risk a bad faith action, but at the same time refuse to agree the insurer could seek

---

[7/]    As set forth below, Liberty has the right to recoupment under both Ohio and Georgia law. *See infra* 54-63.

reimbursement should the claim not be covered, the resulting Catch-22 would force insurers to indemnify noncovered claims").

*Third*, the claims are not moot because there remains a live issue as to whether Liberty is entitled to recoup the amounts it paid to defend and indemnify Red Roof. *See Nationwide Prop. & Cas. Ins. Co. v. Renaissance Bliss, LLC*, 823 F. App'x 815, 821 (11th Cir. 2020) (per curiam) (claims between insurer and insured not moot where there is a live claim about recoupment of settlement expenses).

*Fourth*, even if the claims for declaratory relief were moot with respect to the six Underlying Lawsuits that had settled (they are not), there is an exception to the mootness doctrine for claims that are capable of repetition yet evade review. *See, e.g.*, *Bourgeois v. Peters*, 387 F.3d 1303, 1308 (11th Cir. 2004) (noting this Court may "entertain a moot case" if this standard is satisfied). The disputes between the parties persist; Red Roof has filed coverage actions in Ohio federal court and Ohio state court. Indeed, in the Ohio state court action, the parties are litigating the existence (or not) of coverage in connection with sex trafficking at certain Georgia hotels. *See Red Roof Inns, Inc. v. Liberty*

*Mut. Fire Ins. Co.*, No. 24CV002683 (Franklin Cty., Ohio Ct. Common Pleas).

## II.    Liberty Had No Duty to Defend Red Roof Against the H.B. Lawsuit.

Turning to the merits, the district court concluded that Liberty had a duty to defend the H.B. Lawsuit because H.B. supposedly alleged that Red Roof was alleged to be negligent in regard to the violations of the TVPRA, thus implicating Coverage A.  That conclusion conflicts with this Court's precedents, which make clear that the "participation" element of a TVPRA claim requires purposeful or volitional conduct by the defendant.  Because H.B.'s allegations of Red Roof's conduct facilitating sex trafficking do not fall within the scope of coverage provided by the Policies (whether Coverage A or Coverage B), Liberty had no duty to defend Red Roof against the H.B. Lawsuit and, absent a duty to defend, Liberty had no duty to indemnify.[8]

---

[8]    There is also no coverage for the Georgia RICO claims.  H.B. relinquished her RICO claims.  Opp'n to Mot. for Summ. J. at 2 n.3, *H.B. v. Red Roof Inns, Inc.*, No. 22-cv-01181 (N.D. Ga.), ECF No. 103 (dropping RICO claims).  Moreover, a Georgia RICO claim requires alleging that Red Roof engaged in "racketeering activity" by committing, attempting to commit, soliciting, coercing, or intimidating another "'to commit any crime which is chargeable by indictment under' Georgia law." *Red Roof Inns*, 21 F.4th at 728 (quoting Georgia statute).  Allegations of criminal

"[T]o determine whether a liability [is] covered by the policy," Georgia (and Ohio) courts "compare the terms of the insurance contract to the allegations in the complaint." *O'Dell v. St. Paul Fire & Marine Ins. Co.*, 478 S.E.2d 418, 419 (Ga. Ct. App. 1996) (citation omitted); *accord Ellis v. Skinner*, 218 N.E.3d 197, 202 (Ohio Ct. App. 2023).[9/] "An insurer has no duty to defend where the acts alleged of an insured fall outside the scope of policy coverage." *Gearing v. Nationwide Ins. Co.*, 665 N.E.2d 1115, 11120 (Ohio 1996); *see, e.g., O'Dell*, 478 S.E.2d at 420 (no duty to defend whether plaintiff alleged emotional distress and not physical harm sufficient to constitute a covered "bodily injury"). Policy language is interpreted according to its plain meaning. *Perry v. State Farm Fire & Cas. Co.*, 676 S.E.2d 376, 378 (Ga. Ct. App. 2008); *accord Chiquita Brands Int'l, Inc. v. Nat'l Union Ins. Co.* (*Chiquita I*), 988 N.E.2d 897, 899 (Ohio Ct. App. 2013) (unambiguous policy terms will apply "as written").

---

conduct do not constitute an "occurrence", a point Red Roof did not dispute below. *Compare* Doc. 86 at 17 (Liberty's opposition), *with generally* Doc. 87 (no mention of RICO in Red Roof's reply).

[9/]     Although Ohio law applies to this case, *see infra* 55-59, there is no coverage, whether defense or indemnity, under either Ohio or Georgia law for the allegations here.

When there is no duty to defend, there is no duty to indemnify because the duty to defend is broader than the duty to indemnify. *City of Atlanta v. St. Paul Fire & Marine Ins. Co.*, 498 S.E.2d 782, 785 (Ga. Ct. App. 1998); *accord Ellis*, 218 N.E.3d at 205. Accordingly, if Liberty does not have a duty to defend Red Roof under the Policies against allegations that it violated the TVPRA, then Liberty could have no duty to indemnify Red Roof. But, even when an insurer has a duty to defend, it is "not necessarily . . . required to indemnify" because an indemnity obligation is assessed based upon litigated facts. *City of Atlanta*, 498 S.E.2d at 785. The duties are "separate and independent." *Id.*; *accord Chiquita I*, 988 N.E.2d at 899.

## A.  H.B.'s allegations do not come within the scope of Coverage A.

Turning first to Coverage A, the district court erred when it determined that H.B.'s allegations that Red Roof violated the TVPRA constituted an "occurrence" under the Policies. To the contrary, this Court's precedents construing claims under the TVPRA require volitional conduct incongruous with the Insuring Agreement's fortuity requirement. Thus, H.B.'s alleged "bodily injury" was not caused by an accident, but, rather, was the natural and probable consequence or

design of Red Roof's volitional conduct.  Moreover, even if it is possible to negligently violate the TVPRA, H.B. did not allege such conduct by Red Roof; rather she alleged that Red Roof facilitated the traffickers' venture at the hotel.  And even if H.B.'s allegations could somehow fall within the scope of coverage, because Red Roof should have expected "bodily injury" resulting from H.B. being sex trafficked, the Expected or Intended Injury Exclusion bars coverage for her claims.

### 1.    Volitional conduct is required to violate the TVPRA.

Congress enacted the Trafficking Victims Protection Act in 2000 ("TVPA") "to combat trafficking in persons, a contemporary manifestation of slavery whose victims are predominantly women and children, to ensure just and effective punishment of traffickers, and to protect their victims."  Pub. L. No. 106-386, § 102(a), 114 Stat. 1464, 1466 (codified at 22 U.S.C. § 7101(a)).  Originally, the TVPA created new federal criminal offenses, including for sex trafficking of children or by force, fraud or coercion.  In 2003, "responding to the needs of victims of trafficking," Congress enacted the Trafficking Victims Protection Reauthorization Act, adding a civil remedy for victims of trafficking against perpetrators.  Pub. L. No. 108-193, 117 Stat. 2875, 2878 (codified

as amended at 18 U.S.C. § 1595(a)).  In 2008, Congress amended the TVPRA again to add a civil remedy not only against perpetrators, but also against anyone who "knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter." William Wilberforce Trafficking Victims Protection Reauthorization Act, Pub. L. No. 110-457, 122 Stat. 5044, 5067 (codified as amended at 18 U.S.C. § 1595(a)).  Section 1595(a) thus provides a civil remedy for a "victim" under the TVPRA to bring a claim for damages against both perpetrators of trafficking as well as those who participated in trafficking.  *See* 18 U.S.C. § 1595(a).

