No. 25-13187

_____

# 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 𝔆𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰 for the 𝔈𝔩𝔢𝔳𝔢𝔫𝔱𝔥 ℭ𝔦𝔯𝔠𝔲𝔦𝔱

_____

LIBERTY MUTUAL FIRE INSURANCE COMPANY.,

*Plaintiff - Appellant,*

v.

RED ROOF INNS, INC., ET AL.,

*Defendants - Appellees.*

On Appeal from the United States District Court
for the Northern District of Georgia,
Case No. 1:23-cv-02047-LMM

_____

**AMICI CURIAE BRIEF OF THE COMPLEX INSURANCE CLAIMS LITIGATION ASSOCIATION AND AMERICAN PROPERTY CASUALTY INSURANCE ASSOCIATION IN SUPPORT OF PLAINTIFF - APPELLANT AND REVERSAL**

_____

Parker J. Lavin
LAVIN RINDNER DUFFIELD LLC
3811 Frederica Rd., Ste. 201
St. Simons Island, GA 31522
plavin@lrd.law
(912) 266-8301

*Counsel for the Complex Insurance Claims Litigation Association and American Property Casualty Insurance Association*

No. 25-13187

*Liberty Mutual Fire Insurance Company v. Red Roof Inns, Inc., et al.*

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1 and Eleventh Circuit Rule 26.1, counsel for *Amici Curiae* states:

The Complex Insurance Claims Litigation Association is not a publicly owned corporation. It has not issued shares of stock nor does it have any parent corporation.

The American Property Casualty Insurance Association is not a publicly owned corporation. It has not issued shares of stock, nor does it have any parent corporation.

Pursuant to Eleventh Circuit Rules 26.1-1, 26.1-2, and 26.1-3, counsel for *Amici Curiae* certify that in addition to those persons and entities listed in the brief filed by Appellant in this matter, the following listed persons and entities have or may have an interest in the outcome of this case:

1. Complex Insurance Claims Litigation Association (*Amicus Curiae*)

2. American Property Casualty Insurance Association *(Amicus Curiae)*

No. 25-13187
*Liberty Mutual Fire Insurance Company v. Red Roof Inns, Inc., et al.*

3. Lavin, Parker J. (Counsel for proposed *Amici Curiae*)

4. Lavin, Rindner, Duffield LLC (Counsel for *Amici Curiae*)

December 29, 2025

/s/ Parker J. Lavin
Parker J. Lavin
LAVIN RINDNER
DUFFIELD LLC
3811 Frederica Rd., Ste. 201
St. Simons Island, GA 31522
plavin@lrd.law
(912) 266-8301

*Counsel for the Complex Insurance Claims Litigation Association and the American Property Casualty Insurance Association*

## <u>TABLE OF CONTENTS</u>

INTEREST OF *AMICI CURIAE* ........................................................1

STATEMENT OF THE ISSUES ........................................................5

SUMMARY OF THE CASE AND FACTS...........................................6

SUMMARY OF ARGUMENT...............................................................8

ARGUMENT ......................................................................................11

    I.    CLAIMS THAT THE HOTEL PARTICIPATED
        IN AND KNOWINGLY BENEFITTED FROM
        SEX TRAFFICKING ON HOTEL PREMISES
        ARE NEITHER INSURED NOR INSURABLE. .................11

        A.    Insurance Covers Only Fortuitous Losses.................11

        B.    No Occurrence is Alleged in Claims Regarding the
               Alleged Conduct of Participating in and
               Knowingly Benefitting from the Sex Trafficking
               Enterprise...................................................14

        C.    Coverage is Barred by the LM Policy's Exclusions.
               ......................................................18

        D.    Georgia's Strong Public Policy Against Sex
               Trafficking Bars Coverage for the Reprehensible
               Conduct Alleged. .......................................20

    II.    IMPOSING COVERAGE ON INSURANCE
         CARRIERS FOR SEX TRAFFICKING CLAIMS
         WOULD HARM GEORGIA'S INSURANCE
         MARKETPLACE................................................24

CONCLUSION....................................................................................26

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ACMAT Corp. v. Greater N.Y. Mut.*,
  923 A.2d 697 (Conn. 2007)....................................................................3

*Allstate Ins. v. Jarvis*,
  393 S.E.2d 489 (Ga. Ct. App. 1990)..................................................22

*Am. Mining Ins. v. Peters Farms, LLC*,
  557 S.W.3d 293 (Ky. 2018)..................................................................11

*Centennial Ins. Co. v. Johnson*,
  No. 1:07-cv-1885-MHS, 2008 WL 11336791 (N.D. Ga. Oct.
  28, 2008).............................................................................................19

*CX Reinsurance Co. v. Johnson*,
  282 A.3d 126 (Md. 2022).......................................................................3

*Georgia Farm Bureau Mut. Ins. Co. v. Smith*,
  784 S.E.2d 422 (Ga. 2016) ..........................................................1, 2, 3

*Georgia Farm Bureau Mutual Insurance Co. v. Hall County*,
  586 S.E.2d 715 (Ga. Ct. App. 2003)..............................................15-16

*Gilreath Family & Cosmetic Dentistry, Inc. v. Cincinnati Ins.
  Co.*,
  No. 21-11046, 2021 WL 3870697 (11th Cir. Aug. 31, 2021) ........1, 2, 3

*Grain Dealers Mut. Ins. v. Pat's Rentals, Inc.*,
  492 S.E.2d 702 (Ga. Ct. App. 1997), *rev'd on other
  grounds*, 505 S.E.2d 729 (Ga. 1998) ..................................................14