To plead a participant-liability claim under § 1595(a), a plaintiff must allege that the defendant (1) knowingly benefited (2) from participating in a venture; (3) that venture violated the TVPRA as to the plaintiff because a commercial sex act involved force, fraud, or coercion, or was with a minor; and (4) the defendant "knew or should have known that the venture violated the TVPRA as to the [plaintiff]." *Red Roof Inns*, 21 F.4th at 723; *see* 18 U.S.C. §§ 1591, 1595(a).  The first, third, and fourth elements are not relevant to whether the Policies afford coverage.

Relevant for purposes of coverage is the second element: participating in a venture. A "venture" is "an undertaking or enterprise involving risk and potential profit." *Id.* at 724-25. To participate "is to take part in or share with others in common or in an association." *Id.* So, together, "the phrase 'participation in a venture' requires that [plaintiffs] allege that the [defendants] took part in a common undertaking or enterprise involving risk and potential profit." *Id.*

Contrary to the district court's understanding, alleging participation requires more than alleging only that the defendant "should have known" that sex trafficking was afoot. Doc. 93 at 12. Participation and constructive knowledge that the venture in which the defendant participated violated the TVPRA as to the plaintiff are separate elements. *See Red Roof Inns*, 21 F.4th at 724. As this Court has held, "observing something is not the same as participating in it." *Id.* at 727; *see also K.H. v. Riti, Inc.*, No. 23-11682, 2024 WL 505063, at *4 (11th Cir. Feb. 9, 2024) (same). The participation element instead looks to what actions the defendant took to take part in "a common undertaking or enterprise involving risk and potential profit." *Red Roof Inns*, 21 F.4th at 725.

Courts have repeatedly held that "something more than engaging in an ordinary buyer-seller transaction is required to establish 'participation' in an unlawful venture" under the TVPRA. *Doe 1 v. Apple Inc.*, 96 F.4th 403, 415-16 (D.C. Cir. 2024) (affirming dismissal of § 1595(a) claim based on forced labor, noting that an agreement "merely to buy and sell cobalt . . . , without more, is not 'participation in a venture' with the seller"). Thus, for example, renting a hotel or motel room to someone whom the innkeeper knew or should have known was violating the TVPRA is not sufficient on its own to create liability under the TVPRA. *K.H.*, 2024 WL 505063, at \*4. A plaintiff therefore does not adequately allege participation in a venture through "passive non-feasance" or by alleging only "an 'arm's length, passive, and largely indifferent' relationship with the criminal." *G.G. v. Salesforce.com, Inc.*, 76 F.4th 544, 563-64 (7th Cir. 2023) (quoting *Twitter, Inc. v. Taamneh*, 598 U.S. 471, 500 (2023)).

If passive conduct were sufficient to violate the TVPRA, then routine sales of off-the-shelf products or standard services would create criminal and civil liability under the TVPRA. For example, the Seventh Circuit in *G.G.* noted that the term "participation" would not sweep in "a

convenience store that sells disposable cell phones or a clothing store that sells an outfit used as a disguise"—even if the plaintiffs could prove the separate knowledge element that the convenience store "should have known" the phones were being used in a venture that violated the TVPRA. 76 F.4th at 563.

Participation thus requires affirmative, culpable assistance by the defendant to take part in the common undertaking that violated the TVPRA. *Id.* at 559. "[P]articipation" reflects "our 'ordinary understanding of culpable assistance to a wrongdoer,' which requires only 'a desire to promote the wrongful venture's success.'" *Id.* Arms-length transactions, such as the rental of a hotel room to a trafficker or their victim, are not sufficient. *K.H.*, 2024 WL 505063, at *4; *G.G.*, 76 F.4th at 563-64; *Apple, Inc.*, 96 F.4th at 416.

For example, this Court has held that allegations that a hotel owner observed sex trafficking at its hotel and continued renting rooms to those traffickers were not sufficient to plead participant liability. *K.H.*, 2024 WL 505063, at *4 ("allegations of financial benefit alone are not sufficient to establish that the defendant participated in a sex trafficking venture and observing signs of sex trafficking 'is not the same as participating in

it'" (citation omitted)).  Similarly, the D.C. Circuit affirmed the dismissal of participant-liability claims against electronics manufacturers who bought cobalt from suppliers who allegedly relied on forced labor because the plaintiffs had alleged only that the defendants "purchas[ed] a commodity."  *Apple, Inc.*, 96 F.4th at 416.

In contrast, the Seventh Circuit in *G.G.* found sufficient allegations that Salesforce's activities rose beyond "passive nonfeasance" because Salesforce "'sold Backpage'" (the alleged perpetrator) "'targeted solutions addressed to the needs of Backpage's business,' repeatedly assessed Backpage's 'operational needs,' and provided 'active, ongoing support' that was 'tailored' to those needs."  76 F.4th at 562, 563.  Similarly, the Tenth Circuit held allegations were sufficient to plead participant liability where the defendant's actions (as an attorney) "far surpass[ed]" standard legal services and instead deployed a scheme "designed *expressly* for the purpose of facilitating" the perpetrator's forced-labor crimes while "simultaneously protecting him from any liability."  *Bistline v. Parker*, 918 F.3d 849, 874-75 (10th Cir. 2019).

In this case, the Court need not draw a line to demarcate when commercial activity violates the TVPRA.  So long as that line is not

crossed by the passive rental of a hotel or motel room to someone that the innkeeper knew or should have known was violating the TVPRA, *i.e.*, accidental involvement with sex trafficking, the district court erred when it held that H.B.'s alleged "bodily injury" was caused by an "occurrence".

### 2. H.B. did not allege "bodily injury" caused by an "occurrence".

For Coverage A to apply, at a minimum, H.B.'s alleged "bodily injury" must be caused by an "occurrence". Doc. 79-8 at 3. The Policies define an "occurrence" to mean, in relevant part, "an accident". *Id.* at 8. Under both Ohio and Georgia law, an "occurrence" requires fortuity; an "incident of an *accidental* . . . nature." *Gearing*, 665 N.E.2d at 1118 (Ohio); *see O'Dell*, 478 S.E.2d at 420 (Georgia). "The term accident means an event which takes place without one's foresight or expectation or design." *Meritplan Ins. Co. v. Leverette*, 552 F. App'x 900, 901 (11th Cir. 2014) (per curiam) (applying Georgia law) (cleaned up); *see also Chiquita I*, 988 N.E.2d at 901; *see G.M. Sign, Inc. v. St. Paul Fire & Marine Ins. Co.*, 768 F. App'x 982, 988 (11th Cir. 2019) (per curiam) (applying Georgia law). Georgia law, specifically, distinguishes between injuries which are caused by an "accidental occurrence," which are potentially covered, and "accidental injuries," which are not. *Perry*, 676 S.E.2d at 378. "An

accidental injury," which is not covered, "is an injury that is unexpected but may arise from a conscious voluntary act." *Id.* "In contrast, an injury from accidental means is one that is the unexpected result of an unforeseen or unexpected act that was involuntarily or unintentionally done." *Id.* (citation omitted).