*Koenig v. Progressive Ins.*,
  599 A.2d 690 (Pa. Super. Ct. 1991) ...................................................25

*Miller-Wohl Co. v. Comm'r of Lab. & Indus.*,
  694 F.2d 203 (9th Cir. 1982)................................................................3

*Nat'l Union Fire Ins. of Pittsburgh v. Turner Constr. Co.*,
119 A.D.3d 103 (N.Y. App. Div. 2014) ................................................. 11

*Owners Ins. v. James*,
295 F. Supp. 2d 1354 (N.D. Ga. 2003) ................................................. 17

*Pilkington N. Am., Inc. v. Travelers Cas. & Sur.*,
861 N.E.2d 121 (Ohio 2006) ................................................................ 3

*Racetrac Petroleum, Inc. v. ACE Am. Ins. Co.*,
446 F. App'x 211 (11th Cir. 2011) ........................................................ 2

*Richardson v. Ga. Farm Bureau Mut. Ins. Co.*,
678 S.E.2d 348 (Ga. Ct. App. 2009) ................................................... 19

*Roe v. State Farm Fire & Cas.*,
376 S.E.2d 876 (Ga. 1989) ..................................................... 17, 19, 22

*Sidman v. United States*,
336 F. Supp. 474 (S.D.N.Y. 1971), *aff'd*, No. 71-2209, 1972
WL 2624 (2d Cir. 1972) ...................................................................... 12

*St. Paul Fire & Marine Ins. Co. v. Rosen Hotels & Resorts,
Inc.*,
No. 18-14427, 2020 WL 13558953 (11th Cir. Jan. 8, 2020) ................ 2

*State Farm Fire & Cas. v. Davis*,
612 So. 2d 458 (Ala. 1993) ................................................................. 17

*Strickland v. Auto–Owners Ins. Co.*,
615 S.E.2d 808 (Ga. Ct. App. 2005) ................................................... 14

*Thomas v. Benchmark Ins.*,
179 P.3d 421 (Kan. 2008) ................................................................... 21

*Travelers Indemnity Co. v. Hood*,
140 S.E.2d 68 (Ga. Ct. App. 1964) ..................................................... 23

*Truck Ins. Exch. v. Kaiser Gypsum Co.*,
602 U.S. 268 (2024) ............................................................................. 3

**Rules and Statutes**

Trafficking Victims Protection Reauthorization Act, 18
U.S.C. §1591 ................................................................... 11

Trafficking Victims Protection Reauthorization Act, 18
U.S.C. § 1595(a) ....................................................... 4, 6, 8

Fed. R. App. P. 29(a)(2) ................................................. 1

Fed. R. App. P. 29(a)(4)(E) ........................................... 1

O.C.G.A. § 16-5-46 (2024)..................................... 11, 22

CAL. INS. CODE. § 533 (2024) .................................. 21

MONT. CODE ANN. § 28-2-702 (2023) ..................... 21

N.D. CENT. CODE § 26.1-32-04 (2023)..................... 21

**Other Authorities**

9 *Couch on Ins.* § 126:25 (3d ed. Dec. 2024 Update)............................. 12

Ostrager, Barry R.  & Newman, Thomas R., *Handbook On
Insurance Coverage Disputes* § 8.02[a] (Elisa Alcabes &
Karen Cestari eds., 20th ed. 2020)  ..................................... 12

Keeton, Robert E. & Widiss, Alan I., *Insurance Law* § 5.3(a)
(student ed. 1988) ....................................................... 13, 24

Richter, Andreas & Wilson, Thomas C., *Covid-19:
Implications for Insurer risk Management and the
Insurability of Pandemic Risk*, 45 Geneva Risk Ins. Rev.
171 (Sept. 22, 2020) ........................................................ 25

Ross, Lori N., *Making A Declaration: The Rise of Declaratory
Judgment Actions and the Insurer As Regulator in the
Fight to End Sex Trafficking in the Hotel Industry*, 54
Loy. L.A. L. Rev. 843 (2021) .............................................. 10

Whatley, M. Landon, *"No Nation Is Exempt"—the United States' Legal Fight Against Sex Trafficking*, 44 Am. J. Trial Advoc. 479 (2021) ....................................................................... 10

## INTEREST OF *AMICI CURIAE*[1]

This case presents key questions of insurance law and public policy that will impact the insurance marketplace. The Complex Insurance Claims Litigation Association ("CICLA") and American Property Casualty Insurance Association ("APCIA") (collectively, "*Amici*") are trade associations of property and casualty insurance companies that have substantial experience on insurance matters and appear as *amici curiae* to assists courts in important cases such as this one. Together, *Amici* represent the vast majority of commercial and personal lines insurance companies in the United States. They have both a national perspective and an in-depth knowledge of the important insurance issues in this appeal. *Amici* regularly participate as *amici curiae* in state and

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), *Amici Curiae* declare that: (i) no party's counsel authored the brief in whole or in part; (ii) no party or party's counsel contributed money intended to fund preparing or submitting the brief; and (iii) no one, other than *Amici Curiae* and their counsel, contributed money to prepare or submit this brief.

Under Rule 29(a)(2), Appellant consents to this *amicus* brief filing, but Appellees have not given consent, requiring a motion for leave to file.

federal appellate courts on important insurance questions, including before this Court.[2]

APCIA is the primary national trade association for home, automobile, and business insurers. With a legacy dating back 150 years, APCIA promotes and protects the viability of private competition to benefit consumers and insurers. APCIA's member companies represent 66 percent of the U.S. property-casualty insurance market, including over 75 percent of Georgia's commercial insurance market. On issues of importance to the insurance industry and marketplace, APCIA advocates sound and progressive public policies on behalf of its members in legislative and regulatory forums at the federal and state levels and submits *amicus curiae* briefs in significant cases before federal and state courts.