Moreover, even if the insured's subjective intent to injure were relevant to determine whether an "occurrence" was alleged (it is not), an insured's protestations that they did not intend injury do not create coverage. Ohio's and Georgia's high courts have both recognized that courts may infer the insured's intent where "the insured's intentional act and the harm caused are intrinsically tied so that the act has necessarily resulted in the harm." *Travelers Prop. Cas. Corp. v. Chiquita Brands Int'l, Inc.* (*Chiquita II*), 243 N.E.3d 797, 810 (Ohio Ct. App. 2024) (quoting *Allstate Ins. Co. v. Campbell*, 942 N.E.2d 1090, 1098 (Ohio 2010)); *Roe v. State Farm Fire & Cas. Co.*, 376 S.E.2d 876, 877 (Ga. 1989) (no coverage despite insured's claim that he did not expect or intend to injure the plaintiff when he sexually molested her because there was a "presumption of intent to inflict injury" from the insured's act); *see also, e.g.*, *Vt. Mut. Ins. Co. v. Malcolm*, 517 A.2d 800, 802 (N.H. 1986) (Souter,

J.).  A contrary rule espousing "a completely subjective test would virtually make it impossible to preclude coverage for intentional injuries absent admissions by insureds of specific intent to harm or injure," because "[h]uman nature augurs against any viable expectation of such admissions." *See Gearing*, 665 N.E.2d at 1118 (cleaned up), *overruled in part by Campbell*, 942 N.E.2d 1090.

For example, in *Chiquita I*, the Ohio Court of Appeals held that injuries caused by a terrorist operation financed by the insured were not caused by an occurrence.  988 N.E.2d at 901-02.  There, the underlying plaintiffs alleged that the insured, Chiquita, "illegally financed terrorist groups in Columbia, and that the plaintiffs in those suits had suffered damage as a result of the terrorists' operations." *Id.* at 898-99.  Though "the underlying complaints set forth some causes of action sounding in negligence," the Ohio Court of Appeals held that "those causes of action were all based on Chiquita's alleged intentional conduct." *Id.* at 901.  Further, in *Chiquita II*, the court clarified that even if Chiquita "did not subjectively intend to harm anyone," that was of no moment because "[t]he natural and probable consequences of knowingly supporting acts of terrorism is that people would be harmed." *Chiquita II*, 243 N.E.3d at

808-09.  It was therefore "proper[]" to "infer[] the intent of Chiquita to injure the" plaintiffs.  *Id.* at 809; *see also Acuity, A Mut. Ins. Co. v. Siding & Insulation Co.*, 62 N.E.3d 937, 942 (Ohio Ct. App. 2016) (finding no "occurrence" was alleged after applying the doctrine of inferred intent to the insured's intentional conduct and determining the alleged harm was the natural and expected consequences of the insured's acts).

Similarly, in *G.M. Sign*, this Court held there was no occurrence for property damage caused by the insured's purposeful, albeit mistaken, actions.  768 F. App'x at 987.  There, the insured allegedly violated the Telephone Consumer Protection Act by sending advertisements via fax without recipients' permission.  *Id.* at 984.  The insured claimed those allegations constituted "property damage" caused by "an event," which was defined to mean "an accident."  *Id.* at 983-94.  This Court rejected that argument, holding that the insured's acts—sending faxes—were not an accident, and any property damage was therefore not caused by an accident.  *Id.* at 988.  This Court said that "had the deliberate act been performed correctly," the result—*i.e.*, the property damage—would have been the same.  *Id.*  That was true even though the insured argued that it had mistakenly believed the recipients consented.  *Id.*

In sum, to constitute an "occurrence" under both Ohio and Georgia law, the injuries caused must be outside the "natural and probable consequences," or outside the insured's "foresight or expectation or design" in relation to their conduct. *Chiquita II*, 243 N.E.3d at 809; *Meritplan Ins. Co.*, 552 F. App'x at 901.

Applying that standard here, the H.B. Lawsuit did not allege "bodily injury" caused by an "occurrence". The TVPRA requires something more than passive non-feasance; it requires "direct, active and substantial" involvement on the part of the defendant. *See G.G.*, 76 F.4th at 564; *Red Roof Inns*, 21 F.4th at 727. Those acts must go beyond renting a hotel room; they must be the sort of actions that reflect the defendant's "culpable assistance." *G.G.*, 76 F.4th at 559; *see also Bistline*, 918 F.3d at 874. Just as the natural and probable consequence of funding a terrorist group by way of protection payments was that people would be harmed, so too the defendant's culpable assistance, support, and facilitation to the sex trafficker done with "a desire to promote the wrongful venture's success," *G.G.*, 76 F.4th at 559, naturally and probably caused H.B.'s "bodily injury". On that basis, H.B. does not allege "bodily injury" caused by an "occurrence". Stated differently, the

natural and probable consequence of Red Roof's participation in the sex-trafficking venture is that H.B. would be harmed.

The district court erred when it conflated the elements of the TVPRA, holding that the "knew or should have known" requirement of the fourth element meant that mere negligence was sufficient to prove a TVPRA violation. *See* Doc. 93 at 12-13. This Court has explained that the fourth element, which requires only constructive knowledge, applies to whether the defendant knew or should have known that the plaintiff was a minor or was subject to force, fraud, or coercion. *See Red Roof Inns*, 21 F.4th at 725. Accordingly, the fourth element refers only to knowledge of the age of the person engaged in the commercial sex act or the means of causing someone to engage in a commercial sex act. Moreover, even if the fourth element is satisfied, the TVPRA cannot be violated unless the defendant *participated* in a venture through something more than passive behavior. *See id.* at 723, 727 ("observing something is not the same as participating in it"); *K.H.*, 2024 WL 505063, at *3 ("observing signs of sex trafficking 'is not the same as participating in it'"); *see, e.g.*, *G.G.*, 76 F.4th at 562-63 (Salesforce's actions rose past "passive nonfeasance" through "targeted solutions" "tailored" to the sex

trafficker's needs); *Bistline*, 918 F.3d at 874-75 (attorney's actions "far surpass[ed]" standard legal services with scheme "designed *expressly*" to facilitate the perpetrator's crimes while avoiding liability).[10]

What's more, even if participation in a sex-trafficking venture could be considered fortuitous (it cannot), H.B. alleged far more. Indeed, she alleged that Red Roof went beyond the passive rental of a hotel or motel room. H.B. alleged that hotel employees "assist[ed] the traffickers in evading detection from other guests and the police." Doc. 79-6, ¶ 34. They "typically rented rooms that would be used for prostitution and crime on the back side of the hotel." *Id.* ¶ 42. Employees responded to requests for unusual housekeeping services. *See id.* ¶ 24. They even "served as lookouts for sex traffickers, including Plaintiff's traffickers, alerting them to the presence of law enforcement at the hotel in order to