CICLA is a trade association of major property and casualty insurance companies. Through *amicus curiae* efforts, CICLA seeks to

---

[2] *E.g., Georgia Farm Bureau Mut. Ins. Co. v. Smith*, 784 S.E.2d 422 (Ga. 2016) (CICLA); *St. Paul Fire & Marine Ins. Co. v. Rosen Hotels & Resorts, Inc.*, No. 18-14427, 2020 WL 13558953 (11th Cir. Jan. 8, 2020)(APCIA & CICLA); *Gilreath Family & Cosmetic Dentistry, Inc. v. Cincinnati Ins. Co.*, No. 21-11046, 2021 WL 3870697 (11th Cir. Aug. 31, 2021) (APCIA); *Racetrac Petroleum, Inc. v. ACE Am. Ins. Co.*, 446 F. App'x 211 (11th Cir. 2011) (CICLA).

help courts understand and resolve coverage issues of great importance to insurers today.

*Amici* seek to fulfill "the classic role of *amicus curiae* by assisting in a case of general public interest, supplementing the efforts of counsel, and drawing the court's attention to law that escaped consideration." *Miller-Wohl Co. v. Comm'r of Lab. & Indus.,* 694 F.2d 203, 204 (9th Cir. 1982). Courts across the country, including the United States Supreme Court, have recognized the valuable perspective CICLA and APCIA provide.[3]

The Court is asked to decide whether Red Roof Inns, Inc. and affiliated entities (collectively, "Red Roof") can escape the financial consequences of participating in and knowingly benefitting from sex

---

[3] *Truck Ins. Exch. v. Kaiser Gypsum Co.*, 602 U.S. 268 (2024) (quoting and twice citing APCIA's and CICLA's brief); *see also CX Reinsurance Co. v. Johnson*, 282 A.3d 126, 145 (Md. 2022) (agreeing with the "*Amicus Curiae* Complex Insurance Claims Litigation Association" on implications of recognizing known and unknown tort claimants as policy beneficiaries); *ACMAT Corp. v. Greater N.Y. Mut.*, 923 A.2d 697, 708 n.14 (Conn. 2007) (finding arguments CICLA presented as *amicus curiae* persuasive in a case of first impression on recovery of attorneys' fees); *Pilkington N. Am., Inc. v. Travelers Cas. & Sur.*, 861 N.E.2d 121, 125 n.1 (Ohio 2006) ("The court acknowledges with appreciation the briefs provided by *amici curiae* . . . the Complex Insurance Claims Litigation Association.").

trafficking – conduct that is inherently harmful – by passing those costs on to its insurer. This appeal concerns the meaning of an insurance contract term in Appellant Liberty Mutual Fire Insurance Company's ("LM") policies requiring "accidental" conduct, the application of widely used insurance contract exclusions, and Georgia public policy.

Red Roof allegedly violated the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. § 1595(a), by participating in and knowingly benefitting from sex trafficking minors on hotel premises. The complaint alleges that Red Roof knew that victims were being sex trafficked, expected it, and actively participated and profited from it. It asserts that hotel employees actively participated in the enterprise by acting as lookouts, warning traffickers of police activity, accepting payments in exchange for facilitating the sex trafficking, and by renting rooms in the back of the hotel to help conceal sex trafficking. And it asserts that Red Roof management had actual knowledge that sex trafficking was taking place and condoned it while the hotel continued to profit financially from it. Red Roof's conduct allegedly resulted in injuries to the victims that were expected and naturally followed from these intentional acts.

*Amici* are vitally interested in the outcome of this case. A ruling that hotels/motels can call on their insurers to pay for the consequences of participating in and knowingly benefitting from sex trafficking would impact not only *Amici's* members, but the commercial liability insurance market for hotels/motels in Georgia, to the detriment of insureds that comply with the anti-trafficking law and the public.

## STATEMENT OF THE ISSUES

*Amici* address four issues: [4]

1. Whether insurance coverage for injury caused by participation in sex trafficking is barred by the fortuity doctrine because there is no unforeseen loss?

2. Whether a claim alleging that a hotel owner participated in and knowingly benefitted financially from sex trafficking on hotel premises alleges an "occurrence" where the fundamental factual averments allege repeated intentional and knowing conduct?

3. Whether coverage for participating in and knowingly benefitting from a sex trafficking enterprise is barred by the policy's exclusions for Expected or Intended Injury and for Knowing Violation of Rights of Another?

---

[4] The district court also held that certain of Liberty Mutual's declaratory judgment claims were moot and that Liberty Mutual had no right to reimbursement of defense or indemnity payments. *Amici* disagree with these holdings, as well as any contention that Coverage B applies (an argument not reached below), but focus their brief on the issues stated.

5

4. Whether coverage for claims that an insured participated in and knowingly profited from sex trafficking is legally uninsurable as against Georgia public policy as a matter of law?

## SUMMARY OF THE CASE AND FACTS

*Amici* adopt the Statement of Facts set forth in the Brief for Appellant Liberty Mutual Fire Insurance Company ("LM Br.") at 7-14 and briefly highlight key facts here.