---

[10] Some district courts, including numerous opinions from one judge in the Southern District of Ohio, have disagreed. *See L.M.H. v. Red Roof Inns*, No. 24-cv-1823, 2025 WL 961720, at *13 (S.D. Ohio Mar. 31, 2025) (concluding plaintiffs could allege participation in a "commercial venture" merely by alleging that the hotel operator rented rooms to people it knew or should have known were engaged in sex trafficking). Those opinions, however, run contrary to every circuit's understanding of participation in this context. *See, e.g.*, *Doe (T.M.) v. G6 Hosp. LLC*, No. 23-cv-2598, 2024 WL 4457563, at *5 (N.D. Ga. Sept. 23, 2024) (rejecting such allegations even in context of a commercial, not specifically sex-trafficking, venture).

protect and facilitate the illegal commercial sex operations that filled the hotel's rooms." *Id.* ¶ 33; *see id.* ¶ 25 (alleging that employees "called [H.B.]'s sex traffickers to alert them to the police presence at the hotel"). In fact, employees allegedly were paid "cash in exchange for the hotel's facilitation of [her] sex trafficking by permitting the trafficking to occur at the hotel and by acting as lookouts for her traffickers." *Id.* ¶ 19.

Red Roof's alleged violation of the TVPRA reflects, as it must, purposeful, volitional, and affirmative conduct on Red Roof's part. Thus, H.B.'s resulting injury, *i.e.*, injury from being sold for commercial sex at Red Roof's hotel, was the natural and probable consequence, or part of the expectation or design, of Red Roof's conduct. As such, H.B.'s "bodily injury" was not the result of an accident, and Coverage A is not applicable.

### 3.    Even if H.B. alleged "bodily injury" caused by an "occurrence", the Expected or Intended Injury Exclusion bars coverage.

Even if the claims in the H.B. Lawsuit fell within Coverage A (and they do not), Liberty still would have no duty to defend because the Expected or Intended Injury exclusion applies. That exclusion bars coverage for "bodily injury" that is "expected or intended from the

standpoint of the insured".    Doc. 79-8 at 6.    Contrary to Red Roof's protestations below, Liberty need not demonstrate Red Roof's subjective intent to injure for the exclusion to apply.    *See* Doc. 81-1 at 15.    Instead, under Ohio and Georgia law, the exclusion applies "if the insured acts with the intent *or expectation* that bodily injury occur, even if the actual, resulting injury is different either in kind or magnitude from that intended or expected."    *Richardson v. Ga. Farm Bureau Mut. Ins. Co.*, 678 S.E.2d 348, 349 (Ga. Ct. App. 2009) (emphasis added); *see Allstate Vehicle & Prop. Ins. Co. v. Inabnitt*, Nos. CA2021-10-094, -098, 2022 WL 2208799, at *6 (Ohio Ct. App. June 21, 2022) (exclusion applies not only to intentional injury, but where the insured "reasonably expected the injury to result").

Here, H.B. alleges that Red Roof participated in a venture with her sex traffickers and "knew of, condoned, and permitted the widespread prostitution and sex trafficking at the Norcross Red Roof, *including [H.B.]'s minor sex trafficking*."    Doc. 79-6, ¶ 31 (emphasis added).    Her allegations thus facially allege that, at a minimum, Red Roof expected that the consequence of its participation in a sex-trafficking venture was that she would be injured by being sex trafficked.

- 42 -

Moreover, even if Liberty had to demonstrate Red Roof's intent to injure, both Ohio and Georgia courts (as discussed above) have recognized that courts may infer the insured's intent where "the insured's intentional act and the harm caused are intrinsically tied so that the act has necessarily resulted in the harm." *Chiquita II*, 243 N.E.3d at 810 (inferring intent to injure from insured's alleged support of a terrorist organization); *Roe*, 376 S.E.2d at 877 (holding a "presumption of intent to inflict injury" from the intentional act of sexual molestation). Red Roof's alleged participation in a sex trafficking venture is similarly "intrinsically tied" to the injury here—a victim injured by the sex trafficking that Red Roof allegedly supported.

The Expected or Intended Injury Exclusion thus bars coverage under Coverage A.

## B. H.B.'s allegations do not fall within the grant of coverage afforded under Coverage B.

Contrary to what Red Roof argued below, there is also no coverage for H.B.'s allegations under Coverage B. Doc. 81-1 at 16-18.[11/] Broadly,

---

[11/]    Although the district court did not reach Coverage B, this Court can and should address the issue "in the interest of judicial efficiency and to avoid further delay" because review of the district court's decision after

the Policies provide that Coverage B applies to "personal and advertising injury" that was "caused by an offense arising out of [Red Roof's] business". Doc. 79-8 at 4. The Policies provide that those "offenses" include, as relevant here, "[f]alse arrest, detention or imprisonment". *Id.* at 5. To establish coverage under Coverage B, Red Roof must demonstrate that (1) "personal and advertising injury" was *caused by* one of the offenses listed in the Policies, and (2) the offense arose out of Red Roof's business (here, the operation of the hotel). Red Roof cannot for three reasons.

### 1. H.B. did not allege any offense giving rise to "personal and advertising injury".

Below, Red Roof argued that H.B. alleged "false arrest, detention or imprisonment". Doc. 81-1 at 16. Yet the only allegations Red Roof could identify demonstrating such offenses were that H.B. was "rescued from the hotel" in a police sting and that she was "confined and sold." *Id.* (citing Doc. 79-6, ¶¶ 26, 55). Read fairly, though, H.B.'s complaint does not allege false imprisonment or detention.

---

remand "would be *de novo* anyway." *Walter v. Blue Cross & Blue Shield United*, 181 F.3d 1198, 1202 (11th Cir. 1999).

Contrary to Red Roof's belief, an insurer's duty to defend turns not on labels, conclusions, or isolated phrases in the underlying complaint, but on the facts alleged. *See, e.g.*, *Chiquita I*, 988 N.E.2d at 901 ("The mere insinuation of negligence in a civil suit complaint cannot transform what are essentially intentional torts into something 'accidental' that might be covered by insurance."); *Littrell v. Colony Ins. Co.*, 492 S.E.2d 299, 300 (Ga. Ct. App. 1997) (assault and battery exclusion precluded coverage for negligence cause of action because the operative pleading did not allege any unintentional acts). Moreover, an insured cannot "create coverage simply by reinterpreting the factual allegations made so as to come within the scope of the insurance contract." *Shafe v. Am. States Ins. Co.*, 653 S.E.2d 870, 874 (Ga. Ct. App. 2007) (cleaned up).

Here, H.B.'s allegations demonstrate that she was sex trafficked. The allegation that she was "rescued" recounts how she was removed from her *trafficker's* control while she happened to be at the hotel. *See* Doc. 79-6, ¶ 25. Similarly, the trace allegations of "confine[ment]" do not allege factually that Doe was falsely imprisoned or detained but instead how H.B.'s traffickers carried out their scheme to sex traffic H.B. (and others). *See id.* ¶ 55. Because H.B.'s allegations demonstrated she was

sex trafficked—not falsely imprisoned or detained—there is no "personal and advertising injury" alleged and thus no coverage under Coverage B.