Several underlying lawsuits against Red Roof allege violations of the TVPRA. An example is H.B.'s lawsuit alleging that she was sex trafficked at the Red Roof Inn in Norcross, Georgia when she was 16 years old. Doc. 79-6. H.B.'s Complaint alleges that:

- Red Roof knew of the rampant sex trafficking and prostitution at the Norcross Red Roof for years, before, during and after [H.B.'s] trafficking. *Id*. at ¶4;

- The employees at the Norcross location were complicit in assisting H.B.'s sex traffickers in the sex trafficking of H.B. *Id*. at ¶¶4(b) and (c);

- Red Roof "knew of, condoned, and permitted the widespread prostitution and sex trafficking at the Norcross Red Roof, including [H.B.'s] minor sex trafficking." *Id*. at ¶31;

- Before H.B. was first sex trafficked at the Norcross Red Roof, hotel employees knowingly rented rooms directly to minor sex trafficking victims who lacked identification and paid for their rooms in cash. *Id*. at ¶29;

6

- H.B. witnessed one of her traffickers pay cash to employees of the Norcross Red Roof in exchange for the hotel's facilitation of H.B.'s sex trafficking by permitting the trafficking to occur at the hotel and by acting as lookouts for her traffickers. *Id.* at ¶19;

- "In addition to providing a market for illegal sex and sex trafficking as part of the hotel's operations, Norcross Red Roof employees served as lookouts for sex traffickers, including Plaintiff's traffickers, alerting them to the presence of law enforcement at the hotel in order to protect and facilitate the illegal commercial sex operations that filled the hotel's rooms." *Id.* at ¶33;

- "Before, during, and after [H.B.'s] trafficking, employees of the Norcross Red Roof called sex traffickers, including [H.B.'s] traffickers, to warn them when law enforcement was present at or coming to the hotel or [to] warn[] them to slow down or stop buyer traffic to a particular room in order to assist the traffickers in evading detection from other guests and the police." *Id.* at ¶34;

- Hotel guests reported sex trafficking and prostitution-related activities to Red Roof. *Id.* at ¶4(f);

- Red Roof "had knowledge of sex trafficking … at the Norcross Red Roof specifically." *Id.* at ¶4(g);

- In January 2012, the Gwinnett County Police Department conducted a sting operation at the Norcross Red Roof and hotel employees called H.B.'s sex traffickers to alert them to the police presence at the hotel. *Id.* at ¶25; and

- Before [H.B.] was first sex trafficked at the Norcross Red Roof, hotel employees informed Jay Moyer, Red Roof's Director of Operations, and Vince Vittatoe, Red Roof's Director of Safety and Security, about the crime and prostitution that was constant at the Norcross Red Roof. *Id.* at ¶40.

7

The complaint asserts a statutory claim under §1595(a) of the TVPRA. *Id.* at ¶¶ 5, 59-69 (Count I Statutory Liability).[5]

The LM policies covers "those sums [Red Roof] becomes legally obligated to pay as damages because of 'bodily injury' … caused by an occurrence." Doc. 79-8 at 3-4. "Occurrence" is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." *Id.* at 8. Further, an Expected or Intended Exclusion bars coverage for "'bodily injury' … expected or intended from the standpoint of the insured." *Id.* at 6. The Policies also contain a Knowing Violation of Rights of Another Exclusion, which provides that Coverage B does not apply to "personal and advertising injury" that is "caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict" such injury. *Id.* at 4.

## SUMMARY OF ARGUMENT

Red Roof is alleged to have participated in and knowingly benefitted financially from a well-known sex trafficking enterprise at its

---

[5] The H.B. Complaint originally also asserted RICO claims, which have since been dropped. *See* ECF No. 103 at 2 n.3 (dropping RICO claims).

hotels. Commercial general liability ("CGL") insurance policies such as the LM Policies do not cover damages because of injury or damage[6] caused by the type of conduct alleged here.

The Court should find no coverage for four independent reasons. *First*, CGL policies cover third-party liability in tort for fortuitous loss, subject to the terms of the policy. Without genuine risk or uncertainty about whether loss will occur, the fortuity doctrine bars coverage as a matter of public policy.

*Second,* an insurer's duty to defend is determined by the policy terms and the factual averments of the complaint. Under Georgia law, where, as here, the complaint's factual allegations describe purposeful acts and "actual knowledge" of criminal sex trafficking, there is no covered "occurrence" under the policy.

*Third*, coverage for the underlying claims is separately barred by the policy's exclusions. The Expected or Intended Exclusion precludes coverage when the alleged injury is "expected" from the insured's

_____

[6] This *amicus* brief references the policy's requirement of bodily injury, and also uses more generic terms such as "harm" and "injury." All "harm" or "injury" does not constitute covered "bodily injury" or "personal and advertising" injury, and *Amici* do not address or concede that covered harm or injury has been alleged in the underlying claims.

conduct. And the Knowing Violation of Rights of Another Exclusion bars coverage for personal injury "caused by . . . the insured with the knowledge that the act would violate the rights of another and would inflict" harm. Harm to the victims of sex trafficking is expected and known, as Georgia law and nearly every court in the country recognizes.

*Fourth*, finding that an insurer must defend or indemnify a policyholder who participated in sex trafficking would violate Georgia public policy and law. Georgia has historically been identified as a major hub for human sex trafficking,[7] and hotels and motels are at the center of it.[8] Georgia's anti-trafficking statute reflects the state's strong public

---

[7] According to the Georgia Department of Public Health, more than 370 girls are trafficked each month, with the average age of victims just 14.8 years old. News Release, Ga. Dep't of Public Health, January is Human Trafficking Prevention Month (Jan. 30, 2025) https://dph.georgia.gov/press-releases/2025-01-30/january-human-trafficking-prevention-month#:~:text=In%20Georgia%2C%20more%20than%20370,the%20lives%20of%20those%20affected.