### 2. Any alleged "personal and advertising injury" was inextricably intertwined with H.B.'s alleged "bodily injury".

Even if H.B.'s allegations could be read as alleging false detention or imprisonment (they do not), where allegations of "personal and advertising injury" are inherently intertwined with allegations of "bodily injury", such allegations do not constitute a stand-alone claim; rather, the allegations are part and parcel of the claims under Coverage A. *See State Farm Ins. Co. v. Bruns*, 942 A.2d 1275, 1282 (N.H. 2008) ("Where the facts reveal that potentially covered acts are inextricably intertwined with and dependent upon the commission of uncovered acts, an insurer will not be required to defend.").

Indeed, courts around the country have recognized that where allegations of false detention or imprisonment are part and parcel of, "or inextricably linked" with, claims for "bodily injury" that do not fall within Coverage A, Coverage B cannot apply. *See, e.g.*, *Cole v. State Farm Fire & Cas. Co.*, 25 F. App'x 791, 796 (10th Cir. 2002) (Colorado law); *Bruns*, 942 A.2d at 1281-83 (New Hampshire law); *Auto-Owners Ins. Co. v. Todd*,

547 N.W.2d 696, 699 (Minn. 1996); *Allstate Indem. Co. v. Messina*, No. CV 19-2748, 2021 WL 3080926, at *7 (D. Minn. July 21, 2021) (Florida law); *Farm Fam. Cas. Ins. Co. v. Samperi*, 242 F. Supp. 3d 83, 91 (D. Conn. 2017) (Connecticut law); *Collins Bldg. Servs., Inc. v. United Capitol Ins. Co.*, No. 98 CIV 3502, 1999 WL 259519, at *5 (S.D.N.Y. Apr. 30, 1999) (New York law); *Com. Union Ins. Cos. v. Sky, Inc.*, 810 F. Supp. 249, 255 (W.D. Ark. 1992) (Arkansas law).

Courts have repeatedly applied this framework to claims in which the insured identified allegations of false imprisonment to seek coverage under Coverage B for claims that, in truth, alleged "bodily injury" caused by sexual assault. The decision in *Cole* is instructive. There, the underlying plaintiff brought claims based on an attempted sexual assault for which the insured was convicted. 25 F. App'x at 793. After the court concluded that the allegations of attempted sexual assault were excluded from the policy's coverage for bodily injury, the insured argued that the insurer nonetheless had a duty to defend under the policy's personal-injury coverage because the plaintiff had alleged "false imprisonment." *Id.* at 796. Because "it was not possible to separate the false imprisonment from the sexual assault," the Tenth Circuit confirmed that

"no duty to defend existed for either." *Id.* at 796 (citation omitted); *accord Auto-Owners Ins. Co.*, 547 N.W.2d at 699 (because the insured's "overall intentional plan was to sexually assault his daughter, not to falsely imprison her" and "[a]bsent the sexual assault, there would be no claim of false imprisonment," there was no coverage for the false-imprisonment claim); *Allstate Indem. Co.*, 2021 WL 3080926, at *7 (term "false imprisonment" in complaint "simply describes a contemporaneous and indivisible act comprising sexual assault"); *Farm Fam. Cas. Ins. Co.*, 242 F. Supp. 3d at 92 ("false imprisonment count would not exist 'but for' [underlying plaintiff's] alleged sexual assault and should not be covered under the Policy").

To the extent H.B. alleged any "detention" or "imprisonment", it is inseparable from her alleged sex trafficking. Such allegations exist for the purpose of establishing how H.B.'s traffickers carried out their sex-trafficking scheme and how they "forced [H.B.] to perform" commercial sex acts. *See* Doc. 79-6, ¶ 84. Such acts of force and coercion were thus "a contemporaneous and indivisible act" comprising her traffickers' scheme to force H.B. to engage in commercial sex acts for their benefit—

"not to falsely imprison her."  *Id.* ¶ 32; *see Auto-Owners Ins. Co.*, 547 N.W.2d at 699; *Allstate Indem. Co.*, 2021 WL 3080926, at *7.

Because any allegations of detention or false imprisonment are merely "part and parcel" of, or "inextricably intertwined" with, H.B.'s alleged sex trafficking, coverage is dictated by Coverage A.  Thus, such allegations cannot create coverage under Coverage B.

### 3.    Any alleged "personal and advertising injury" was not caused by an offense arising out of Red Roof's business

Assuming H.B. alleged "personal and advertising injury", her claim still does not come within the scope of Coverage B because any such injury was not also "caused by an offense arising out of [Red Roof's] business".  Doc. 79-8, at 4.  Red Roof's business is to "own[], control[], operate[], and directly employ[] the staff at the hotel."  Doc. 79-6, ¶ 3. While H.B. alleged that Red Roof engaged in a trafficking venture, the trafficking venture is distinct from Red Roof's business for purposes of analyzing Coverage B.  Stated differently, any alleged "personal and advertising injury" was not caused by an offense arising out of Red Roof's business.

The phrase "arising out of [your] business" means arising out of "'a business transaction' or work performed by [the insured]." *Ryder Integrated Logistics, Inc. v. BellSouth Telecommc'ns, Inc.*, 627 S.E.2d 358, 363 (Ga. Ct. App. 2006), *vacated in part on other grounds*, 642 S.E.2d 695 (Ga. 2007); *see Am. Fam. Ins. Co. v. Roach*, No. 2008CA00181, 2009 WL 2772552, at *1, *5 (Ohio Ct. App. Aug. 31, 2009) (same language intended to "insure the business activities and operations" of the company).

Further, an offense "arising out of" the insured's business must have been committed as part of the insured's legitimate business operations or transactions. *See, e.g.*, *Maryland Cas. Co. v. Salon Ave. Suite 2*, No. 13-cv-3056, 2014 WL 4925623, at *5 (N.D. Ga. Sept. 29, 2014) (no coverage under Coverage B because insured's "recording or distributing customers in various states of undress" was not "a legitimate part of [its] business" as a hair salon); *Am. Fam. Ins. Co.*, 2009 WL 2772552, at *2, *5 (individual business owner's defamatory statements not considered part of "business activities and operations" and so not covered). Here, any apparently alleged "personal and advertising injury" was caused by sex-traffickers who were not a part of Red Roof's legitimate business of owning and operating the hotel. *See Maryland Cas. Co.*, 2014

WL 4925623, at *5; *Roach*, 2009 WL 2772552, at *5. Thus, H.B. did not allege an offense "arising out of [Red Roof's] business" sufficient for Coverage B.

### 4. Even if Coverage B applies, the Knowing Violation of Rights of Another Exclusion bars coverage.

Even if Red Roof could meet its burden to demonstrate that the H.B. Lawsuit falls within the grant of coverage for Coverage B (and it cannot), the Knowing Violation of Rights of Another Exclusion bars coverage. Specifically, the Knowing Violation of Rights of Another Exclusion provides that "[t]his insurance does not apply to" "'[p]ersonal and advertising injury' caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict 'personal and advertising injury'". Doc. 79-8 at 4.