[8] As one commentator observed: "[s]ex traffickers target hotels and motels for facilities for commercial sex because of their anonymity, seclusive atmosphere, and transient nature." M. Landon Whatley, *"No Nation Is Exempt"—the United States' Legal Fight Against Sex Trafficking*, 44 Am. J. Trial Advoc. 479, 484 (2021). An estimated "73.55% of cases reported to the National Human Trafficking Hotline were for sex trafficking centralized at hotels and motels, and an estimated 80% of sex trafficking-based arrests were made in or around hotels and motels." *Id*. *See also* Lori N. Ross, *Making A Declaration: The Rise of Declaratory*

policy of holding hotel operators responsible for participating in and knowingly benefitting from sex trafficking. *See* O.C.G.A. § 16-5-46(c) (2024).[9] Under Georgia law, public policy prohibits coverage because of the reprehensible nature of the insured's conduct. This is so whether or not the insured subjectively intended to injure the plaintiff. Purposefully facilitating the sexual servitude of children for financial gain is so inherently wrong that such conduct is legally uninsurable.

## ARGUMENT

### I. CLAIMS THAT THE HOTEL PARTICIPATED IN AND KNOWINGLY BENEFITTED FROM SEX TRAFFICKING ON HOTEL PREMISES ARE NEITHER INSURED NOR INSURABLE.

#### A. Insurance Covers Only Fortuitous Losses.

The concept of fortuity, *i.e.*, that insurance responds to losses from unexpected events, not to harm that follows directly and immediately from intentional acts, is fundamental to liability insurance.[10] *See, e.g.*,

---

*Judgment Actions and the Insurer As Regulator in the Fight to End Sex Trafficking in the Hotel Industry*, 54 Loy. L.A. L. Rev. 843, 849-50 (2021) (discussing extent of sex trafficking at hotels).

[9] *See also* 18 U.S.C. §1591.

[10] Courts have long recognized the limitation of liability insurance to contingent events. *E.g.*, *Am. Mining Ins. v. Peters Farms, LLC*, 557 S.W.3d 293, 296–97 (Ky. 2018) (The concept of fortuity is inherent in all insurance contracts.); *Nat'l Union Fire Ins. of Pittsburgh v. Turner*

Barry R. Ostrager & Thomas R. Newman, *Handbook On Insurance Coverage Disputes* § 8.02[a], at 581–82 (Elisa Alcabes & Karen Cestari eds., 20th ed. 2020) ("[T]here is an implicit requirement read into every liability insurance policy that coverage will be provided only for fortuitous losses ...."). Fortuity does not exist where the alleged loss is certain, expected or within the insured's control and follows from allegedly intentional conduct. When the very nature of the policyholder's alleged conduct causes the harmful result, the resulting harm is no longer a "risk."

The fundamental bargain of general liability coverage turns on fortuity. An insurer is economically able to sell insurance precisely because the events that it insures are fortuitous or unplanned and will not arise as to all policyholders. While neither the buyer nor the seller of insurance knows with certainty whether a given loss will befall that

---

*Constr. Co.*, 119 A.D.3d 103, 108 (N.Y. App. Div. 2014) (The requirement of a fortuitous loss is a necessary element of insurance policies based on either an "accident" or "occurrence."); *Sidman v. United States*, 336 F. Supp. 474, 476 (S.D.N.Y. 1971), *aff'd*, No. 71-2209, 1972 WL 2624 (2d Cir. 1972) (identifying "the general indicia of insurance—that is, a contract by which one party undertakes to indemnify another against loss arising from an unknown or contingent event"); *see* 9 *Couch on Ins.* § 126:25 (3d ed. Dec. 2024 Update) ("[I]nsurance is intended to protect against unforeseen 'events' ....").

policyholder, the insurer can calculate the likely number of insured losses among a large number of policyholders and spread that risk among that large class of insurance buyers. This risk-spreading is the primary function of insurance, and the concept of fortuitous loss is critical because it permits the market to function properly, which benefits the public interest.

As explained in Robert E. Keeton & Alan I. Widiss, *Insurance Law* § 5.3(a), at 476-77 (student ed. 1988):

> [The concept of fortuity], which expresses the concern that insurance arrangements should be limited to the transfer of economic detriments that are fortuitous, is generally regarded as a principle that is central to the basic determination of what risks may or should be transferred by an insurance arrangement. In most circumstances, it is contrary to public policy to permit the enforcement of an insurance contract if it would provide indemnification for losses that are not fortuitous. . .. The [rule requiring fortuity] embodies a fundamental and significant public policy interest that in some contexts is sufficiently important to preclude coverage claims even when there are explicit agreements to the contrary, but in any case is a very compelling public interest in regard to coverage questions when there is no applicable provision in the insurance agreement.

Where the harm alleged naturally follows from the insured's intentional conduct, the insured has removed "fortuity" from the equation. That is precisely what is alleged against Red Roof here – that the insured participated in and knowingly profited from sex trafficking.

13

On these facts, there was no genuine uncertainty about harm resulting from the alleged conduct. When a loss is not fortuitous, it is not part of the insurance bargain and there is no coverage.

### B.  No Occurrence is Alleged in Claims Regarding the Alleged Conduct of Participating in and Knowingly Benefitting from the Sex Trafficking Enterprise.