Here, H.B. alleged that Red Roof knew it was violating her rights. She alleged that Red Roof "knew of, condoned, and permitted the widespread prostitution and sex trafficking at the Norcross Red Roof, including [H.B.]'s minor sex trafficking." Doc. 79-6, ¶ 31. Thus, even if H.B. had alleged a "personal and advertising injury" caused by an offense arising out of Red Roof's business, coverage under Coverage B would be

barred based on Red Roof's alleged knowledge. *See Travelers Prop. Cas. Co. of Am. v. Mericle*, 486 F. App'x 233, 238-39 (3d Cir. 2012) (applying Pennsylvania law, holding that exclusion applied where the insured was "was part of a conspiracy in which juveniles were committed to facilities with the knowledge that their detention had been procured by violating their constitutional rights").

### C. Public policy prohibits providing insurance coverage for participation in a sex-trafficking venture.

Even if Red Roof could demonstrate coverage under the Policy (it cannot), public policy bars coverage. Public policy prevents intentional, injury-causing conduct from being insured. *See Travelers Indem. Co. v. Hood*, 140 S.E.2d 68, 70 (Ga. Ct. App. 1964) ("Courts and authoritative writers have considered it against public policy to insure against injuries intentionally inflicted."); *Gearing*, 665 N.E.2d at 1118 (insurance for intentional torts "may not be issued consistent with the established public policy of this state"). Otherwise, liability insurance would "relieve wrongdoers of liability for intentional, antisocial, *criminal* conduct," requiring the rest of the insuring public to bear the cost of those intentional acts. *Gearing*, 665 N.E.2d at 1118; *see also Travelers Indem.*

*Co.*, 140 S.E.2d at 70 ("public policy will not permit a person by contract to exempt himself from liability to others whom the law seeks to protect").

The law "seeks to protect" victims of sex trafficking under the TVPRA against participants like Red Roof. In her complaint, H.B. alleged that Red Roof "knew of, condoned, and permitted the widespread prostitution and sex trafficking at the [hotel], including [H.B.]'s minor sex trafficking." Doc. 79-6, ¶ 31. As discussed, participation in a venture under the TVPRA necessarily requires affirmative conduct in furtherance of a sex trafficking venture. As discussed above, Red Roof's participation in and conduct in support of a sex-trafficking venture is "intrinsically tied so that the act has necessarily resulted in the harm." *Chiquita II*, 243 N.E.3d at 810 (no insurance coverage for knowingly supporting acts of terrorism, even if those acts were conducted by third parties); *see also Travelers Indem. Co.*, 140 S.E.2d at 70. So too here, Red Roof's participatory conduct by condoning widespread sex trafficking at the hotel was so "intrinsically tied" to the harm that H.B.—and others— suffered. Such participation in a sex-trafficking venture is uninsurable as a matter of public policy under both Ohio and Georgia law.

### III.    Liberty Has the Right to Recoup Payments Where There Is No Coverage.

The district court erred when it concluded that Liberty could not state a claim for recoupment of the defense expenses and settlement payments incurred on Red Roof's behalf.  The district court's error stems from its decision to apply Georgia law rather than Ohio law to this dispute.  Under Ohio law, Liberty has the right to recoup both defense expenses and settlement payments if there is a subsequent determination that no coverage exists.  Moreover, even if Georgia common law applies, Liberty has the right to recoup settlement payments.  This Court should therefore remand for further proceedings concerning whether Liberty is entitled to recoup the defense expenses and settlement payments incurred on Red Roof's behalf.[12]

---

[12]    If this Court concludes, as it should, that there is no duty to defend TVPRA claims as a matter of law, then that would resolve the question whether Liberty is entitled to recoup the settlement payments in the Underlying Lawsuits.  But even if Liberty had a duty to defend, remand is still necessary to assess whether, under the narrower duty to indemnify, the "conclusive" or "true facts" show that the claim fell within the scope of the Policies' coverage.  *Pilkington N. Am., Inc. v. Travelers Cas. & Sur. Co.*, 861 N.E.2d 121, 127 (Ohio 2006); *see also ALEA London Ltd. v. Woodcock*, 649 S.E.2d 740, 746 (Ga. Ct. App. 2007) (same under Georgia law).

## A.    Ohio law applies to this case.

Under Georgia's choice-of-law principles, contracts are "to be governed as to their nature, validity, and interpretation by the law of the place where they were made." *Johnson v. Occidental Fire & Cas. Co.*, 954 F.2d 1581, 1584 (11th Cir. 1992) (quoting *Gen. Tel. Co. of Se. v. Trimm*, 311 S.E.2d 460, 461 (Ga. 1984)). For insurance contracts, that is the state where the policies were delivered. *Id.* Here, there is no dispute that the Policies were delivered to Red Roof, and so Ohio law applies. *See* Doc. 53-1 at 7.

The district court, however, concluded that although Ohio law governed, Georgia's interpretation of the common law applied anyway. Doc. 73 at 3. In so finding, the district court relied on the "presumption of identity" rule, under which the application of another state's laws in Georgia courts is limited to the other state's statutes. *See Coon v. Med. Ctr., Inc.*, 797 S.E.2d 828, 833 (Ga. 2017) (describing the rule). Where there is no statute involved, though, "at least with respect to a state where the common law is in force, a Georgia court will apply the common law as expounded by the courts of Georgia." *Id.* at 834. The rationale for the rule is that "[t]he common law is presumed to be the same in all the

American States where it prevails," and though there may be varying constructions, "[t]here is still only one right construction," which Georgia courts presume to be their own. *Id.* (citation omitted).

Even by its own terms, though, the rule applies only if (1) "the other state was one of, or formed from the territory of one of, the original 13 colonies that inherited the common law of England," *Coon*, 797 S.E.2d at 834 n.5, or (2) the other state has "adopted English common law," *Mt. Hawley Ins. Co. v. E. Perimeter Pointe Apartments*, 861 F. App'x 270, 275-76 (11th Cir. 2021).[13/]

Here, neither basis for applying the presumption of identity rule holds. Ohio was not one of, or formed from, the original thirteen colonies. Instead, it was part of the Northwest Territory. Georgia courts have applied other states' common law to interpret contracts governed by other Northwest (or Southwest) Territory states. *See Nuvell Nat'l Auto Fin., LLC v. Monroe Guar. Ins. Co.*, 736 S.E.2d 463, 468 (Ga. Ct. App. 2012)

---

[13/] This Court has also applied the common law of other states (including other colonies), not Georgia, to interpret contracts in cases arising out of Georgia. *See, e.g.*, *Velten v. Lippert*, 985 F.2d 1515, 1519 (11th Cir. 1993) (applying New Jersey law to contract claim on appeal from Georgia); *Kirkland v. Guardian Life Ins. Co. of Am.*, 352 F. App'x 293, 299 (11th Cir. 2009) (applying Florida law to insurance policy).

(applying Michigan law); *O'Neal v. State Farm Mut. Auto. Ins. Co.*, 533 S.E.2d 781, 782 (Ga. Ct. App. 2000) (applying Tennessee law).