Under Georgia law, an insurer's duty to defend is determined by comparing the factual allegations of the underlying complaint to the terms of the insurance contract. Courts look to the substance of the allegations, and coverage is controlled by "the underlying facts and circumstances of the claim."[11] Here, the gravamen of the underlying complaint is that Red Roof participated in and knowingly profited from sex trafficking activities. The facts alleged specifically assert deliberate conduct by Red Roof's personnel who allegedly were participating in and facilitating sex trafficking.[12] Whether or not the fortuity principle bars coverage, the express LM Policy terms bar coverage on these facts.

---

[11] *Grain Dealers Mut. Ins. v. Pat's Rentals, Inc*., 492 S.E.2d 702, 705 (Ga. Ct. App. 1997), *rev'd on other grounds*, 505 S.E.2d 729 (Ga. 1998); *Strickland v. Auto–Owners Ins. Co*., 615 S.E.2d 808, 810 (Ga. Ct. App. 2005).

[12] References to Red Roof having "constructive knowledge" of the extensive prostitution and criminal activity at the Norcross Red Roof do not convert H.B.'s claim into a claim based on "accidental" conduct or

The deliberate acts by Red Roof personnel allegedly participating in sex trafficking, including the sex trafficking of H.B., are not an insured "occurrence" under the LM Policy. Under Georgia law, the resulting injury to sex trafficking victims is the natural and expected consequence of Red Roof's alleged deliberate conduct. This is not an occurrence under settled Georgia law.

In *Georgia Farm Bureau Mutual Insurance Co. v. Hall County*, 586 S.E.2d 715, 716 (Ga. Ct. App. 2003), the Georgia Court of Appeals found no duty to defend claims[13] that an insured sold the timber on real property that had been condemned by the county government a few days earlier. The Georgia Court of Appeals recognized that the lawsuit did not allege an "occurrence" and there was no duty to defend or indemnify because the insured's decision to enter the contract was a "deliberate, *intentional* act of which the damages were a natural and expected consequence." *Id.* at 718.

---

involving "fortuitous" harm. Georgia courts will not ignore the gist of the action or avoid the effect of plain policy terms to create coverage.

[13] The lawsuit asserted claims for fraud, unjust enrichment, breach of contract and "negligence in failing to advise [him] of the existence of the condemnation petition."

15

[The insured] cannot negotiate and consummate a contract with [the claimant] with knowledge of the State's pending condemnation action and then look to his insurance company to defend him, or to insulate him, from the damages which naturally resulted from his conduct. . . . His conduct in this contract matter does not constitute an "occurrence" or an "accident" and is not covered by the policy.

*Id.*

The same rationale applies here. The factual averments in the underlying lawsuits allege the hotel's ongoing active participation and financial benefit from the sex trafficking enterprise. Red Roof allegedly facilitated H.B.'s sex trafficking by deliberate conduct including permitting the trafficking to occur at the hotel, assigning rooms at the rear of the hotel to conceal trafficking, and acting as lookouts for her traffickers. Doc. 79-6 at ¶¶ 19, 42. For instance, her complaint alleges that Norcross Red Roof employees allegedly "served as lookouts for sex traffickers, including Plaintiff's traffickers, alerting them to the presence of law enforcement at the hotel in order to protect and facilitate the illegal commercial sex

operations that filled the hotel's rooms." *Id*. at ¶33.[14] These are deliberate, intentional acts allegedly undertaken by Red Roof.

Moreover, the injury to sex trafficking victims is the natural and expected result of Red Roof's alleged deliberate conduct.[15] In Georgia, as in nearly every jurisdiction, intent to commit harm is often imputed to insureds accused of sexual molestation of a minor, thereby precluding insurance coverage. *See generally State Farm Fire & Cas. v. Davis*, 612 So. 2d 458, 463 (Ala. 1993) (overwhelming majority of courts agree that, in cases involving sexual abuse of children, "intent to injure is inferred as a matter of law regardless of claimed intent.") (internal quotations omitted).[16]  On the facts

---

[14]  Her complaint also expressly alleges that Red Roof's Director of Operations and its Director of Safety and Security had knowledge of the sex trafficking and prostitution, and Red Roof allegedly "knew of, condoned, and permitted the widespread prostitution and sex trafficking at the Norcross Red Roof, including [H.B.'s] minor sex trafficking." Doc. 79-6 at ¶¶4, 4(f), 4(g), 31, 40.

[15] *See Owners Ins. v. James*, 295 F. Supp. 2d 1354 (N.D. Ga. 2003) (surveying Georgia case law, the court concluded: "the policy term 'occurrence' does not extend to injuries flowing from intentional acts— even if (unlike the facts here) the injuries themselves were accidental").

[16] *Cf. Roe v. State Farm Fire & Cas.,* 376 S.E.2d 876, 877(Ga. 1989) ("Child molestation and the injury caused by it are so closely tied as to be virtually inseparable.").

17

alleged, there is no "occurrence," and no coverage under the LM Policy.

## C.    Coverage is Barred by the LM Policy's Exclusions.

There is also no coverage for the independent reason that the policy's exclusions bar coverage. First, the Expected or Intended Exclusion bars coverage for "'bodily injury' … expected or intended from the standpoint of the insured." Second, the Knowing Violation of Rights of Another Exclusion bars coverage for personal injury "caused by . . . the insured with the knowledge that the act would violate the rights of another and would inflict" harm. If any injury covered by the LM Policies is alleged, exclusions under both Coverage A and Coverage B bar coverage.