And Ohio has not adopted the English common law. *Wolfe v. Wolfe*, 350 N.E.2d 413, 418 n.15 (Ohio 1976) ("The common law used by the courts in Ohio is not a copy of the English common law as it is in many states; for even though the English common law was introduced for adoption in the state, this provision was repealed in 1806."), *superseded by statute on other grounds as recognized in Morris v. Morris*, 69 N.E.3d 664 (Ohio 2016).  Instead, Ohio has expressly held that English common law is merely a guide (like any persuasive authority), but not the decisional law.  *See State v. Cleveland & P. R. Co.*, 113 N.E. 677, 679 (Ohio 1916) (rejecting argument that presumed application of English common law, noting that "[i]t has been repeatedly determined by the courts of this state that they will adopt the principles of the common law as the rules of decision so far only as those principles are adapted to our circumstances, state of society, and form of government"); *Bloom v. Richards*, 2 Ohio St. 387, 390 (1853) ("our courts have not hesitated to modify [English common law] to suit our circumstances, or, if necessary, to wholly depart from it"); *see also Wells v. Twenty-First St. Realty Co.*,

12 F.2d 237, 238 (6th Cir. 1926) (noting that although Ohio did not "wholly exclude the English common law" when it repealed a prior law adopting the English common law in 1806, Ohio courts "adopt" certain principles of the common law, but discard others). The district court concluded otherwise based on a singular, passing quote from an Ohio Supreme Court opinion and district-court opinions in Georgia. Neither can be squared with the Ohio courts' (and the Sixth Circuit's) clear understanding that Ohio adopts principles of the English common law as appropriate but does not adopt the common law as other states do. *See Wolfe*, 350 N.E.2d at 418 n.15.

Because Ohio is neither one of the thirteen colonies, nor has it adopted the English common law, Ohio law—including Ohio common law—applies here. Tellingly, in other coverage litigation involving Red Roof hotels, including hotels in Georgia, the parties do not dispute that Ohio law (not Georgia law or another state's law) applies to the interpretation of the Policies. *See* Opp'n to Mot. for J. on Pleadings at 5, *Liberty Mut. Fire Ins. Co. v. Red Roof Inns, Inc.*, No. 23-cv-01692 (E.D. Pa. Sep. 15, 2023), ECF No. 34; Mot. for J. on Pleadings at 7, *Red Roof Inns, Inc. v. Liberty Mut. Fire Ins. Co.*, No. 25-cv-00352 (S.D. Ohio, Aug.

13, 2025), ECF No. 34.  Thus, Red Roof does not dispute—and, in fact, agrees—that Ohio law applies to the interpretation of the Policies even with respect to Georgia risks.  The district court's analysis leads to the peculiar result that different law applies to the applicability of the Policies for Georgia risks, simply depending on where the parties brought their lawsuit.

### B.     Liberty has the right to recoup expenses, both defense and indemnity, under Ohio law.

Under Ohio law, Liberty has the right to recoup both its defense expenses and settlement payments made on Red Roof's behalf if there was no coverage in the first place.  *See, e.g.*, *Otarma v. Miami Twp.*, --- N.E.3d ----, 2025 WL 2374827 (Ohio Ct. App. 2025) ("based on the decisions by the First District, the choice of the Supreme Court of Ohio not to accept an appeal in *William Powell*, and the long-standing view of the Sixth Circuit, we believe Ohio would follow the majority approach"); *William Powell Co. v. OneBeacon Ins. Co.*, 162 N.E.3d 927, 945 (Ohio Ct. App. 2020) (recognizing insurer's right to recovery under a restitution theory); *United Nat'l Ins. Co. v. SST Fitness Corp.*, 309 F.3d 914, 921 (6th Cir. 2002) (Ohio law) (holding that an insurer had a right to reimbursement of defense costs for non-covered claims, provided under a

reservation of rights, because the insured entered into an implied-in-fact contract when it accepted the insurer's provision of a defense).

Ohio courts reason that this is a straightforward application of a restitution theory.  "Restitution is proper where one party to a contract demands performance from the other 'that is not in fact due by the terms of that contract under circumstances where it is reasonable to accede to that demand, and where the party on whom the demand is made renders such performance under a reservation of rights.'"  *William Powell Co.*, 162 N.E.3d at 945.  The rule also encourages insurers to provide defenses even in questionable cases, rather than denying outright.  *See United Nat'l Ins. Co.*, 309 F.3d at 921.

Because Ohio law entitles Liberty to recoup defense expenses and settlement payments made on behalf of Red Roof if those claims are not covered, the case should be remanded for further proceedings to determine whether Liberty is entitled to recoupment here.

## C.    Even if Georgia law applies, Liberty has the right to recoup indemnity expenses.

Even if Georgia common law applies, however, Liberty still pled a viable claim for recoupment of settlement payments.  Concluding otherwise, the district court relied on this Court's opinion in *Continental*

*Casualty Co. v. Winder Laboratories, LLC*, 73 F.4th 934, 949 (11th Cir. 2023). There, this Court held that Georgia law does not permit insurers to seek recoupment of *defense* expenses for uncovered claims. *Id.* But this Court did not address whether the same was true for settlement payments. Under a straightforward application of *Winder*, Georgia law permits recoupment of settlement payments that it was not contractually obligated to make.

The concerns that drove *Winder* do not provide the same concern for recoupment of settlement payments. In deviating from the longstanding common-law tradition that insurers have the right to recoup amounts paid for uncovered claims, this Court adopted a "recent" "switch in trend," driven by the "deleterious effect that such a rule would have on the distinction between the duty to defend and the duty to indemnify." *Winder*, 73 F.4th at 949. *Winder*'s analysis rested on the "structure of Georgia's insurance law," specifically the "foundational" "broad duty to defend" under Georgia law. *See id.* This Court worried that if defense expenses were reimbursable "upon a court's determination that no ongoing duty to defend exists, the duty to defend would simply become the duty to indemnify." *Id.* Here, though, there is no danger to

the structure of Georgia's insurance law. The duty to defend is broader than the duty to indemnify; whereas the former can be invoked even where there may ultimately be no covered claim, the latter depends on assessing whether the litigated facts comprise a covered claim. *See ALEA London Ltd.*, 649 S.E.2d at 746. On that basis, there is no risk of collapsing the duties, only enforcing them.

A contrary rule would risk a "Catch-22" for insurers. As previously explained, when there is a question regarding the availability of coverage, the "proper" course for insurers is to "enter upon a defense under a reservation of rights and then proceed to seek a declaratory judgment." *World Harvest Church, Inc.*, 586 F.3d at 956 n.6 (citation omitted). Yet if an insurer cannot recoup settlement payments, the insured could, if the underlying lawsuit (as here) reaches settlement before the insurer can obtain a ruling on the merits of its duties, force its insurer into choosing between paying for uncovered claims or facing a possible bad-faith action (as Red Roof threatened here). *See Blue Ridge Ins. Co.*, 22 P.3d at 321. Allowing an insurer to seek reimbursement of settlement payments for noncovered claims advances public policy

considerations. "In particular, it encourages insurers to defend and settle cases for which insurance coverage is uncertain." *Id.*

This rule does not break new ground. In fact, this Court in *Winder* relied on the Eight Circuit's assessment that Minnesota law would not permit recoupment of defense expenses, yet even Minnesota permits recoupment of settlement payments for uncovered claims. *Compare Westchester Fire Ins. Co. v. Wallerich*, 563 F.3d 707, 719 (8th Cir. 2009) (no recoupment of defense expenses under Minnesota law), *with Jacobs v. Cable Constructors, Inc.*, 704 N.W.2d 205, 209 (Minn. Ct. App. 2005) (allowing recoupment of settlement payments).