The complaint against Red Roof is replete with allegations it knew of the sex trafficking and the deliberate acts of its employees. For instance, the complaint alleges that Red Roof knew of the rampant sex trafficking and prostitution at the Norcross Red Roof for years, before, during and after [H.B.'s] trafficking. Doc. 79-6, ¶4. And H.B.'s complaint expressly claims that Red Roof "knew of, condoned, and permitted the widespread prostitution and sex trafficking at the Norcross Red Roof,

including [H.B.'s] minor sex trafficking." *Id.* at ¶31. With knowledge and facilitation of H.B.'s sex trafficking, Red Roof necessarily expected or intended the resulting harm. Further, any possible claim for personal injury is excluded because any such injury was "caused by . . . the insured with the knowledge that the act would violate the rights of another and would inflict" harm. Because sex trafficking is exploitative, facilitating it reflects knowledge those acts would violate the rights of another and inflict harm.  The harm is not unexpected or incidental – it is a virtually certain consequence of the deliberate acts at issue.

Georgia courts routinely enforce such exclusions where, as here, the alleged harm was expected and known. *E.g., Richardson v. Ga. Farm Bureau Mut. Ins. Co.*, 678 S.E.2d 348, 349 (Ga. Ct. App. 2009) (applying policy exclusion and stating it applies when insured acts with expectation or intent that injury occur); *Centennial Ins. Co. v. Johnson,* No. 1:07-cv-1885-MHS, 2008 WL 11336791, at *4-5 (N.D. Ga. Oct. 28, 2008) (finding no occurrence and coverage separately barred by expected or intended exclusion for assault, based on inference of intent to cause injury through the act of punching someone in the face); *Cf. Roe v. State Farm Fire & Cas. Co.*, 376 S.E.2d 876 (Ga. 1989) (Sexual molestation claims barred

because injury was expected or intended as a matter of law.). The allegations against Red Roof concern harm to underage sex trafficking victims. Any injury within the meaning of the policy terms is squarely within the Expected or Intended Exclusion and/or the Knowing Violation of Rights of Another Exclusion in the LM Policy.

### D.    Georgia's Strong Public Policy Against Sex Trafficking Bars Coverage for the Reprehensible Conduct Alleged.

Georgia courts recognize the freedom of contract and generally permit private parties to agree to shift certain risks. Here, the LM Policy terms make clear there is no coverage for the claims against Red Roof. But *if* coverage for harm from reprehensible conduct such as Red Roof's alleged conduct was not barred by the insurance contract, public policy imposes a backstop. Some conduct is so egregious that public policy precludes insurability to deter wrongdoing, prevent the potential for moral hazard,[17] and require wrongdoers to bear the consequences for

---

[17] Moral hazard refers to the increased likelihood of the insured engaging in certain conduct because the financial consequences of loss from that conduct are shifted to the insurer.

their actions. States across the country recognize that public policy bars coverage for certain intentional acts as a matter of law.[18]

Deliberate acts participating in and facilitating sex trafficking are the kind of intentional acts that are uninsurable as against Georgia public policy. In 2008, the Georgia General Assembly created the Joint Commercial Sexual Exploitation of Minors Study Commission.[19] It found that

> Georgia and metropolitan Atlanta in particular, perhaps in large part due to its position as a major U.S. transportation hub, has been at the forefront of this crisis. The Federal Bureau of Investigation ranks Atlanta among the top 14 cities

---

[18] *E.g.,* CAL. INS. CODE. § 533 (2024) (implied exclusionary clause read into every insurance policy precluding coverage for a loss caused by an insured's willful act); MONT. CODE ANN. § 28-2-702 (West 2023) ("[A]ll contracts that have for their object, directly or indirectly, to exempt anyone from responsibility for the person's own fraud, for willful injury to the person or property of another, or for violation of law, whether willful or negligent, are against the policy of the law."); N.D. CENT. CODE § 26.1-32-04 (2023) ("An insurer is not liable for a loss caused by the willful act of the insured, but the insurer is not exonerated by the negligence of the insured or of the insured's agents or others."); *See also Thomas v. Benchmark Ins.*, 179 P.3d 421, 425 (Kan. 2008) ("Kansas public policy prohibits insurance coverage for intentional acts: '[A]n individual should not be exempt from the financial consequences of his own intentional injury to another.'").

[19] *See* Final Report of the Commercial Sexual Exploitation of Minors Joint Study Commission, Senate Research Office (2008), https://www.senate.ga.gov/sro/Documents/StudyCommRpts/08JtSexual ExploitationMinors.pdf.

> in the nation for child prostitution, and experts estimate that
> hundreds of children are exploited each month throughout the
> state. The average age of a child prostitute is 14.5 years old,
> with most such youth entering the world of prostitution at age
> 13 or 14.

*Id.*[20]

Georgia's anti-sex trafficking statute, and the Georgia legislature's criminalization of conduct facilitating sex trafficking reflects its recognition of the central role hotels play in enabling sex trafficking.[21] O.C.G.A. § 16-5-46 (2024). According to the Georgia Attorney General's Office, human trafficking continues to be a "multi-billion-dollar criminal enterprise" in which "the average victim is a 6th to 8th grade girl."[22] In

---

[20] According to Georgia's "GRACE Commission," "The human trafficking hotline reported Atlanta received the 7th most calls related to trafficking [in the nation]." GRACE Commission, Ga. Office of the Governor, https://gov.georgia.gov/first-lady/grace-commission (last visited Dec. 16, 2025).

[21] The enactment of law prohibiting conduct such as sex trafficking reflects a recognition of the harm that naturally flows from it. *See Allstate Ins. v. Jarvis*, 393 S.E.2d 489, 490 (Ga. Ct. App. 1990) (Georgia legislature's enactment of statutes prohibiting child molestation reflected the "common-sense recognition that inherent in every act [of molestation] is the element of harm.").