Thus, even if Georgia law applies, Liberty has a right to recoup settlement payments made on behalf of Red Roof if those claims are not covered. The case should therefore be remanded for further proceedings to determine whether Liberty is entitled to recoupment.

## CONCLUSION

The judgment should be vacated and the case remanded for further proceedings.

Respectfully submitted,

/s/ Nancy D. Adams

Latasha L. Scott
BUTLER WEIHMULLER
  KATZ CRAIG LLP
400 N. Ashley Drive, Suite 2300
Tampa, FL 33602
(813) 281-1900

Nancy D. Adams
  *Counsel of Record*
Alec J. Zadek
Mitchell J. Clough
MINTZ, LEVIN, COHN, FERRIS,
  GLOVSKY AND POPEO, P.C.
One Financial Center
Boston, MA 02111
(617) 542-6000

DECEMBER 22, 2025

## CERTIFICATE OF COMPLIANCE

I, Nancy D. Adams, a member of the Bar of this Court and counsel for appellant, hereby certify pursuant to Federal Rules of Appellate Procedure 32(a)(5), 32(a)(6), and 32(a)(7) that the attached brief is proportionally spaced, has a typeface of 14 points or more, and contains 12,988 words.

DECEMBER 22, 2025                    */s/ Nancy D. Adams*
                                     Nancy D. Adams

# ADDENDUM

**Statute**                                              **Page**

18 U.S.C. § 1591 ........................................................... 67

18 U.S.C. § 1595 ........................................................... 70

18 U.S.C. § 1595 (2008) ................................................ 71

18 U.S.C. § 1595 (2003) ................................................ 72

## 18 U.S.C. § 1591
## <u>Sex trafficking of children or by force, fraud, or coercion</u>

(a) Whoever knowingly--

    (1) in or affecting interstate or foreign commerce, or within the special maritime and territorial jurisdiction of the United States, recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person; or

    (2) benefits, financially or by receiving anything of value, from participation in a venture which has engaged in an act described in violation of paragraph (1),

knowing, or, except where the act constituting the violation of paragraph (1) is advertising, in reckless disregard of the fact, that means of force, threats of force, fraud, coercion described in subsection (e)(2), or any combination of such means will be used to cause the person to engage in a commercial sex act, or that the person has not attained the age of 18 years and will be caused to engage in a commercial sex act, shall be punished as provided in subsection (b).

(b) The punishment for an offense under subsection (a) is--

    (1) if the offense was effected by means of force, threats of force, fraud, or coercion described in subsection (e)(2), or by any combination of such means, or if the person recruited, enticed, harbored, transported, provided, obtained, advertised, patronized, or solicited had not attained the age of 14 years at the time of such offense, by a fine under this title and imprisonment for any term of years not less than 15 or for life; or

    (2) if the offense was not so effected, and the person recruited, enticed, harbored, transported, provided, obtained, advertised, patronized, or solicited had attained the age of 14 years but had not attained the age

of 18 years at the time of such offense, by a fine under this title and imprisonment for not less than 10 years or for life.

(c) In a prosecution under subsection (a)(1) in which the defendant had a reasonable opportunity to observe the person so recruited, enticed, harbored, transported, provided, obtained, maintained, patronized, or solicited, the Government need not prove that the defendant knew, or recklessly disregarded the fact, that the person had not attained the age of 18 years.

(d) Whoever obstructs, attempts to obstruct, or in any way interferes with or prevents the enforcement of this section, shall be fined under this title, imprisoned for a term not to exceed 25 years, or both.

(e) In this section:

> (1) The term "abuse or threatened abuse of law or legal process" means the use or threatened use of a law or legal process, whether administrative, civil, or criminal, in any manner or for any purpose for which the law was not designed, in order to exert pressure on another person to cause that person to take some action or refrain from taking some action.

> (2) The term "coercion" means--

>> (A) threats of serious harm to or physical restraint against any person;

>> (B) any scheme, plan, or pattern intended to cause a person to believe that failure to perform an act would result in serious harm to or physical restraint against any person; or

>> (C) the abuse or threatened abuse of law or the legal process.

(3) The term "commercial sex act" means any sex act, on account of which anything of value is given to or received by any person.

(4) The term "participation in a venture" means knowingly assisting, supporting, or facilitating a violation of subsection (a)(1).

(5) The term "serious harm" means any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing commercial sexual activity in order to avoid incurring that harm.

(6) The term "venture" means any group of two or more individuals associated in fact, whether or not a legal entity.

# 18 U.S.C. § 1595
## Civil remedy

(a) An individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator (or whoever knowingly benefits, or attempts or conspires to benefit, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter) in an appropriate district court of the United States and may recover damages and reasonable attorneys fees.

(b)

    (1) Any civil action filed under subsection (a) shall be stayed during the pendency of any criminal action arising out of the same occurrence in which the claimant is the victim.

    (2) In this subsection, a "criminal action" includes investigation and prosecution and is pending until final adjudication in the trial court.

(c) No action may be maintained under subsection (a) unless it is commenced not later than the later of--

    (1) 10 years after the cause of action arose; or

    (2) 10 years after the victim reaches 18 years of age, if the victim was a minor at the time of the alleged offense.

(d) In any case in which the attorney general of a State has reason to believe that an interest of the residents of that State has been or is threatened or adversely affected by any person who violates section 1591, the attorney general of the State, as parens patriae, may bring a civil action against such person on behalf of the residents of the State in an appropriate district court of the United States to obtain appropriate relief.

## 18 U.S.C. § 1595 (2008)
## Civil remedy

(a) An individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator (or whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter) in an appropriate district court of the United States and may recover damages and reasonable attorneys fees.

(b)

> (1) Any civil action filed under this section shall be stayed during the pendency of any criminal action arising out of the same occurrence in which the claimant is the victim.
>
> (2) In this subsection, a "criminal action" includes investigation and prosecution and is pending until final adjudication in the trial court.

(c) No action may be maintained under this section unless it is commenced not later than 10 years after the cause of action arose.

## 18 U.S.C. § 1595 (2003)
## <u>Civil remedy</u>

(a) An individual who is a victim of a violation of section 1589, 1590, or 1591 of this chapter may bring a civil action against the perpetrator in an appropriate district court of the United States and may recover damages and reasonable attorneys fees.

(b)

> (1) Any civil action filed under this section shall be stayed during the pendency of any criminal action arising out of the same occurrence in which the claimant is the victim.

> (2) In this subsection, a "criminal action" includes investigation and prosecution and is pending until final adjudication in the trial court.