[22] *See* Human Trafficking, Office of the Ga. Att'y Gen., https://law.georgia.gov/key-issues/human-trafficking#:~:text=Human%20Trafficking%20Prosecution%20Unit,red%20flags%20of%20human%20trafficking. (last visited December 16, 2025).

2019, the state established a Human Trafficking Prosecution Unit to work with local, state and federal law enforcement to arrest and prosecute offenders and rescue victims of sex trafficking.[23]

In addition to finding no coverage under the LM Policy terms, this Court should hold that the crime of sex trafficking is so abhorrent that it is uninsurable as a matter of law. Georgia recognizes that egregious misconduct is uninsurable, and the conduct at issue is intentional and egregious. Red Roof's alleged conduct in this case is unlike the insured's risk-taking behavior in *Travelers Indemnity Co. v. Hood*, 140 S.E.2d 68, 70 (Ga. Ct. App. 1964), where the Georgia Court of Appeals held that public policy did not preclude the insurability of automobile racing on a public highway based on the "willful and wanton" nature of such conduct where there was no specific intent to injure. In *Hood*, while there was a high risk of injury from such conduct, injury was not effectively certain to occur from the insured's conduct, and the state legislature had not made such conduct a felony under Georgia law.

---

[23] *See* Kemp, Carr Announce New Human Trafficking Prosecution Unit, Ga. Office of the Governor (May 24, 2019), https://gov.georgia.gov/press-releases/2019-05-24/kemp-carr-announce-new-human-trafficking-prosecution-unit.

Here, on the other hand, claims that an insured participated in and knowingly profited from sex trafficking allege felonious, reprehensible conduct from which harm to sex trafficking victims necessarily flows. To allow Red Roof to escape responsibility for the expected consequences of its deliberate conduct is against compelling public policy, as established by the Georgia legislature and Georgia case law recognizing the intentional nature of harm from sexually exploiting children.

## II. IMPOSING COVERAGE ON INSURANCE CARRIERS FOR SEX TRAFFICKING CLAIMS WOULD HARM GEORGIA'S INSURANCE MARKETPLACE.

Additional public policy reasons support the conclusion that there is no coverage for the underlying lawsuits under Georgia law. To underwrite liability insurance policies such as those at issue, insurers calculate and pool the risk of damages payable for accidental third-party bodily injury and property damage, which impact different policyholders in different locations at different times. By evaluating and distributing risks in this fashion, insurance allows businesses and individuals to pool their risks of specified categories of loss, which enables them to engage in activities that would be impossible to undertake if they each had to bear the associated risks alone. *See* Keeton & Widiss, *supra* at 12-13. This

24

important economic and societal function can only be accomplished in an economically sustainable manner by aggregating like risks and collecting premiums from all like insureds based on actuarial estimates. Risks beyond common risks cannot be priced effectively (undermining the integrity of the underwriting process) and cannot be included without shifting costs to insureds who do not present such risks. This would create a subsidy from responsible actors to willful tortfeasors.

Rejecting the limits placed on insurers' contractual obligations by the occurrence requirement and the exclusions in the LM Policies and instead finding potential coverage for the expected consequences of participating in and knowingly benefitting from sex trafficking would create excessive uncertainty about the effect of clear, widely-used policy language insurers and insureds rely on. Courts and scholars caution that such uncertainty "would have a decidedly detrimental effect on the affordability of insurance coverage." *Koenig v. Progressive Ins.*, 599 A.2d 690, 696 (Pa. Super. Ct. 1991); *see also* Andreas Richter & Thomas C. Wilson, *Covid-19: Implications for Insurer risk Management and the Insurability of Pandemic Risk*, 45 Geneva Risk Ins. Rev. 171, 174, 179 (Sept. 22, 2020) (discussing uncertainty of outcomes even in cases with

clear contractual language). Sex trafficking has imposed a massive collective cost on society. Retroactively imposing the costs of sex trafficking and other intentional injury on general liability policies would significantly impair the industry's ability to pay other claims and undermine the insurance mechanism. This would detrimentally impact Georgia hotels and motels that comply with the law, and the public.

## CONCLUSION

For these reasons, this Court should enforce the "occurrence" requirement and the exclusions in LM's Policy to find no coverage under the insurance contract and further hold that Georgia public policy prohibits coverage for allegations such that those against Red Roof in this case.

Dated: December 29, 2025      Respectfully submitted,

_/s/ Parker J. Lavin_

Parker J. Lavin
LAVIN RINDNER
DUFFIELD LLC
3811 Frederica Rd., Ste. 201
St. Simons Island, GA 31522
plavin@lrd.law
(912) 266-8301

_Counsel for the Complex_
_Insurance Claims Litigation_
_Association and American_
_Property Casualty Insurance_
_Association_

27

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g), I certify that:

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(4) because this brief contains 5,556 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface in Microsoft Word in fourteen (14) point Century Schoolbook font.

*/s/ Parker J. Lavin*
Parker J. Lavin

Parker J. Lavin
LAVIN RINDNER DUFFIELD LLC
3811 Frederica Rd., Ste. 201
St. Simons Island, GA 31522
plavin@lrd.law
(912) 266-8301

*Counsel for the Complex Insurance Claims Litigation Association and American Property Casualty Insurance Association*

28

## CERTIFICATE OF SERVICE

I certify that on December 29, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*/s/ Parker J. Lavin*
Parker J. Lavin