Appeal No. 25-13187

UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

LIBERTY MUTUAL FIRE INSURANCE COMPANY,

Appellant,

v.

RED ROOF INNS, INC.; RED ROOF FRANCHISING, LLC;
RRI WEST MANAGEMENT, LLC; FMW RRI NC, LLC,

Appellees,

JANE DOE #1; JANE DOE #2; JANE DOE #3; JANE DOE #4; W.K.;
E.H.; M.M.; R.P.; M.B.; D.P.; A.F.; C.A.; R.K.; K.P.; T.H.; H.B.; and
K.M.,

Nominal Defendants.

On Appeal from the United States District Court
For the Northern District of Georgia

**APPELLEES' RESPONSE BRIEF**

Shattuck Ely
Georgia Bar No. 246944
J. Alexander Prescott
Georgia Bar No. 966471
Jonathan Spratling
Georgia Bar No. 358001

FELLOWS LABRIOLA LLP
Peachtree Center
Suite 2400, Harris Tower
233 Peachtree Street, N.E.
Atlanta, Georgia 30303-1731
(404) 586-9200

Attorneys for Appellees

Liberty Mutual Fire Ins. Co. v. Red Roof Inns, Inc., et al.
Appeal No. 25-13187

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to 11th Circuit Rules 26.1-1 through 26.1-3, Appellees hereby submit the following Certificate of Interested Persons and Corporate Disclosure Statement, and pursuant to Federal Rule of Appellate Procedure 26.1, hereby certifies that the following is a complete list of the trial judges, all attorneys, persons, associations of persons, firms, partnerships, or corporations that have an interest in the outcome of this case, including subsidiaries, conglomerates, affiliates, parent corporations, any publicly held corporation that owns 10% or more of the party's stock, and other identifiable legal entities related to a party in this case:

1.    Adams, Nancy D.

2.    A.F.[1]

3.    Andersen, Tate, & Carr, P.C.

4.    Baumrind, Michael R.

5.    Bendin Sumrall & Ladner, LLC

6.    Birg, Erika C.

---

[1] Because they allege they are trafficking victims, the Nominal Defendant-Appellees are identified either by their initials or as Jane Doe.

Liberty Mutual Fire Ins. Co. v. Red Roof Inns, Inc., et al.
Appeal No. 25-13187

7.      Bondurant Mixson & Elmore, LLP

8.      C.A.

9.      Doe, Jane #1

10.     Doe, Jane #2

11.     Doe, Jane #3

12.     Doe, Jane #4

13.     D.P.

14.     E.H.

15.     Ely, Shattuck

16.     Farrell, Ellen M.

17.     Fellows LaBriola LLP

18.     Floyd, John E.

19.     FMW RRI, LLC

20.     Gallo-Cook, Alexandra

21.     H.B.

22.     K.M.

23.     K.P.

24.     Liberty Mutual Fire Insurance Company

25.     Liberty Mutual Group Inc.

Liberty Mutual Fire Ins. Co. v. Red Roof Inns, Inc., et al.
Appeal No. 25-13187

26.    Liberty Mutual Holding Company, Inc.

27.    LMHC Massachusetts Holdings Inc.

28.    May, The Honorable Leigh Martin

29.    Mesa, Juliana

30.    Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.

31.    M.B.

32.    M.M.

33.    Mykkeltvedt, Tiana S.

34.    Nelson Mullins Riley & Scarborough LLP

35.    Prescott, J. Alexander

36.    Red Roof Franchising, LLC

37.    Red Roof Inns, Inc.

38.    R.K.

39.    R.P.

40.    RRI West Management, LLC

41.    Rosenzweig, Andrew J.

42.    Seals, Amanda Kay

43.    Spratling, Jonathan

44.    Stoddard, Matthew B.

C-3 of 4

<u>Liberty Mutual Fire Ins. Co. v. Red Roof Inns, Inc., et al.</u>
Appeal No. 25-13187

45.    Swift, Donald L. III

46.    T.H.

47.    The Stoddard Firm

48.    Tonge, Jonathan

49.    Varghese, Manoj Sam

50.    W.K.

51.    Zadek, Alec J.

## CORPORATE DISCLOSURE STATEMENT

Pursuant to 11th Circuit Rule 26.1-3(b), Counsel for Appellees certify that no publicly traded company or corporation has an interest in the outcome of the case or appeal.

## APPELLEES' STATEMENT REGARDING ORAL ARGUMENT

Appellees believe that the facts and legal arguments are adequately presented in the briefs and record, and that Appellant's arguments lack merit. Appellees therefore believe that the decisional process will not be significantly aided by oral argument, and that prompt resolution of this matter on the briefs best ensures efficient and appropriate use of judicial and governmental resources. *See* 11th Cir. R. 34-3(a), (b)(3); Fed. R. App. P. 34(a)(1), (a)(2)(C).

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT ................................................................ C-1

APPELLEES' STATEMENT REGARDING ORAL ARGUMENT ............ i

TABLE OF CITATIONS ............................................................................ v

STATEMENT OF JURISDICTION ......................................................... 1

INTRODUCTION ...................................................................................... 1

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ............. 5

STATEMENT OF THE CASE .................................................................. 6

    A.    The Underlying Lawsuits. ........................................................ 6

    B.    Course of proceedings and dispositions in the district court. .... 8

STANDARD OF REVIEW ....................................................................... 10

SUMMARY OF THE ARGUMENT ......................................................... 11

ARGUMENT ............................................................................................. 13

  I.    Georgia law governs. ................................................................. 13

  II.    The District Court Correctly Found That Liberty's Claims Were Moot. ......................................................................................... 17

    A.    Claims for declaratory relief require an "actual controversy." 17

    B.    Mootness is not a matter of public policy; it is jurisdictional. 18

    C.    Whether a live controversy continues to exist as to Liberty's *other claims* is irrelevant to whether its declaratory judgment claims are moot. ................................................................. 20

D.    The decisions Liberty cites all recognized future conduct in need of guidance. Liberty asks the Court to evaluate decisions it already made. ...................................................................... 21

E.    The "capable of repetition yet evading review" exception to the mootness doctrine is narrow and reserved for exceptional situations, not routine coverage disputes. ............................... 23

III.    The District Court correctly found that Liberty owed a duty to defend the *H.B.* Lawsuit under Coverage A. ............................... 25

A.    Georgia's duty-to-defend standard is "extremely broad" and resolves doubt in favor of the insured. ...................................... 25

B.    The H.B. Lawsuit alleges bodily injury caused by an occurrence—i.e., an accidental and fortuitous loss. ................ 26

1.    An "occurrence" is not limited to passive nonfeasance. .......... 27

2.    H.B.'s TVPRA beneficiary claim does not allege that Red Roof intended to harm her and an intent to injure is not an element of the claim. ............................................................. 33

3.    Alternative allegations involving unnamed employee(s) of an insured do not bar coverage for all claims against all insureds. ............................................................................ 41

4.    The expected or intended injury exclusion does not apply. . 44

IV.    Coverage B independently triggers Liberty's duty to defend. ... 45

A.    H.B. alleged "personal and advertising injury." ...................... 46

B.    The "inextricably intertwined" doctrine is not Georgia law and, in any event, does not collapse Coverage B into Coverage A.  48

C.    The personal and advertising injury arose out of Red Roof's business. ............................................................................ 51

Page iii

D.      The Knowing Violation of Rights of Another Exclusion does
        not bar coverage. ...................................................................... 52

V.      Georgia public policy does not bar coverage absent an express
        intent to harm, and *Amici's* broader public-policy theory is
        beyond the scope of this appeal. .................................................. 54

A.      Georgia public policy does not bar coverage because the
        Underlying Plaintiffs do not allege that Red Roof intentionally
        inflicted injury upon them. ........................................................ 54

B.      *Amici Curiae* ask the Court to legislate state law by judicial
        fiat in the first instance, for reasons not raised in the district
        court. .......................................................................................... 56

VI.     Liberty has no right to recoup its defense or settlement
        payments. ................................................................................... 60

A.      Under Georgia law, the district court correctly extended
        *Winder Lab'ys* to indemnity payments. ..................................... 60

CONCLUSION ....................................................................................... 64

CERTIFICATE OF COMPLIANCE WITH RULE 32(a) ........................ 65

CERTIFICATE OF SERVICE ................................................................ 66

# TABLE OF CITATIONS

**Cases**

*A.G. v. Northbrook Indus., Inc.,*
171 F.4th 1257 (11th Cir. 2026) .......................................... 35, 36, 37, 38

*Allstate Indem. Co. v. Messina,*
2021 WL 3080926 (D. Minn. July 21, 2021) ....................................... 50

*Allstate Ins. Co. v. Employers Liab. Assurance Corp.,*
445 F.2d 1278 (5th Cir. 1971) ....................................................... 21, 22

*Allstate Ins. Co. v. Justice,*
493 S.E.2d 532 (Ga. App. 1997) ............................................................. 29

*Am. Empire Surplus Lines Ins. Co. v. Hathaway Dev. Co.,*
707 S.E.2d 369 (Ga. 2011).............................................................. 30, 31

*Am. Fam. Ins. Co. v. Almassud,*
522 F. Supp. 3d 1263 (N.D. Ga. 2021)................................................ 64

*Am. Fam. Mut. Ins. Co. v. Wyndham Hotels & Resorts, Inc.,*
2026 WL 851639 (S.D. Ind. Feb. 25, 2026) ..................................... 4, 47

*Ameritas Variable Life Ins. Co. v. Roach,*
411 F.3d 1328 (11th Cir. 2005) ............................................................ 10

*Auto-Owners Ins. Co. v. Todd,*
547 N.W.2d 696 (Minn. 1996).............................................................. 50

*Barrett v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.,*
696 S.E.2d 326 (2010) ........................................................................ 51

*Bituminous Cas. Corp. v. N. Ins. Co. of New York,*
548 S.E.2d 495 (Ga. App. 2001)........................................................... 26

*Bourgeois v. Peters,*
387 F.3d 1303 (11th Cir. 2004).................................................... 23, 24

*Brown v. St. Paul Fire & Marine Ins. Co.*,
338 S.E.2d 721 (Ga. App. 1985) ........................................................... 29

*Chiquita Brands Int'l, Inc. v. Nat'l Union Ins. Co.*,
988 N.E.2d 897 (Ohio Ct. App. 2013) ................................................... 39

*Cincinnati Ins. Co. v. Magnolia Estates, Inc.*,
648 S.E.2d 498 (Ga. App. 2007) ........................................................... 33

*Citizens Ins. Co. of Am. v. Banyan Tree Mgmt., LLC*,
631 F. Supp. 3d 1256 (N.D. Ga. 2022) ................................................. 51

*City of Atlanta v. St. Paul Fire & Marine Ins. Co.*,
498 S.E.2d 782 (Ga. App. 1998) ........................................................... 48

*City of Los Angeles v. Lyons*,
461 U.S. 95 (1983) ................................................................................ 18

*Cole v. State Farm Fire & Cas. Co.*,
25 F. App'x 791 (10th Cir. 2002) .......................................................... 50

*Collins Bldg. Servs., Inc. v. United Capitol Ins. Co.*,
1999 WL 259519 (S.D.N.Y. Apr. 30, 1999) .......................................... 50

*Colonial Penn Ins. Co. v. Hart,*
291 S.E.2d 410 (Ga. App. 1982) ..................................................... 28, 29

*Com. Union Ins. Cos. v. Sky, Inc.*,
810 F. Supp. 249 (W.D. Ark. 1992) ...................................................... 50

*Compare Cleveland, C. & C.R. Co. v. Keary*,
3 Ohio St. 201 (1854) ........................................................................... 16

*Cont'l Cas. Co. v. Winder Lab'ys, LLC,*
73 F.4th 934 (11th Cir. 2023) ....................................................... passim

*Coon v. Medical Ctr., Inc.*,
797 S.E.2d 828 (Ga. 2017) ........................................................ 14, 15, 17

*Doe #1 v. Red Roof Inns, Inc.*,
  21 F.4th 714 (11th Cir. 2021) ........................................................... 35

*Doe 1 v. Apple Inc.*,
  96 F.4th 403 (D.C. Cir. 2024) ............................................................. 3

*Doe 1 v. Twitter*,
  148 F.4th 635 (9th Cir. 2025) .............................................................. 3

*Edwards v. Sharkey*,
  747 F.2d 684 (11th Cir. 1984) ...................................................... 21, 22

*Emory v. Peeler*,
  756 F.2d 1547 (11th Cir. 1985) ..................................................... 17, 18

*Evanston Ins. Co. v. Dillard House, Inc.*,
  2017 WL 3498953 (N.D. Ga. June 28, 2017) ....................................... 50

*Farm Fam. Cas. Ins. Co. v. Samperi*,
  242 F. Supp. 3d 83 (D. Conn. 2017) .................................................... 50

*Fields v. Kroger Co.*,
  414 S.E.2d 703 (Ga. App. 1992) ......................................................... 47

*Fireman's Fund Ins. Co. v. University of Ga. Athletic Ass'n*,
  654 S.E.2d 207 (Ga. App. 2007) ......................................................... 25

*G.G. v. Salesforce.com, Inc.*,
  76 F.4th 544 (7th Cir. 2023) .................................................... 3, 35, 38

*G.M. Sign, Inc. v. St. Paul Fire & Marine Ins. Co.*,
  768 F. App'x 982 (11th Cir. 2019) ...................................................... 30

*Ga. Farm Bureau Mut. Ins. Co. v. Smith*,
  784 S.E.2d 422 (Ga. 2016) ................................................................. 53

*GEICO Indem. Co. v. Whiteside*,
  857 S.E.2d 654 (Ga. 2021) ........................................................... 61, 63

*Global Marine Exploration, Inc. v. Republic of France,*
    151 F.4th 1296 (11th Cir. 2025) .......................................................... 56

*Graham v. Att'y Gen., State of Ga.,*
    110 F.4th 1239 (11th Cir. 2024) .......................................................... 23

*Great Am. All. Ins. Co. v. Anderson,*
    847 F.3d 1327 (11th Cir. 2017) ........................................................... 45

*Greenwood Cemetery, Inc. v. Travelers Indem.* Co.,
    232 S.E.2d 910 (Ga. 1977) ................................................................. 54

*HDI-Gerling Am. Ins. Co. v. Morrison Homes, Inc.,*
    701 F.3d 662 (11th Cir. 2012) ............................................................ 26

*Hoover v. Maxum Indem. Co.,*
    730 S.E.2d 413 (Ga. 2012) ................................................................. 25

*Hopper v. Solvay Pharms., Inc.,*
    588 F.3d 1318 (11th Cir. 2009) .......................................................... 11

*Houston Specialty Ins. Co. v. The Five Paces Inn Co.,*
    2019 WL 9633224 (N.D. Ga. Dec. 19, 2019) ........................................ 12

*Houston Specialty Ins. Co. v. The Five Paces Inn Co.,*
    823 F. App'x 897 (11th Cir. 2020) ...................................................... 12

*JNJ Found. Specialists, Inc. v. D.R. Horton, Inc.,*
    717 S.E.2d 219 (2011) ....................................................................... 51

*Kindley v. First Acceptance Ins. Co. of Ga., Inc.,*
    889 S.E.2d 412 (Ga. App. 2023) ......................................................... 54

*King v. Dallas Fire Ins. Co.,*
    85 S.W.3d 185 (Tex. 2002) ................................................................. 43

*Landmark Am. Ins. Co. v. Khan,*
    705 S.E.2d 707 (Ga. App. 2011) .......................................... 25, 43, 44, 47

Page viii

*Louisville & N.R. Co. v. Cook*,
  53 So. 190 (Ala. 1910) .......................................................................... 16

*Malowney v. Fed. Collection Deposit Grp.*,
  193 F.3d 1342 (11th Cir. 1999) ........................................................... 17

*Md. Cas. Co. v. Jacob Ward, M.D., LLC*,
  2015 WL 11237022 (N.D. Ga. July 31, 2015) ...................................... 32

*Medberry v. Crosby*,
  351 F.3d 1049 (11th Cir. 2003) ........................................................... 18

*Meritplan Ins. Co. v. Leverette*,
  552 F. App'x 900 (11th Cir. 2014) ....................................................... 30

*Miller v. FCC*,
  66 F.3d 1140 (11th Cir. 1995) ............................................................. 24

*Moore v. State*,
  796 S.E.2d 754 (Ga. App. 2017) .......................................................... 46

*Morrison v. Allstate Indem. Co.*,
  228 F.3d 1255 (11th Cir. 2000) ........................................................... 18

*Mt. Hawley Ins. Co. v. East Perimeter Pointe Apartments*,
  861 F. App'x 270 (11th Cir. 2021) ....................................................... 14

*Nat'l Cas. Co. v. Ga. Sch. Boards Ass'n-Risk Mgmt. Fund*,
  818 S.E.2d 250 (Ga. 2018) ................................................................... 54

*Nationwide Prop. and Cas. Co. v. Renaissance Bliss, LLC*,
  823 F. App'x 815 (11th Cir. 2020) ....................................................... 22

*Northfield Ins. Co. v. Northbrook Indus., Inc.*,
  749 F. Supp. 3d 1325 (N.D. Ga. 2024) .................................................. 4

*Ohio v. Kentucky*,
  410 U.S. 641 (1973) ............................................................................ 14

*Otwell v. Ala. Power Co.*,
    747 F.3d 1275 (11th Cir. 2014) ......................................................... 11

*Patel v. Hamilton Medical Center, Inc.*,
    967 F.3d 1190 (11th Cir. 2020) ......................................................... 10

*Peerless Indem. Ins. Co. v. Tilma, Inc.*,
    2025 WL 2052479 (E.D. Va. July 22, 2025) .................................... 4, 47

*Penn-Am. Ins. Co. v. Disabled Am. Veterans, Inc.*,
    490 S.E.2d 374 (Ga. 1997) ............................................................ 25, 26

*Perry v. State Farm Fire and Cas. Co.*,
    676 S.E.2d 376 (Ga. App. 2008) .................................................... 30, 31

*Philadelphia Indemnity Ins. Co. v. Eubanks*,
    927 S.E.2d 518 (Ga. App. 2026) ............................................... 31, 32, 33

*Provident Life and Accident Ins. Co. v. Hallum*,
    576 S.E.2d 849 (Ga. 2003) .................................................................. 31

*Red Roof Inns, Inc. v. Liberty Mut. Fire Ins. Co.*,
    2026 WL 775589 (S.D. Ohio Mar. 19, 2026) ............................. 4, 31, 41

*Reed v. Auto-Owners Ins. Co.*,
    667 S.E.2d 90 (Ga. 2008) ................................................................... 49

*Ricchio v. Bijal, Inc.*,
    424 F. Supp. 3d 182 (D. Mass. 2019) .................................... 4, 40, 47, 51

*Richmond v. Ga. Farm Bureau Mut. Ins. Co.*,
    231 S.E.2d 245 (Ga. App. 1976) ......................................................... 19

*Roe v. State Farm Fire & Cas. Co.*,
    376 S.E.2d 876 (Ga. 1989) .................................................................. 30

*S. Guar. Ins. Co. of Georgia v. Saxon*,
    379 S.E.2d 577 (Ga. App. 1989) ......................................................... 42

*S. Mut. Ins. Co. v. Mason*,
  445 S.E.2d 569 (Ga. App. 1994) ..................................................... 29, 45

*S.M.A. v. Salesforce, Inc.*,
  2024 WL 1337370 (N.D. Tex. Mar. 28, 2024) ...................................... 38

*SCI Liquidating Corp. v. Hartford Fire Ins. Co.*,
  181 F.3d 1210 (11th Cir. 1999) ........................................................... 32

*Shively v. Bowlby*,
  152 U.S. 1 (1894) ................................................................................ 15

*Smith v. Casey*,
  741 F.3d 1236 (11th Cir. 2014) ........................................................... 10

*Starr Indem. & Liab. Co. v. Choice Hotels Int'l, Inc.*,
  2021 WL 2457107 (S.D.N.Y. June 16, 2021) .................................... 4, 40

*State Farm Fire & Cas. Co. v. Brewer*,
  2008 WL 450817 (N.D. Ga. Feb. 15, 2008) .......................................... 32

*State Farm Ins. Co. v. Bruns*,
  942 A.2d 1275 (N.H. 2008) .................................................................. 50

*Thomas v. Cooper Lighting, Inc.*,
  506 F.3d 1361 (11th Cir. 2007) ........................................................... 46

*Travelers Indem. Co. v. Hood*,
  140 S.E.2d 68 (Ga. App. 1964) ..................................................... passim

*Travelers Prop. Cas. Corp. v. Chiquita Brands, Int'l, Inc.*,
  243 N.E.3d 797 (Ohio Ct. App. 2024) ............................................ 39, 40

*Twin City Fire Ins. Co. v. Hartman, Simons & Wood, LLP*,
  609 F. App'x 972 (11th Cir. 2015) ................................................. 20, 21

*Union Camp Corp. v. Cont'l Cas. Co.*,
  452 F. Supp. 565 (S.D. Ga. 1978) ....................................................... 55

*United States v. Blake,*
  868 F.3d 960 (11th Cir. 2017) ............................................................. 50

*W. Am. Ins. Co. v. Merritt,*
  456 S.E.2d 225 (Ga. App. 1995) .................................................... 29, 45

*Wheaton v. Peters,*
  33 U.S. 591 (1834) ............................................................................. 15

*Wilton v. Seven Falls Co.,*
  515 U.S. 277 (1995) ........................................................................... 11

*Wood v. Raffensperger,*
  981 F.3d 1307 (11th Cir. 2020) .......................................................... 23

*Young v. City of Augusta, Ga. Through DeVaney,*
  59 F.3d 1160 (11th Cir. 1995) .............................................................. 7

**Statutes**

18 U.S.C. § 1591 ............................................................... 35, 36, 37, 50

18 U.S.C. § 1595 ...................................................................... passim

18 U.S.C. § 2333 ................................................................................ 39

22 U.S.C. § 7101 ................................................................................. 2

28 U.S.C. § 2201 .............................................................................. 20

Ga. Laws 2025, Act 9, § 4 .............................................................. 57, 58

O.C.G.A. § 51-3-53 ........................................................................... 58

**Rules**

11th Cir. R. 34-3 ...............................................................................i

Fed. R. App. P. 34 .............................................................................i

Fed. R. Civ. P. 12 ............................................................................. 11

**Treatises**

Ga. Practice & Procedure § 1:13 (2024-2025 ed.)................................... 57

Restatement of the Law of Liability Insurance
  § 25 (Am. L. Inst. 2019) ......................................................... 61, 62, 63

## STATEMENT OF JURISDICTION

Appellees agree with and restate Appellant's Statement of Jurisdiction.

## INTRODUCTION

Liberty asks this Court to be the first in the country to hold that TVPRA beneficiary claims are categorically uninsurable under a commercial general liability ("CGL") policy. Seven courts—including the district court below—have held the opposite. No Georgia court has ever adopted the *per se* rule Liberty seeks and the district court's careful application of settled Georgia law should be affirmed.

This insurance coverage dispute arises from seven underlying lawsuits filed against Red Roof by seventeen individuals who allege they were trafficked for sex at various Atlanta-area hotels, including several Red Roof properties. *See* Doc. 100, ¶ 3.[2] The underlying lawsuits asserted civil beneficiary claims under the Trafficking Victims Protection Reauthorization Act ("TVPRA").

---

[2] The format for references to the record is the document number followed by the page or paragraph number from the district court docket: (Doc. __, p. __) or (Doc. __, ¶ __). The only exceptions are the Brief of the Appellant (Br. of Appellant, p. __) and Brief of the *Amici Curiae* (Br. of *Amici Curiae*, p. __).

Congress enacted the Trafficking Victims Protection Act ("TVPA") in 2000 "to combat trafficking in persons…." Pub. L. No. 106-386, § 102(a), 114 Stat. 1464, 1466 (codified at 22 U.S.C. § 7101(a)). The original statute was a creature of criminal law, establishing new federal offenses for sex trafficking by force, fraud, or coercion, and for sex trafficking of minors. Three years later, Congress passed the TVPRA, which for the first time created a private civil remedy against the perpetrators. Pub. L. No. 108-193, 117 Stat. 2875, 2878 (codified as amended at 18 U.S.C. § 1595(a)). In 2008, Congress, through the William Wilberforce Trafficking Victims Protection Reauthorization Act, expanded the civil remedy beyond direct perpetrators to reach anyone who "knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter." Pub. L. No. 110-457, 122 Stat. 5044, 5067 (codified at 18 U.S.C. § 1595(a)).

The 2008 amendment—commonly called the "beneficiary" provision—has spawned a steadily expanding wave of civil litigation against businesses that are alleged to have financially benefitted from trafficking. Plaintiffs have invoked Section 1595(a) against electronics

manufacturers accused of purchasing cobalt from mines that allegedly relied on forced labor, *see Doe 1 v. Apple Inc.*, 96 F.4th 403 (D.C. Cir. 2024); against technology and software providers whose products were sold to platforms used by traffickers, *see G.G. v. Salesforce.com, Inc.*, 76 F.4th 544 (7th Cir. 2023); and against social media companies for failing to remove child pornography posts, *see Doe 1 v. Twitter*, 148 F.4th 635 (9th Cir. 2025). New industries continue to be drawn into the litigation, with claims advancing against financial institutions, transportation providers, payment processors, advertising platforms, and others. No industry, however, has borne more of this litigation than hospitality.[3] Hotels and motels have become principal targets of TVPRA suits, with plaintiffs alleging that property owners, franchisors, and management companies benefitted from the rental of rooms used for sex trafficking.

Liberty and its *Amici* now ask the Court to rule that TVPRA beneficiary claims are *per se* uninsurable under CGL policies. The novel and breathtakingly broad relief sought by Liberty finds no support under

---

[3] *See* "Using Civil Litigation to Combat Human Trafficking", Federal Human Trafficking Civil Litigation, 2024 Data Update, pp. 28-30 https://htlegalcenter.org/wp-content/uploads/2024-Civil-Litigation-Report-FINAL.pdf (last visited May 25, 2026).

Page 3

Georgia law. The district court correctly applied Georgia law when it found that Liberty owed a duty to defend the *H.B.* Lawsuit because neither the allegations nor the elements of the claims asserted against Red Roof require an intent to injure.

Liberty's position conflicts with the decision of ***every*** court that has addressed beneficiary claims under a CGL policy. Absent a specific exclusion for abuse and molestation or assault and battery—neither of which was included in the Liberty Policies—courts have unanimously found a duty to defend. Seven courts, including the district court below, have so held. *See Ricchio v. Bijal, Inc.,* 424 F. Supp. 3d 182, 194 (D. Mass. 2019); *Starr Indem. & Liab. Co. v. Choice Hotels Int'l, Inc.,* 2021 WL 2457107 (S.D.N.Y. June 16, 2021); *Northfield Ins. Co. v. Northbrook Indus., Inc.,* 749 F. Supp. 3d 1325 (N.D. Ga. 2024); *Peerless Indem. Ins. Co. v. Tilma, Inc.,* 2025 WL 2052479 (E.D. Va. July 22, 2025); *Am. Fam. Mut. Ins. Co. v. Wyndham Hotels & Resorts, Inc.,* 2026 WL 851639 (S.D. Ind. Feb. 25, 2026); *Red Roof Inns, Inc. v. Liberty Mut. Fire Ins. Co.,* 2026 WL 775589 (S.D. Ohio Mar. 19, 2026) ("*Red Roof (Ohio)*").

This Court should reject Liberty's invitation to depart from this unanimous and well-reasoned precedent and be the first court in the country to hold that TVPRA beneficiary claims are uninsurable.

## **STATEMENT OF THE ISSUES PRESENTED FOR REVIEW**

1.    Whether Georgia law applies to the parties' dispute under Georgia's "presumption of identity" rule.

2.    Whether the district court correctly ruled that Liberty's claims for declaratory judgment as to the six settled or dismissed Underlying Lawsuits were moot because a declaration would have no bearing on the parties' future conduct.

3.    Whether the district court correctly held that Liberty owed a duty to defend the H.B. Lawsuit under Coverage A, where the underlying complaint alleges that Red Roof "should have known" of trafficking—a constructive-knowledge standard that does not require, and the elements of a TVPRA beneficiary claim do not include, any intent to harm.

4.    Whether the district court's order may be affirmed on the independent ground that Liberty owed a duty to defend under Coverage B, where the complaint alleges false imprisonment and detention arising out of Red Roof's business.

5.    Whether the district court correctly ruled that Georgia's public policy does not bar coverage for TVPRA beneficiary claims.

6.    Whether the district court correctly applied Georgia law and this Court's precedent to find that Liberty could not unilaterally create a right to recoupment after failing to include such a right in its policies.

**STATEMENT OF THE CASE**

**A.    The Underlying Lawsuits.**

Liberty's Second Amended Complaint addresses seven underlying lawsuits alleging that the Underlying Plaintiffs were trafficked for commercial sex at various hotels, including several Red Roof Inns:

- *Jane Doe #1 v. Red Roof Inns, Inc., et al.*, in the United States District Court for the Northern District of Georgia, Case No. 1:19-cv-03840, filed August 26, 2019;

- *Jane Doe #2 v. Red Roof Inns, Inc., et al.,* in the United States District Court for the Northern District of Georgia, Case No. 1:19-cv-03841, filed August 26, 2019;

- *Jane Doe #3 v. Red Roof Inns, Inc., et al.,* in the United States District Court for the Northern District of Georgia, Case No. 1:19-cv-03843, filed August 26, 2019;

- *Jane Doe #4 v. Red Roof Inns, Inc., et al.,* in the United States District Court for the Northern District of Georgia, Case No. 1:19-cv-03845, filed August 26, 2019;

- *W.K., et al. v. Red Roof Inns, Inc., et al.,* in the United States District Court for the Northern District of Georgia, Case No. 1:20-cv-05263, filed December 29, 2020;

Page 6

- *H.B. v. Red Roof Inns, Inc., et al.,* in the United States District Court for the Northern District of Georgia, Case No. 1:22-cv-01181, filed March 24, 2022; and

- *K.M. v. CPA Hotels of Atlanta, LLC et al.,* in the United States District Court for the Northern District of Georgia, Case No. 1:23-cv-00190, filed January 13, 2023.

Doc. 79, ¶¶ 33-108 (collectively, the "Underlying Lawsuits").

The *Jane Does 1-4, W.K.,* and *K.M.* Suits were settled or dismissed before Liberty's Second Amended Complaint. *Id.* ¶¶ 42, 52, 62, 70, 88, and 109. The last remaining underlying lawsuit—the *H.B.* Lawsuit—involved a single plaintiff who alleged that she was trafficked at the Norcross Red Roof over several days in January 2012. Doc. 79-6, ¶ 17. The *H.B.* Lawsuit asserted a TVPRA beneficiary claim under 18 U.S.C. § 1595(a), alleging that Red Roof benefitted from participation in a venture that it knew or should have known involved sex trafficking. *Id.* ¶ 60. H.B. initially alleged a violation of the Georgia Racketeer Influenced and Corrupt Organizations Act ("RICO"), but that claim was later dismissed.[4]

---

[4] For the district court's Order dismissing H.B.'s civil RICO claim with prejudice, *see* N.D. Ga. Civ. Action No. 1:22-CV-01181, Doc. 165. Although this filing is not in the appellate record, this Court may take judicial notice of such "judicial acts." *Young v. City of Augusta, Ga. Through DeVaney*, 59 F.3d 1160, 1166 n.11 (11th Cir. 1995).

For her TVPRA beneficiary claim, H.B. alleged generally that "Defendants participated in a venture by associating with Plaintiff's sex traffickers, facilitating Plaintiff's minor sex trafficking, and providing to Plaintiff's traffickers the necessary venue for Plaintiff's minor sex trafficking." *Id.* ¶ 62. Among her specific allegations, H.B. alleged that Red Roof responded to unusual requests for housekeeping services (*id.* ¶ 24) and "rented rooms directly to minor sex trafficking victims who lacked identification and paid for their rooms in cash" (*id.* ¶ 29).

## B.    Course of proceedings and dispositions in the district court.

Liberty instituted this action on May 5, 2023, seeking a declaration that it owed no duty to defend or indemnify Red Roof in the Underlying Lawsuits. Doc. 1. Liberty amended its complaint on August 22, 2024 and again on September 20, 2024. Docs. 74 and 79. In its Second Amended Complaint, Liberty asserted seventeen causes of action, broken down into two groups: (1) requests for declaratory relief (Counts I – IX); and (2) requests for reimbursement or restitution (Counts X – XVII). *See generally* doc. 79.

Liberty's first group of claims included requests for declaratory relief on the six Underlying Lawsuits that were already settled or

dismissed (Counts I – V, and VII), as well as general requests for declaratory relief for all the Underlying Lawsuits (Counts VIII and IX). *Id.* The only declaratory judgment count that related specifically to the then-pending *H.B.* Lawsuit was Count VI. *Id.*

As for the second group of claims seeking reimbursement or restitution, Liberty asserted claims for breach of contract (Counts X – XIII) and unjust enrichment (Counts XIV – XVII). *Id.* Liberty did not, however, allege that its insurance policies grant it the right to seek reimbursement of defense costs or settlement payments. *See generally Id.*

In October 2024, Red Roof, joined by H.B, moved to dismiss Liberty's Second Amended Complaint. Doc. 81. The district court granted the motion, finding that the requests for declaratory relief for the settled or dismissed lawsuits (Counts I through V and VII) were moot. Doc. 93, pp. 4-6. And with respect to the *H.B.* Lawsuit, the district court found that the request for declaratory judgment on the duty to indemnify was not ripe because Red Roof's liability had not been established. *Id.* at 6-8. As for Liberty's duty to defend the *H.B.* Lawsuit, the district court held that H.B.'s allegations at least potentially triggered coverage under

Page 9

Coverage A and therefore dismissed Liberty's remaining declaratory judgment claims (Counts VI, VIII, and IX). *Id.* at 8-16.

Finally, the district court dismissed Liberty's claims for recoupment (Counts X through XVII) because Liberty has no right to reimbursement of either the defense costs it incurred or the settlements it voluntarily paid. *Id.* at 16-18.

## **STANDARD OF REVIEW**

A district court's subject-matter jurisdiction is a question of law reviewed *de* novo, *Patel v. Hamilton Medical Center, Inc.*, 967 F.3d 1190, 1193 (11th Cir. 2020), but the district court's decision to dismiss Liberty's declaratory judgment claims (Counts I-IX) is reviewable only for an abuse of discretion. *Ameritas Variable Life Ins. Co. v. Roach*, 411 F.3d 1328, 1330 (11th Cir. 2005) ("We review the district court's dismissal of a declaratory judgment action for abuse of discretion.")*; see also Smith v. Casey*, 741 F.3d 1236, 1244 (11th Cir. 2014) (noting that "[w]e review the district court's dismissal of a Declaratory Judgment Act claim for an abuse of discretion" and concluding that the district court did not abuse its discretion when declining jurisdiction over an unripe claim regarding the effectiveness of a copyright termination). The district court is also

afforded a wide berth in deciding whether to issue a declaratory judgment. *Otwell v. Ala. Power Co.*, 747 F.3d 1275, 1280 (11th Cir. 2014) ("It is well established that district courts have exceptionally broad discretion in deciding whether to issue a declaratory judgment, and the remedy is not obligatory." (citing *Wilton v. Seven Falls Co.*, 515 U.S. 277, 286–88 (1995)).

With respect to Liberty's claims for recoupment (Counts X-XVII), the district court's dismissal under Fed. R. Civ. P. 12(b)(6) is subject to a *de novo* review. *Hopper v. Solvay Pharms., Inc.,* 588 F.3d 1318, 1324 (11th Cir. 2009).

## <u>SUMMARY OF THE ARGUMENT</u>

Georgia law governs this dispute. Under Georgia's century-old "presumption of identity" rule, the common law of Georgia controls where, as here, no foreign statute supplies the rule of decision. The rule applies here because Ohio was carved from territory originally ceded by Virginia and has adopted the English common law.

Liberty's claims for declaratory relief were properly dismissed. For all the Underlying Lawsuits except for the *H.B.* Lawsuit, there were no pending requests for coverage because the suits had been settled or dismissed on the merits. Because there was no longer a need or basis for

declaratory relief, Liberty's claims were moot and properly dismissed with prejudice.

As for the one Underlying Lawsuit pending at the time of the parties' briefing below—the *H.B.* Lawsuit—a declaration on the duty to indemnify was premature. And with respect to the duty to defend, the district court correctly concluded that the allegations in the underlying complaint triggered a duty to defend under Coverage A because they were at least potentially covered. *Houston Specialty Ins. Co. v. The Five Paces Inn Co.*, 2019 WL 9633224, at *8 (N.D. Ga. Dec. 19, 2019), *aff'd,* 823 F. App'x 897 (11th Cir. 2020) (dismissing insurer's declaratory judgment action where, "the allegations on the face of the underlying lawsuit set forth a claim of *potential* coverage….") (emphasis added). The claims asserted in the *H.B.* Lawsuit are accidental and fortuitous because they do not allege or require an intent to harm.

While the district court never reached Liberty's duty to defend under Coverage B, it provides an independent basis for affirmance. The *H.B.* Lawsuit alleged "personal and advertising injury" because the claims arise in part from H.B.'s alleged false imprisonment and detention. This alleged false imprisonment and detention arose in connection with Red

Roof's business and no exclusions apply. As a result, Liberty was required to defend under Coverage B.

Finally, Liberty's claims for reimbursement of defense costs and settlements are not cognizable claims under Georgia law and were properly dismissed with prejudice. Georgia law does not allow a claim for reimbursement where, as here, the insurance policies do not expressly provide such a right. Liberty failed to include a right to recoupment in its policies and cannot subsequently create such a right through a unilateral reservation of rights.

## ARGUMENT

### I.    Georgia law governs.

The district court correctly applied Georgia law to the parties' dispute. Both because Ohio was formed from the territory of one of the original thirteen colonies and because it has adopted the English common law, Georgia's choice-of law principles require the application of Georgia law here.

Under Georgia's "presumption of identity" rule, a foreign state's law will be applied only when it "comes from a statute or judicial decisions interpreting that statute." *Mt. Hawley Ins. Co. v. East Perimeter Pointe*

Page 13

*Apartments*, 861 F. App'x 270, 277 (11th Cir. 2021). Thus, if "the law to be applied to a contract dispute by a Georgia court or a federal court in Georgia is judicially-created, then 'the common law as expounded by the courts of Georgia' must govern." *Id.* at 276 (quoting *Coon v. Medical Ctr., Inc.*, 797 S.E.2d 828, 834 (Ga. 2017)).  Because no applicable Ohio statute applies here, Georgia common law controls.

The century-old rule was reaffirmed by the Supreme Court of Georgia in 2017. *Coon*, 797 S.E.2d 833-36 (applying the law of Georgia over Alabama). And as noted by the district court, the presumption of identity rule has been applied by several courts to apply Georgia law over Ohio's. Liberty seeks to avoid the rule here by arguing that Ohio was not formed from one of the original thirteen colonies and has not adopted the English common law. Both contentions are incorrect.

*First,* Ohio was formed from Virginia. "The State of Ohio was established from the land ceded by legislative act of the Commonwealth of Virginia to the United States on the 1st day of March, 1784, which act is known as the Cession of Virginia." *Ohio v. Kentucky*, 410 U.S. 641, 642 (1973). Liberty seeks to obscure this fact by acknowledging only that— for eighteen years *after* the Cession of Virginia—Ohio was "part of the

Page 14

Northwest Territory." (Br. of Appellant, p. 56). True, but this is no different than Alabama's inclusion in the Mississippi Territory after Georgia's cession in 1802:

> The act of 1783, and the deed of 1784, by which the state of Virginia, before the adoption of the constitution, ceded 'unto the United States in congress assembled, for the benefit of the said states, all right, title and claim, as well of soil as jurisdiction,' to the Northwest Territory, and the similar cession by the state of Georgia to the United States, in 1802, of territory including a great part of Alabama and of Mississippi, each provided that the territory so ceded should be formed into states, to be admitted, on attaining a certain population, into the Union….

*Shively v. Bowlby*, 152 U.S. 1, 26 (1894). The Supreme Court of Georgia applied the presumption of identity rule to Alabama law, because in its words, "Alabama was formed predominantly from the territory of Georgia." *Coon*, 797 S.E.2d at 834, n.5. Ohio was similarly formed from the territory of Virginia and thus the rule applies equally here.

*Second*, Ohio is a common law state. Liberty protests that Ohio did not adopt the English common law in unmodified form, but no state has. "No one will contend, that the common law, as it existed in England, has ever been in force in all its provisions, in any state in this union. It was adopted only so far as its principles were suited to the condition of the colonies…." *Wheaton v. Peters*, 33 U.S. 591, 592 (1834). The relationship

between Ohio's common law and the English common law is no different from that of Alabama. *Compare Cleveland, C. & C.R. Co. v. Keary*, 3 Ohio St. 201 (1854) ("The common law of England, when not inconsistent with the genius and spirit of our own institutions, and thus rendered inapplicable to our situation and circumstances, furnishes the rule of decision in the courts of this State.") *with Louisville & N.R. Co. v. Cook*, 53 So. 190, 192–93 (Ala. 1910) ("The common law of England was never adopted by the United States, nor by any one of them, as an entirety, but only those parts which were adapted and applicable to the needs and spirit and genius of the institutions of the respective sovereigns…."). In any event, the Supreme Court of Georgia has never limited the application of the presumption of identity rule based on the extent of a foreign state's adoption of the English common law.

Liberty invites the Court to abandon the presumption of identity rule by pointing to decisions from this Court and the Georgia Court of Appeals which applied the common law of other states. But none of those decisions addressed the presumption of identity rule at all—much less declined to apply it. And all predate *Coon*, which dispensed with a similar contention:

Page 16

> it is axiomatic that the decisions of this Court do not stand for points that were neither raised by the parties nor actually decided in the resulting opinion, and that questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents.

797 S.E.2d at 836 (cleaned up).

Finally, Liberty complains that Red Roof has not disputed the application of Ohio law in lawsuits in other jurisdictions. But none of those cases involved Georgia's choice-of-law rules. The presumption of identity rule remains the law of Georgia and there is no basis to depart from it here.

## II.    The District Court Correctly Found That Liberty's Claims Were Moot.

### A.    Claims for declaratory relief require an "actual controversy."

"The federal courts are confined by Article III of the Constitution to adjudicating only actual 'cases' and 'controversies.'" *Malowney v. Fed. Collection Deposit Grp.*, 193 F.3d 1342, 1346 (11th Cir. 1999). And the Declaratory Judgment Act, 28 U.S.C. § 2201, "specifically provides that a declaratory judgment may be issued only in the case of an 'actual controversy.'" *Id.* at 1347 (citing *Emory v. Peeler*, 756 F.2d 1547, 1551–52 (11th Cir. 1985)). "In order to demonstrate that a case or controversy

Page 17

exists to meet the Article III standing requirement when a plaintiff is seeking injunctive or declaratory relief, a plaintiff must allege facts from which it appears there is a substantial likelihood that he will suffer injury in the future." *Id.* at 1346 (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983)).

## B. Mootness is not a matter of public policy; it is jurisdictional.

Liberty's second argument as to mootness bears the first response because it misapprehends a jurisdictional question as one of public policy. Whatever the effect of the district court's decision, this argument evades the basic question of whether *these* parties need guidance as to *their* future conduct in relation to the Underlying Lawsuits. Because those lawsuits have all been resolved, the answer is "no."

Mootness is a question of subject-matter jurisdiction. It "strikes at the very heart" of the district court's ability—or lack thereof—to rule on the issues before it. *Medberry v. Crosby*, 351 F.3d 1049, 1054 n.3 (11th Cir. 2003). Accordingly, the downstream public-policy effects of a district court's ability to hear a case are simply irrelevant to whether it has subject matter jurisdiction. *See Morrison v. Allstate Indem. Co.*, 228 F.3d 1255, 1261 (11th Cir. 2000) ("Subject matter jurisdiction is conferred and

Page 18

defined by statute. It cannot be created by the consent of the parties, nor supplanted by considerations of convenience and efficiency.").

While the analysis should stop there, Liberty also fails to acknowledge that its situation is self-imposed. Liberty sat on its rights for more than three years: the first four Underlying Lawsuits were filed in August 2019, but Liberty did not file this action for declaratory relief until May 2023. As Liberty concedes, Georgia has instructed insurers to immediately pursue declaratory judgment if in doubt regarding their duty to defend. *Richmond v. Ga. Farm Bureau Mut. Ins. Co.*, 231 S.E.2d 245, 247 (Ga. App. 1976) ("Upon learning of facts reasonably putting it on notice that there may be grounds for noncoverage and where the insured refuses to consent to a defense under a reservation of rights, the insurer must . . . (c) seek immediate declaratory relief[.]"). If Liberty had acted promptly, it could have obtained a ruling on its duty to defend for all the Underlying Lawsuits. Indeed, Liberty *did* obtain a ruling on its duty to defend the *H.B.* Lawsuit because, as to *that* lawsuit, it did not wait nearly four years to seek declaratory relief. Liberty cannot overcome basic jurisdictional principles by crying foul when it sat on its rights.

Page 19

## C. Whether a live controversy continues to exist as to Liberty's *other claims* is irrelevant to whether its declaratory judgment claims are moot.

Liberty next argues that because a live issue remains as to whether it may recoup defense and settlement costs from Red Roof, its claims for declaratory relief are also justiciable. (Br. of Appellant, p. 24). But the existence of other claims does not save Liberty's declaratory-relief claims which seek guidance on whether it is required to defend and indemnify its insured—both of which have already occurred, and neither of which is ongoing.

Declaratory judgment claims are meant to declare the rights of litigants, not award relief for injury. 28 U.S.C. § 2201. Liberty's separate claims for recoupment thus illustrate *why* its declaratory judgment claims are moot. As this Court pointed out in *Twin City Fire*: "[T]he justiciability of any claims for declaratory relief ultimately is not of practical significance[.] The relief that [insurer] seeks is recoupment of some or all of the $10 million it paid[,] and any ultimate determination of its entitlement to recoupment would entail a determination of coverage and, if appropriate, allocation." *Twin City Fire Ins. Co. v. Hartman, Simons & Wood, LLP*, 609 F. App'x 972, 979 (11th Cir. 2015). The same is true here:

Page 20

for the six settled or dismissed Underlying Lawsuits, Liberty's aim is to recoup its defense and settlement payments. That relief is addressed in Counts X through XVII of its Second Amended Complaint, not its declaratory judgment claims.

### D. The decisions Liberty cites all recognized future conduct in need of guidance. Liberty asks the Court to evaluate decisions it already made.

The district court properly found jurisdiction lacking because Liberty sought a declaration not as to the risk of injury in the future, but as to past events. And, contrary to Liberty's contention, there is no conflict between *Twin City Fire* and this Court's past precedent.

Liberty contends that *Edwards v. Sharkey*, 747 F.2d 684, 687 (11th Cir. 1984), conflicts with *Twin City Fire*. (Br. of Appellant, p. 21). Not so. Unlike both *Twin City Fire* and this case, *Edwards* addressed the allocation of a settlement among multiple insurers, where the fact of coverage itself was undisputed. In other words, the insurers challenged not a fixed amount of past payment, as here, but how to allocate that payment among insurers. 747 F.2d at 686. The same was true in *Allstate Ins. Co. v. Employers Liab. Assurance Corp.*, 445 F.2d 1278 (5th Cir. 1971) and *Nationwide Prop. and Cas. Co. v. Renaissance Bliss, LLC*, 823 F. App'x

815, 821 (11th Cir. 2020). Further, in both *Edwards*, 747 F.2d at 686, and *Allstate*, 445 F.2d at 1280, there was an agreement among the insurers that their settlement would not impair resolution of the declaratory judgment action to determine their respective liabilities to the insured. Liberty obtained no such agreement from its insured before it settled the Underlying Lawsuits.

Unlike *Edwards, Allstate*, or *Renaissance Bliss*, there is one insurer here. And Liberty has already paid all the settlement funds for which anyone contended it was liable. A declaration that Liberty *did not* need to do so is not a declaration as to allocation or any other future conduct. As Liberty concedes, it would simply be advisory as to other ongoing litigation. (*See* Br. of Appellant, pp. 24–25).

Liberty is mistaken when it contends that the district court's ruling means an insurer never has an opportunity to litigation coverage (or would be required to deny coverage to litigate its coverage defenses). An insurer can reach an agreement with its insured to pay the settlement and then litigate coverage (like the insurers in *Edwards* and *Allstate*); an insurer can include a right of reimbursement in its policy thereby preserving its ability to litigate coverage after its own voluntary settlement;

and an insurer can choose not to settle and litigate whether any resulting judgment is covered.

E. **The "capable of repetition yet evading review" exception to the mootness doctrine is narrow and reserved for exceptional situations, not routine coverage disputes.**

There is an exception to the mootness doctrine when the action being challenged is "capable of being repeated and evading review," but this exception is narrow and reserved only for exceptional situations unlike those presented here. *See Graham v. Att'y Gen., State of Ga.*, 110 F.4th 1239, 1245–46 (11th Cir. 2024).[5]

Importantly, the Court "will not apply this exception if some alternative vehicle exists through which a particular policy may effectively be subject to complete review." *Wood v. Raffensperger*, 981 F.3d 1307, 1317 (11th Cir. 2020) (citing *Bourgeois v. Peters*, 387 F.3d 1303, 1308 (11th Cir. 2004)). In *Bourgeois*, the decision that Liberty relies on, this Court confronted whether the City of Columbus's mass magnetometer searches of demonstrators attending a public protest, carried out during the

---

[5] Counsel could not locate any authority applying the "capable of being repeated and evading review" mootness exception to an insurance coverage dispute.

pendency of a lawsuit challenging that policy on constitutional grounds, rendered that challenge moot. *Id.* at 1307–08. This Court found that the protestors' challenge to the searches was moot, but was nevertheless justiciable because it was (1) too short in duration to be fully litigated before its cessation, (2) the protestors had a reasonable expectation of being subjected to the searches again, and (3) there was no alternative vehicle through which the searches might "effectively be subject to a complete round of judicial review." *Id.* at 1308.

In essence, Liberty argues that because it will face the choice between defending, settling, or disclaiming coverage in similar cases for Red Roof in the future, this Court should advise it on which decision to take. (*See* Br. of Appellant, p. 24). But this is, in effect, an admission that there *is* an alternative vehicle of judicial review. *See Bourgeois*, 387 F.3d at 1308. Likewise, it is an admission that no "case or controversy" exists as to *these* Underlying Lawsuits, and that Liberty is therefore seeking an improper advisory opinion, and the "capable of repetition yet evading review" exception does not save it. *Cf. Miller v. FCC*, 66 F.3d 1140, 1146 (11th Cir. 1995) ("The prohibition on advisory opinions is a logical corollary of the case or controversy requirement. Thus, no justiciable

controversy is presented when the parties are asking for an advisory opinion." (quotation omitted and alteration accepted)).

III.   **The District Court correctly found that Liberty owed a duty to defend the *H.B.* Lawsuit under Coverage A.**

A.   **Georgia's duty-to-defend standard is "extremely broad" and resolves doubt in favor of the insured.**

"The duty to defend is extremely broad under Georgia law." *Cont'l Cas. Co. v. Winder Lab'ys, LLC*, 73 F.4th 934, 948 (11th Cir. 2023). "If the facts as alleged in the complaint even *arguably* bring the occurrence within the policy's coverage, the insurer has a duty to defend the action." *Landmark Am. Ins. Co. v. Khan,* 705 S.E.2d 707, 710 (Ga. App. 2011) (citations omitted) (emphasis in original).

The duty to defend is determined by comparing the language of the policy to the allegations of the complaint. *Hoover v. Maxum Indem. Co.*, 730 S.E.2d 413, 418 (Ga. 2012). "[A]n insurer is obligated to defend even where 'the allegations of the complaint against the insured are ambiguous or incomplete with respect to the issue of insurance coverage.'" *Fireman's Fund Ins. Co. v. University of Ga. Athletic Ass'n*, 654 S.E.2d 207, 209 (Ga. App. 2007) (*quoting Penn-Am. Ins. Co. v. Disabled Am. Veterans, Inc.*, 490 S.E.2d 374, 376 (Ga. 1997)). Where the claim asserted is one

that might be covered under the policy, "doubt as to liability and insurer's duty to defend should be resolved in favor of the insured." *Id.* (citation omitted).

Because the existence of a duty to defend is determined based on the allegations in the complaint, "the issue is not whether the insured is *actually liable* to the plaintiffs in the underlying action; the issue is whether a claim has been asserted which falls within the policy coverage and which the insurer has a duty to defend." *Bituminous Cas. Corp. v. N. Ins. Co. of New York,* 548 S.E.2d 495, 497 (Ga. App. 2001) (*quoting Penn– Am. Ins.,* 481 S.E.2d at 852) (emphasis in original).

Finally, "where an insurer has a duty to defend a single claim the complaint presents, it has a duty to defend all the claims asserted." *HDI- Gerling Am. Ins. Co. v. Morrison Homes, Inc.,* 701 F.3d 662, 666 (11th Cir. 2012). Liberty was therefore required to defend the *H.B.* Lawsuit if any claim asserted in the Underlying Lawsuits might be covered.

## B.    The H.B. Lawsuit alleges bodily injury caused by an occurrence—i.e., an accidental and fortuitous loss.

Liberty's occurrence argument misconstrues both Georgia law and the elements of a TVPRA beneficiary claim. Georgia law does not limit liability coverage to "passive nonfeasance," and a TVPRA beneficiary

Page 26

claim does not require an intent to injure. Because the claims asserted by H.B. do not allege—much less require—an intent to injure, there was at least the possibility of coverage and Liberty owed a duty to defend under Coverage A.

### 1. An "occurrence" is not limited to passive nonfeasance.

Under Georgia law, a claim is non-accidental or non-fortuitous only when the insured intended the resulting *injury*—not merely the underlying act. Injuries caused by intentional acts are not categorically uninsurable as Liberty contends. Liberty's focus on the volitional character of the underlying act misses the mark. The alleged injuries here were at least potentially accidental and fortuitous and thus constitute an "occurrence."

The Liberty policies define "occurrence" to mean "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." Doc. 79, ¶ 117. While the term accident is not defined, Georgia courts construe the word broadly:

> [I]njuries "caused by accident" as used in an insurance contract [] include injuries caused without the actor's intent or design to injure and would not include injuries intentionally inflicted. "Accident" is a more comprehensive term than negligence, although negligence is included in it.

*Travelers Indem. Co. v. Hood*, 140 S.E.2d 68, 70 (Ga. App. 1964).

Liberty's argument runs counter to decades of Georgia insurance law. In *Hood*, the Georgia Court of Appeals rejected Liberty's position, finding coverage for an insured who killed a victim while illegally street racing. *Id.* at 70. Like Liberty here, the insurer argued that the results of the insured's racing were not an accident because it was "an intentional act in reckless disregard of the safety of others…." *Id.* The Georgia Court of Appeals rejected this contention, noting that "[t]he fallacy of the defendants' argument lies in the distinction between *intentional act* and *intentional injury*." *Id.* (emphasis in original). Intentional acts are potentially covered; intentional injuries are not. The insured in *Hood* deliberately raced his automobile on a public highway—conduct that was both volitional and illegal. Yet the resulting injuries were an "accident" because the insured did not intend to cause them. *Id.*

Similarly, in *Colonial Penn Ins. Co. v. Hart,* 291 S.E.2d 410 (Ga. App. 1982), the Georgia Court of Appeals found coverage for an insured who intentionally fired a shotgun in the direction of his victim. It was undisputed that the insured intentionally fired his firearm, but the resulting injury was covered because "there is a recognized distinction

Page 28

between intentional and unintentional results of intentional acts." *Id.* at

413. Once again, the unintentional results of intentional acts are covered:

> "Intent" is defined in Restatement, Torts 2d, § 8A (1965) "to denote that the actor desires to cause consequences of his act, or that he believes that the consequences are substantially certain to result from it." "On the other hand, the mere knowledge and appreciation of a risk, short of a substantial certainty, is not the equivalent of intent."

*Id.* at 413.[6]

More recently, the Supreme Court of Georgia rejected the premise

of Liberty's argument: "we reject out of hand the assertion that the acts

of [the insured] could not be deemed an occurrence or accident under the

CGL policy because they were performed intentionally." *Am. Empire*

---

[6] *Hart* is one of a long line of Georgia cases finding a duty to defend claims for an insured's intentional discharge of a firearm. *See, e.g., Allstate Ins. Co. v. Justice,* 493 S.E.2d 532, 535 (Ga. App. 1997) (a jury could reasonably determine that the insured "had no intent to wound [the bystander] and that he had no reason to be substantially certain that an errant bullet might hit a person whose presence he was unaware of."); *W. Am. Ins. Co. v. Merritt*, 456 S.E.2d 225, 226 (Ga. App. 1995) (where insured fired BB gun at individual's thigh area from 35 feet away, court found that "a fact question remain[ed] as to the insured's intent" due to the important distinction between "intent to cause physical pain" and "intent to cause physical injury"); *S. Mut. Ins. Co. v. Mason*, 445 S.E.2d 569, 571 (Ga. App. 1994) (insured's shooting of friend is covered); *Brown v. St. Paul Fire & Marine Ins. Co.*, 338 S.E.2d 721, 723 (Ga. App. 1985) (shooting potentially covered because "the evidence would have authorized a jury to find that Leslie Brown's injury was an unintentional result of an intentional act.").

*Surplus Lines Ins. Co. v. Hathaway Dev. Co.,* 707 S.E.2d 369, 372 (Ga. 2011) (finding coverage for unintentional damage caused by the insured's intentional acts). Indeed, Liberty's arguments echo the lone dissent in *Hathaway*: "where an act is intentional, it does not constitute an 'accident'…." *Id.* at 372. But that is not the law in Georgia. An "occurrence" exists whenever the insured did not intend or expect the *injury* alleged, regardless of whether the insured's underlying conduct was volitional, deliberate, or even illegal.

The authority relied on by Liberty confirms this distinction and supports affirmance of the district court's judgment. In each case Liberty relies on, the insured intended the *specific injury* directly caused by its conduct: in *G.M. Sign,* the insured intended to send faxes, thereby consuming the recipients' ink and paper; in *Perry*, the insured intended to have sexual intercourse with his victim; in *Roe,* the insured intentionally molested his minor victim; and in *Meritplan*, the insured intentionally punched his victim repeatedly in the face.[7] In each case, the specific

---

[7] *G.M. Sign, Inc. v. St. Paul Fire & Marine Ins. Co.*, 768 F. App'x 982 (11th Cir. 2019); *Perry v. State Farm Fire and Cas. Co.*, 676 S.E.2d 376 (Ga. App. 2008); *Roe v. State Farm Fire & Cas. Co.*, 376 S.E.2d 876 (Ga. 1989); *Meritplan Ins. Co. v. Leverette*, 552 F. App'x 900 (11th Cir. 2014).

injury was the direct and intended result of the insureds' volitional acts, not a collateral or unexpected consequence. H.B. does not allege that Red Roof directly *or* intentionally inflicted injury on her. As discussed below, allegations that Red Roof financially benefitted from injuries inflicted by third parties are categorically different.[8] In short, the "passive nonfeasance" standard proposed by Liberty finds no support in Georgia law.[9]

Liberty may invoke the Georgia Court of Appeals' recent decision in *Philadelphia Indemnity Ins. Co. v. Eubanks*, 927 S.E.2d 518 (Ga. App. 2026), but *Eubanks* underscores rather than disturbs the controlling distinction. *Eubanks* arose from decades of sexual abuse by a teacher—*an*

---

[8] Liberty cites *Perry* for the proposition that Georgia law recognizes coverage only for "injury by accidental means" but not for "accidental injury." 676 S.E.2d 376 (Ga. App. 2008). But the quoted distinction comes from the Supreme Court of Georgia's precedent on accidental life and disability policies, not CGL policies. And the principal case cited in *Perry—Provident Life and Accident Ins. Co. v. Hallum—found* coverage for an accidental injury. 576 S.E.2d 849, 851 (Ga. 2003) (finding coverage under a disability policy for an "accidental injury," described by the Court as "an injury that is unexpected but may arise from a conscious voluntary act."). In any event, the principle Liberty asks the Court to draw from *Perry* was expressly rejected by the Georgia Supreme Court in *Hathaway*.

[9] The "natural and probable" standard referenced throughout Liberty's Brief comes from the law of Ohio, not Georgia. But the result is the same under Ohio law. *See Red Roof (Ohio),* 2026 WL 775589, at \*2-6 (finding duty to defend TVPRA beneficiary claims under Coverage A pursuant to Ohio law).

*employee of the insured*—and from the school's *admitted actual knowledge* of that abuse and its decades-long concealment of it from students and parents. *Id.* at 524-27. After finding that the policies did not provide coverage because the abuse predated the policy periods, *id.* at 528-30, the court added, in *dicta*, that the school's own intentional conduct did not constitute an "occurrence." *Id.* at 532 (noting that "the Plaintiffs premised their allegations against Darlington on the fact that Darlington knew of the abuse; failed to stop it or warn other students; and concealed the conduct.").

The cases *Eubanks* relied on are all of the same kind. Each involves an insured whose own deliberate sexual assault, or whose direct employee's intentional sexual misconduct, produced the direct and expected injury. *See Md. Cas. Co. v. Jacob Ward, M.D., LLC*, No. 1:14-CV-160-MHC, 2015 WL 11237022, at \*5 (N.D. Ga. July 31, 2015) (insured medical practice liable solely through its employee's intentional sexual battery of patients); *SCI Liquidating Corp. v. Hartford Fire Ins. Co.*, 181 F.3d 1210, 1216 (11th Cir. 1999) (intentional sexual harassment by the insured employer's manager); *State Farm Fire & Cas. Co. v. Brewer*, No. 1:06-CV-2296-RWS, 2008 WL 450817, at \*3-4 (N.D. Ga. Feb. 15, 2008) (insured's

own personal sexual misconduct). The *Eubanks* court itself placed its analysis squarely within the line of Georgia cases finding that "sexual abuse" committed by the insured is not an occurrence. 927 S.E.2d at 532.

The factual posture here is categorically different. H.B.'s trafficking was committed by *third-party traffickers,* not Red Roof or its employees. And Red Roof's alleged liability rests on a constructive knowledge standard. The *Eubanks* court acknowledges this line citing *Cincinnati Ins. Co. v. Magnolia Estates, Inc.*, 648 S.E.2d 498 (Ga. App. 2007) as a counterpoint to its analysis. 927 S.E.2d at 532. *Magnolia Estates* held that an intentional attack on a nursing home resident by another resident was "properly characterized as accidental for purposes of coverage" because the attack was not intended by the insured nursing home. 648 S.E.2d at 500. That is this case. The intentional conduct of third-party traffickers— not intended by Red Roof from the standpoint of its own business operations—is exactly the kind of harm Georgia law treats as an accident.

> **2. H.B.'s TVPRA beneficiary claim does not allege that Red Roof intended to harm her and an intent to injure is not an element of the claim.**

In alleging that Red Roof violated 18 U.S.C. § 1595(a), H.B. does not allege that Red Roof intended her traffickers to harm her. Rather, H.B.

Page 33

alleges that "Defendants knew or should have known that their operation of the Norcross Red Roof violated the [TVPRA] through its association with Plaintiff's sex traffickers, and from which it benefitted financially." Doc. 79-6, ¶ 5(a). And despite Liberty's strained reading of the statute, a TVPRA beneficiary claim does not require an intent to harm.

Liberty's occurrence argument asks the Court to read a scienter element into Section 1595 beneficiary claims that does not exist. To prevail under Section 1595, a plaintiff need only allege that the defendant "should have known" that it participated in a venture that violated the statute. This is precisely what H.B. alleged—that Red Roof "should have known" that it was associating with sex traffickers.[10] A beneficiary claim under Section 1595 is distinct from the criminal statute and contains no requirement of injurious intent:

> Congress drafted Section 1595(a) so that participant liability for sex trafficking does *not* require proof of the criminal mens rea . . . the civil defendant itself need not have committed a criminal violation of Section 1591, [and] "participation in" that venture need not involve direct participation in the sex trafficking itself. It is the venture that must violate Section 1591, and not the participant.

---

[10] *See* doc. 79-6, ¶¶ 5, 21, 23, 24, 45, 46, 47, 50, 52, 53, 56, 60, 64, 65, 79, and 83.

*G.G.*, 76 F.4th at 563 (emphasis in original).

In *Doe #1*, this Court clarified that unlike a criminal violation under Section 1591, a beneficiary claim under Section 1595 does **not** require that a defendant know that the victim was forced to engage in a commercial sex act. *Doe #1 v. Red Roof Inns, Inc.*, 21 F.4th 714, 724 (11th Cir. 2021) ("Section 1591(a) includes a scienter requirement that does not appear in Section 1595(a) . . . ."). And earlier this year, this Court reaffirmed that "[t]o prove knowledge under § 1595, C.B. did not have to prove that Naseeb had actual knowledge that [the trafficker] was committing 'an act in violation' of § 1591 (i.e., sex trafficking)." *A.G. v. Northbrook Indus., Inc.,* 171 F.4th 1257, 1273 (11th Cir. 2026).

Liberty seeks to avoid Section 1595's constructive knowledge standard by focusing myopically on the "participation in a venture" element. According to Liberty, "participation in a venture" on its own requires an intent to harm. But this interpretation makes no sense when the statute is read as a whole, and the same reasoning was rejected in *Doe #1*. Like the franchisor's argument in *Doe #1,* Liberty's "formulation requires a plaintiff to prove that the defendant knowingly facilitated a violation, making the 'should have known' language superfluous." 21 F.4th at 724.

Page 35

How can a defendant's participation in a venture require an intent to cause the victim's abuse when a plaintiff does not have to prove that the defendant had actual knowledge that the trafficker was involved in sex trafficking? Including such a knowledge or intent requirement in the "participation in a venture" element would, as this Court has put it, create a "nonsense sentence." *Id.*[11]

While this Court has held that participation requires something more than "[m]erely renting a hotel room to a trafficker with actual or constructive knowledge of his trafficking," it has never held that the defendant must intend or expect harm to the plaintiff. *A.G.,* 171 F.4th at 1269. There is an enormous gulf between "something more" and injurious intent. This gulf is demonstrated by the evidence the *A.G.* court found sufficient to state a claim against the United and Hilltop Inns. *Id.* at 1272-76. Evidence that the United Inn was a sex trafficking-friendly hotel in tandem with testimony that a front desk employee let the minor

---

[11] Indeed, Liberty's position eliminates the distinction between civil-perpetrator liability and beneficiary liability—the whole point of Congress's 2008 amendment of the TVPRA. If a plaintiff proves that the defendant knowingly assisted, supported, or facilitated a TVPRA violation, the defendant would be a perpetrator. *See* 18 U.S.C. § 1591(a)(2). Section 1595 only has meaning if participation requires something less than participating in the TVPRA violation itself.

Page 36

plaintiffs back into the hotel room was sufficient to establish participation in a venture. *Id.* at 1271 ("A jury certainly could find it significant that United Inn allowed A.G. and G.W., two seventeen-year-old girls dressed provocatively who were loitering in common areas and purchasing condoms in the lobby, back into a room even though they produced no identification and were not listed on the room reservation."). This evidence, while "not overwhelming," was enough to establish the hotel's participation in a venture. *Id.* at 1271-72. But it falls far short of a finding that the United Inn intended for the plaintiffs to be sex trafficked.

Likewise, evidence that the Hilltop Inn placed sex offenders in the same area of the hotel and only cleaned their rooms once per week, in conjunction with evidence that C.B.'s trafficker was rented a second room next to his own which was not cleaned, was sufficient to find that the hotel's policies enabled the trafficker's operation. *Id.* at 1272-73. Once again, this evidence does not require that the Hilltop Inn expect or intend for C.B. to be sex trafficked. To the contrary, the Court clarified that "C.B. did not have to prove that Naseeb had actual knowledge that Chappell was committing 'an act in violation' of § 1591 (i.e., sex trafficking)." *Id.* at 1273.

In addition to misconstruing the elements of a claim under Section 1595, Liberty misreads the allegations of the *H.B.* Lawsuit. Liberty tries to bolster its arguments by repeatedly claiming that Red Roof is alleged to have participated in a "sex-trafficking venture." (Br. of Appellant, pp. 1, 6, 17, 40, 42, 43, 52, 53). But H.B. never alleges a sex-trafficking venture. *See generally* doc. 79-6. Nor does a beneficiary claim require participation in a sex-trafficking venture. *A.G.,* 171 F.4th at 1269 ("nothing in the plain language of § 1595(a) requires that the 'venture' be a 'sex trafficking venture.'").

The district court correctly found that H.B.'s allegations and the elements of a claim under Section 1595 at least arguably triggered coverage under the Liberty Policies. Liberty takes issue with the district court's description of Section 1595 liability as sounding in negligence. The district court's description is well supported,[12] but the label is immaterial. Negligence qualifies as an accident, but the two are not synonymous. *See Hood,* 140 S.E.2d at 70 ("'Accident' is a more comprehensive term than

---

[12] "[T]he consensus among courts [is] that § 1595(a) imposes a negligence standard." *S.M.A. v. Salesforce, Inc.,* 2024 WL 1337370, at *15 (N.D. Tex. Mar. 28, 2024); *G.G.,* 76 F.4th at 555 n.9 (collecting cases holding that Section 1595 imposes a negligence standard).

Page 38

negligence, although negligence is included in it."). Even willful and wanton misconduct can qualify as an accident. *Id.* at 70 ("[T]he fact that an injury for the purposes of criminal or tort law may be held constructively intentional does not remove it from the category of injury 'caused by accident' in the terms of an insurance contract.").

Liberty's Coverage A theory is built principally around two Ohio Court of Appeals decisions: *Chiquita I* and its successor *Chiquita II*.[13] (Br. of Appellant, pp. 36–38). Liberty uses *Chiquita I* and *II* to argue that even where a complaint pleads negligence, courts can "infer intent" where the harm is the natural and probable consequence of the insured's knowing conduct. But *Chiquita I* and *II* do not apply Georgia law and are readily distinguishable on the facts. The underlying claims in *Chiquita I* and *II* involved the federal Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2333(a). Unlike a TVPRA beneficiary claim, liability under the ATA requires that "material support was given '*knowing or intending*' it would be used to prepare for, or carry out, the killing of Americans in violation of [the ATA]." *Chiquita II,* 243 N.E.3d at 807 (emphasis added). The *Chiquita*

---

[13] *Chiquita Brands Int'l, Inc. v. Nat'l Union Ins. Co.*, 988 N.E.2d 897 (Ohio Ct. App. 2013) and *Travelers Prop. Cas. Corp. v. Chiquita Brands, Int'l, Inc.*, 243 N.E.3d 797 (Ohio Ct. App. 2024).

Page 39

court thus found that the resulting harm was intentional because "the jury would have to find Chiquita made payments to FARC knowing or intending that those payments would be used to prepare or carry out acts of terrorism." *Id.* at 808. No such finding of intent is required under Section 1595(a) and H.B.'s complaint is replete with allegations that Red Roof "should have known" of sex trafficking at its hotel.

Tellingly, Liberty and its *Amici* do not cite any cases analyzing TVPRA beneficiary claims under a CGL policy. The reason is simple: in the absence of an abuse and molestation or assault and battery exclusion (neither of which was included in the Liberty Policies), *every* court to address beneficiary claims under a CGL policy has found a duty to defend. Considering the text of Section 1595, this is no surprise. *See, e.g., Ricchio*, 424 F. Supp. 3d at 194 (TVPRA "permits recovery under a civil standard even in the absence of proof of intentional conduct."); *Choice Hotels*, 2021 WL 2457107, at \*7 (insurer required to defend TVPRA beneficiary claim against insured hotel because "allegations that [the insured] 'should have known' about the trafficking venture are consistent with the text of the TVPRA, which does not require that a defendant have actual knowledge of a trafficking venture in order to be civilly liable…."); *Red Roof (Ohio),*

2026 WL 775589, at *4 ("[t]he 'participation in a venture' element does not require an intent to cause harm."). The district court's decision adheres to both Georgia law and the unanimous weight of authority around the country.

### 3. Alternative allegations involving unnamed employee(s) of an insured do not bar coverage for all claims against all insureds.

Liberty leans heavily on H.B.'s most egregious allegations—namely, that one or more unnamed employees were paid in cash to serve as lookouts for H.B.'s traffickers.[14] But Liberty wrongly assumes that this conduct involved an intent to harm and can be imputed to the defendant-insureds. More importantly, Liberty ignores a foundational principle of the duty to defend: an insurer must defend if any allegation is potentially covered. Thus, even if the actions of an unknown employee (of one insured and committed outside the scope of their employment) could be imputed to all the Red Roof insureds, Liberty nevertheless owes a duty to defend because accidental conduct is also alleged.

---

[14] Many of the allegations cited by Liberty in its Statement of the Case come from the Underlying Lawsuits that were dismissed or settled. Those allegations—while disputed by Red Roof—are not germane to Liberty's duty to defend the *H.B.* Lawsuit.

Page 41

To begin, even if the lookout allegations are credited, they do not equate with an intent to cause injury to H.B. or anyone else. Liberty assumes that the employee(s) knew the specific crime H.B.'s trafficker was committing, but that is never alleged. Serving as a lookout for other criminal conduct—like the sale of drugs or prostitution—requires no intent to harm. The employee may not even know that commercial sex was taking place or may believe (rightly or wrongly) that the commercial sex is consensual adult activity. Even if the employee's conduct was illegal, illegal conduct by an insured is not a bar to coverage. *See S. Guar. Ins. Co. of Georgia v. Saxon*, 379 S.E.2d 577, 579 (Ga. App. 1989) (coverage found for injuries inflicted by insured while fleeing the police). Therefore, even as to the alleged lookout, it is plausible that he or she acted without intending injury to H.B.

But this appeal does not involve Liberty's duty to defend unidentified employees. H.B. sued four corporate insureds. And under the Liberty Policies' Separation of Insureds provision, the conduct of an unnamed employee does not bar coverage for the corporate insureds.[15] Accepting

---

[15] The Liberty Policies' Separation of Insureds provision provides that "[t]his insurance applies: a. As if each Named Insured were the only Named Insured: and b. Separately to each insured against whom claim

Page 42

for the sake of argument that the alleged conduct was within the scope of employment—and taking cash payments from third parties to act as a lookout is at least plausibly, if not presumptively, outside the scope—the conduct of one insured is not imputed to another. *See King v. Dallas Fire Ins. Co.,* 85 S.W.3d 185, 188-89 (Tex. 2002) ("occurrence" analysis must be evaluated from the standpoint of the specific insured seeking coverage, aided by the separation-of-insureds clause; an employee's intentional assault did not automatically defeat coverage for the employer).

In any event, Georgia law requires insurers to defend "mixed" claims alleging both covered and uncovered conduct. So even if the employees' acts were uninsurable and could be imputed to all the defendant-insureds, Liberty would still owe a duty to defend based on H.B.'s constructive knowledge allegations. For instance, in *Landmark Am. Ins. Co. v. Khan*, the underlying complaint asserted both intentional assault and battery as well as negligent security against the insured. 705 S.E.2d 707 (Ga. App. 2011), *cert. denied* (Ga. Sep. 6, 2011). The *Khan* court affirmed

---

is made or 'suit' is brought." Docs. 53-4 at 29, 53-5 at 30, 53-6 at 34, 53-7 at 35, 53-8 at 36, 53-9 at 35, 53-10 at 33, 53-11 at 36.

the trial court's conclusion that there was a duty to defend because the "allegations of the Complaint do not reveal, with certainty, that [Khan] would not be entitled to relief under any state of provable facts asserted in support of the Complaint." *Id.* at 711.

Liberty's duty to defend here is not determined by whether H.B.'s most egregious allegations, standing alone, would be covered, but whether *any* state of provable facts is potentially covered. A jury could conclude that the allegations of employees acting as lookouts are not credible but nevertheless hold Red Roof liable because it "rented rooms directly to minor sex trafficking victims who lacked identification and paid for their rooms in cash." Doc. 79-6, ¶ 29. A jury could disbelieve allegations that Red Roof knew trafficking was occurring on its property but find it credible that Red Roof responded to requests for unusual housekeeping services. *Id.* ¶ 24. Under Georgia's "very broad" duty to defend, H.B.'s Amended Complaint asserts a potentially covered claim.

### 4. The expected or intended injury exclusion does not apply.

Liberty's final argument under Coverage A is the expected or intended injury exclusion. This argument fails for the same reasons its occurrence argument fails: H.B. did not allege that Red Roof expected or

intended to injure her. And because it is an exclusion, the rules of construction apply even more stringently against Liberty. *Great Am. All. Ins. Co. v. Anderson,* 847 F.3d 1327, 1332 (11th Cir. 2017) ("exclusions from coverage sought to be invoked must be strictly construed….").

The standard expected or intended exclusion in the Liberty policies provides that the insurance does not apply to:

> "Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

Doc. 79, ¶ 118. By its terms, the analysis of the exclusion is similar to the existence of an occurrence and Liberty's arguments fail for the same reason. *See W. Am. Ins. Co. v. Merritt,* 456 S.E.2d 225, 226 (Ga. App. 1995) ("[A]n exclusion as to injury caused intentionally by the insured does not exclude coverage where there is an intentional act but not an intentionally caused injury."); *S. Mut. Ins. Co. v. Mason,* 445 S.E.2d 569, 571 (Ga. App. 1994) ("intent in the context of the exclusion contemplates not only the commission of the act, but the consequences thereof.").

## IV.   Coverage B independently triggers Liberty's duty to defend.

Although the district court did not reach Coverage B, this Court may affirm on any ground supported by the record. *Thomas v. Cooper*

*Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007). Coverage B is triggered here and provides an independent and alternative basis for affirmance. Liberty's arguments misread the complaint, misuse the "inextricably intertwined" doctrine, and conflate the standard for TVPRA liability with the standard for an "intentional" exclusion.

### A.    H.B. alleged "personal and advertising injury."

Coverage B insures "personal and advertising injury caused by an offense arising out of your business," and defines offenses to include "false arrest, detention or imprisonment." Doc. 79, ¶¶ 119, 120. Measured against the "extremely broad" standard governing the duty to defend, H.B. alleged imprisonment and detention by claiming she was harbored, transported, detained, held, confined, and was "rescued" from a Red Roof hotel. Doc. 79-6, ¶¶ 25, 55, 81, 93. She repeatedly alleges her captors "confined" her and controlled her movement at Red Roof's property. *Id.* ¶¶ 23, 81, 93. Those are textbook "false arrest, detention or imprisonment" allegations. *Moore v. State*, 796 S.E.2d 754, 756 n.2 (Ga. App. 2017) (discussing crime of false imprisonment and stating "[w]e may consider the word 'confine' to have its commonly understood meaning, which is holding one within a location or keeping one within certain limits."); *Fields v.*

*Kroger Co.*, 414 S.E.2d 703, 704–05 (Ga. App. 1992) (discussing false imprisonment claim as detention or restraint that does not need physical restraint but may contain it). Nor is the exact label "false imprisonment" controlling to trigger a defense; factual allegations trigger Coverage B if they potentially allege an offense. *Khan*, 705 S.E.2d at 710 ("The duty to defend exists if the claim potentially comes within the policy.").

Other courts have found that similar allegations trigger the duty to defend under Coverage B. In *Ricchio*, a TVPRA plaintiff alleged that she was trafficked and detained at a motel, including allegations that she was harbored, transported, and maintained. 424 F. Supp. 3d at 186-87. The court rejected arguments like Liberty's here, finding the claimant's allegations qualified as personal injury. *Id.* at 192-93; *see also Am. Fam. Mut. Ins. Co., S.I.*, 2026 WL 851639, at *4 ("The underlying complaint contends that [] injuries were at least in part caused by [] coerced imprisonment in [hotel] rooms. This is sufficient to characterize her injury as one caused by false imprisonment and thus a "personal and advertising injury" under the Policy."); *Tilma*, 2025 WL 2052479, at *3 (plaintiff's TVPRA beneficiary claim "alleges a personal and advertising injury covered by the Policy.").

Page 47

Liberty's effort to read the H.B. complaint against coverage—insisting there are only trace allegations of "confinement" or "false imprisonment"—concedes that allegations of confinement and detention were expressly pleaded. And Liberty's argument inverts Georgia's duty-to-defend standard, which requires the Court to read complaints broadly and in favor of coverage. *Cont'l Cas. Co. v. Winder Lab'ys, LLC*, 73 F.4th 934, 948 (11th Cir. 2023). If not conclusively, H.B.'s allegations of confinement, detainment, control, and rescue are, at least, "arguably within coverage." *See City of Atlanta v. St. Paul Fire & Marine Ins. Co.*, 498 S.E.2d 782, 784 (Ga. App. 1998) ("If the facts as alleged in the complaint even arguably bring the occurrence within the policy's coverage, the insurer has a duty to defend the action."). That is all Georgia law requires.

**B.    The "inextricably intertwined" doctrine is not Georgia law and, in any event, does not collapse Coverage B into Coverage A.**

Liberty next argues that even if H.B. alleges a Coverage B offense, any such personal-and-advertising injury is "inextricably intertwined" with the bodily-injury claims and is subsumed by excluded conduct in Coverage A. (Br. of Appellant, pp. 61–64). Liberty's "inextricably intertwined" argument collapses on inspection.

To begin, no Georgia court has ever adopted the rule Liberty proposes. Coverage A and Coverage B are separate insuring agreements covering distinct damages: "bodily injury" and "property damage" under Coverage A, and "personal and advertising injury" under Coverage B. The Liberty Policies do not state that the absence of bodily-injury coverage under Coverage A disables Coverage B. To read such a provision into the Policy would rewrite it. Georgia law does not support that kind of judicial reformation of insurance contracts. *See Reed v. Auto-Owners Ins. Co.*, 667 S.E.2d 90, 92 (Ga. 2008) ("Where the contractual language unambiguously governs the factual scenario before the court, the court's job is simply to apply the terms of the contract as written, regardless of whether doing so benefits the carrier or the insured."). Nor do any exclusions across either coverage part apply. Coverage B's grant is independent. Liberty cannot collapse Coverage B into Coverage A for its own convenience.

Nor do the cases cited by Liberty have any persuasive effect because none involve the fact pattern presented here. In every case Liberty cites,

Page 49

the insured was accused of sexual assault or harassment.[16]  Effectively, these cases prevent an insured's recharacterization of excluded claims to create covered claims. But H.B. does not claim that Red Roof committed a sexual assault and her claims for imprisonment and detention exist independent of any sexual assault committed by third parties. A violation of the TVPRA includes harboring, transporting, or maintaining the victim and does not require a sex act. 18 U.S.C. § 1591(a)(1); *United States v. Blake,* 868 F.3d 960, 977 (11th Cir. 2017) (reiterating that "the commission of a sex act is <u>not</u> an element of § 1591.") (emphasis in original).

*Evanston Ins. Co. v. Dillard House, Inc.*, 2017 WL 3498953 (N.D. Ga. June 28, 2017), confirms the point. There, even with an applicable exclusion in play, the court rejected the insurer's contention that every underlying claim was "inextricably intertwined" with excluded conduct, holding that at least some claims did not "clearly" hinge on it. *Id.* at *10.

---

[16] *State Farm Ins. Co. v. Bruns*, 942 A.2d 1275, 1282 (N.H. 2008) (sexual assault); *Cole v. State Farm Fire & Cas. Co.*, 25 F. App'x 791 (10th Cir. 2002) (sexual assault); *Auto-Owners Ins. Co. v. Todd*, 547 N.W.2d 696 (Minn. 1996) (sexual assault); *Allstate Indem. Co. v. Messina*, 2021 WL 3080926 (D. Minn. July 21, 2021) (sexual assault); *Farm Fam. Cas. Ins. Co. v. Samperi*, 242 F. Supp. 3d 83, 91 (D. Conn. 2017); *Collins Bldg. Servs., Inc. v. United Capitol Ins. Co.*, 1999 WL 259519, at *4–6 (S.D.N.Y. Apr. 30, 1999) (sexual harassment); *Com. Union Ins. Cos. v. Sky, Inc.*, 810 F. Supp. 249, 254–55 (W.D. Ark. 1992) (sexual harassment).

If the doctrine could not sweep in tangentially related claims there, it cannot do so here, where no exclusion operates in the first instance.

### C.  The personal and advertising injury arose out of Red Roof's business.

Under Georgia law, "arising out of" means "had its origins in, grew out of, or flowed from." *JNJ Found. Specialists, Inc. v. D.R. Horton, Inc.*, 717 S.E.2d 219, 222 (2011) (citation and punctuation omitted). "Georgia courts have construed that phrase broadly, holding that where [an insurance] contract provides that a loss must 'arise out of' a specified act, it does not mean proximate cause in the strict legal sense but instead encompasses almost any causal connection or relationship." *Barrett v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 696 S.E.2d 326, 331 (2010). The alleged offense need not be an authorized or sanctioned part of the insured's business. So long as the offense took place at a Red Roof hotel in connection with a transaction in which lodging was provided, the condition is met. *Citizens Ins. Co. of Am. v. Banyan Tree Mgmt., LLC*, 631 F. Supp. 3d 1256, 1278 (N.D. Ga. 2022) (claims alleging that an employee's unauthorized video recording of plaintiff in the nude "arose out of" the insured hotel's business); *Ricchio*, 424 F. Supp. 3d at 192 (sex trafficking

claims "arose out of" the insured hotel's business even though the hotel was not in the business of human trafficking).

Red Roof's business is renting hotel rooms to guests. Doc. 1-6, ¶¶ 3, 8. H.B. alleges she was held and trafficked in Red Roof hotel rooms over the course of several days, *id.* ¶¶ 1, 17, 32, 55; during the rental of those rooms, *id.* ¶ 24; by guests to whom Red Roof rented them, *id.* ¶¶ 19, 32. The alleged imprisonment did not occur incidentally to Red Roof's business; it occurred through it.

H.B.'s alleged detention and imprisonment occurred at Red Roof's property, through Red Roof's commercial operations, and the underlying TVPRA theory is itself premised on Red Roof's business venture. The "arising out of" requirement is thus satisfied. Doc. 1-6, ¶¶ 1, 8, 17, 19, 32, 33–34, 60–65.

### D.    The Knowing Violation of Rights of Another Exclusion does not bar coverage.

Liberty's final Coverage B argument rests on an exclusion for personal-and-advertising injury "caused *by or at the direction of the insured with the knowledge that the act would violate the rights of another.*" Doc. 33, pp. 66–67 (emphasis added). This exclusion requires not only that the insured know its conduct would violate H.B.'s rights, but that it causes

Page 52

or directs her injury. Because H.B. never alleged that Red Roof caused or directed her injury, the exclusion does not apply.

H.B. pleads her Section 1595 claim on constructive knowledge—what Red Roof "should have known." Doc. 79-6, ¶¶ 4, 5(a), 21, 23, 24, 45, 46, 47, 49, 50, 60, 64. And consistent with the elements of Section 1595, Red Roof is alleged to have benefitted from her trafficking. *Id.* ¶¶ 5(a), 5(b), 61. But H.B. never alleges that Red Roof caused or directed her injuries. *Id.*

The district court reached the same conclusion when it analyzed the parallel expected or intended injury exclusion under Coverage A: H.B.'s "should have known" allegations "sound[] in negligence, not intent," and therefore do not unambiguously trigger an exclusion keyed to the insured's subjective knowledge of harm. Doc. 93 at 11–13. That analysis applies with equal force here. Georgia strictly construes exclusions against the insurer, and Liberty bears the burden of proving the exclusion applies. *Ga. Farm Bureau Mut. Ins. Co. v. Smith*, 784 S.E.2d 422, 424 (Ga. 2016). Liberty has not carried that burden and the Knowing Violation of Rights of Another Exclusion does not bar coverage.

**V.    Georgia public policy does not bar coverage absent an express intent to harm, and *Amici's* broader public-policy theory is beyond the scope of this appeal.**

**A.    Georgia public policy does not bar coverage because the Underlying Plaintiffs do not allege that Red Roof intentionally inflicted injury upon them.**

Liberty argues that Red Roof's "participation in a sex-trafficking venture is uninsurable as a matter of public policy." (Br. of Appellant, p. 53). *Amici* make an almost identical argument. (*See* Br. of *Amici Curiae*, pp. 23–24). Both are mistaken.

Under Georgia law, parties' freedom of contract is the paramount public policy. *Nat'l Cas. Co. v. Ga. Sch. Boards Ass'n-Risk Mgmt. Fund*, 818 S.E.2d 250, 254 (Ga. 2018). Thus, courts will only bar insurance coverage on the basis of public policy, thereby disregarding the bargained-for terms of the parties' insurance policy, "in cases free from doubt." *Kindley v. First Acceptance Ins. Co. of Ga., Inc.*, 889 S.E.2d 412, 416 (Ga. App. 2023). Applying these principles, Georgia courts have routinely rejected insurers' efforts to avoid coverage under an insurance policy for public policy reasons. A good example is that Georgia—unlike many states— allows coverage for punitive damages. S*ee Greenwood Cemetery, Inc. v. Travelers Indem.* Co., 232 S.E.2d 910, 913–14 (Ga. 1977). It is also not

Page 54

against public policy in Georgia to insure damages from willful and wanton misconduct or racial discrimination. *See Hood*, 140 S.E.2d at 70 (allowing coverage of willful and wanton misconduct); *Union Camp Corp. v. Cont'l Cas. Co.*, 452 F. Supp. 565, 568 (S.D. Ga. 1978) (allowing coverage for racial discrimination).

Liberty argues that this high bar is met in this case because public policy "prevents intentional, injury-causing conduct from being insured," and "participation in a venture under the TVPRA necessarily requires affirmative conduct in furtherance of a sex trafficking venture." (Br. of Appellant, pp. 52, 53). Once again, Liberty misconstrues both the standard for the public-policy exclusion from coverage and the elements of a claim under Section 1595. As to public policy generally, Liberty is wrong that any intentional conduct that happens to cause injury is uninsurable by public policy. The district court properly rejected this argument because Georgia's public-policy exclusion focuses on whether the insured intentionally inflicted *injury*. *Hood*, 140 S.E.2d at 70. H.B. did not allege that Red Roof intended to injure her.

Liberty's framing of its public policy argument underscores its weakness. According to Liberty, "Georgia and Ohio prevent insureds

Page 55

from seeking coverage for intentional, criminal conduct, and, on that basis, coverage must be precluded for Red Roofs participation in a sex-trafficking venture under the TVPRA." (Br. of Appellant, p. 17). *Amici* similarly contend that "this Court should hold that the crime of sex trafficking is so abhorrent that it is uninsurable as a matter of law." (Br. of *Amici Curiae*, p. 23). But those are not the facts of this case, and these arguments once again conflate Section 1591's criminal proscription with a beneficiary claim under Section 1595. Neither Red Roof nor its employees have been charged with any crime or alleged to have violated Section 1591. Nor are they alleged to have participated in a "sex-trafficking venture." The claims against Red Roof are for financially benefitting from third party traffickers' actions. There is no public policy that would bar coverage for the claims asserted against Red Roof.

B.     ***Amici Curiae* ask the Court to legislate state law by judicial fiat in the first instance, for reasons not raised in the district court.**

This Court adheres to the principle of "party presentation," under which it relies on parties to litigation to frame the issues for decision. *Global Marine Exploration, Inc. v. Republic of France*, 151 F.4th 1296, 1309–10 (11th Cir. 2025). Absent exceptional circumstances, *Amici* "may

not expand the scope of an appeal to implicate issues" not so presented. *Id.* at 1310.

The public-policy dispute before the district court was narrow. Without acknowledging that public policy will only bar coverage in cases "free from doubt," Liberty contended that coverage was precluded because the Underlying Plaintiffs alleged that Red Roof "intentionally inflicted" their injuries. Doc. 86 at 25–26. For the reasons explained *supra,* this argument fails.

But *Amici's* second argument goes much further. They ask the Court to reverse based on a sweeping "cost-shifting" public policy issue that was never raised before the district court and bears all the hallmarks of issues properly left to the legislature. (*See* Br. of *Amici Curiae* at 24–25).

The Georgia General Assembly recently passed, in the form of "S.B. 68," sweeping tort-reform legislation intended to keep so-called "nuclear verdicts" from shifting the costs of tort litigation to Georgia's insureds. *See* Ga. Laws 2025, Act 9, § 4, effective April 21, 2025.[17] The legislative

---

[17] *See* § 1:13. 2025 tort reform legislation, Ga. Practice & Procedure § 1:13 (2024-2025 ed.) (summarizing the changes S.B. 68 implemented, none of

Page 57

history behind S.B. 68 reveals that reducing Georgians' insurance premiums was a particular concern.[18] But the legislature expressly exempted tort actions related to human trafficking. O.C.G.A. § 51-3-53(c).

Thus, S.B. 68 represents a decision by the General Assembly to allow sex trafficking victims to pursue civil relief, expressly recognizing the costs this imposes on insurers and insureds alike, nonetheless exempting sex trafficking victims from the sweeping restrictions imposed on nearly all other tort litigants, and declining to grant insurers any protections not already available to them under Georgia law. Despite all of this, *Amici* ask the Court to impose a blanket ban on coverage for *any* claims involving allegations of sex trafficking. The General Assembly could have written such restrictions into S.B. 68 but did not. Likewise, insurers can include such restrictions in their insurance policies, but Liberty did not.[19]

---

which relate to insurance coverage in suits involving allegations of sex trafficking).

[18] *See* https://senatepress.net/president-pro-tempore-john-f-kennedy-applauds-tort-reform-legislation-passing-senate.html (last visited May 25, 2026).

[19] In addition to assault and battery or abuse and molestation exclusions, the insurance industry's principal source of standardized policy forms has created a specific exclusion for human trafficking. *See* https://assets.alm.com/d8/00/269cc57741b881f794032ee6ca9a/cg-40-49-01-26-exclusion-human-trafficking.pdf (last visited May 25, 2026). The existence

Moreover, *Amici's* request for an appellate public-policy ruling in the first instance fails on its own terms. *Amici* cannot complain of improper cost-shifting as to underlying litigation that Liberty *chose to settle.* Such judicial legislation would contradict the narrow public-policy exceptions recognized in Georgia. *Amici*, like Liberty, do not grapple with the scope of or reasoning behind those narrow exceptions. Nor do they distinguish or even acknowledge the reasons the district court ruled that Georgia public policy does not bar coverage here. They simply ask the Court to shift the insurers' costs to the insureds, where the General Assembly very recently declined to do so itself, and in a manner unprecedented by (and far broader than) any public-policy exception ever endorsed by Georgia courts. Finally, they ask the Court to do all of this for the first time on appeal. Such a request is improper and beyond the scope of the issues here, and the Court should reject it.

---

of these specialized exclusions undercuts the arguments of Liberty and *Amici* here. As always, an insurer is free to exclude specific claims from coverage. Liberty chose not to include any such restrictions when it sold its policies to Red Roof and cannot now rely on public policy to rewrite its contracts.

**VI.    Liberty has no right to recoup its defense or settlement payments.**

    **A.    Under Georgia law, the district court correctly extended *Winder Lab'ys* to indemnity payments.**

Liberty concedes—as it must—that under *Cont'l Cas. Co. v. Winder Lab'ys, LLC*, 73 F.4th 934 (11th Cir. 2023), it cannot recoup its defense costs absent a contractual provision that allows it. (Br. of Appellant, p. 75-76). The Liberty Policies contain no such provision. But Liberty nevertheless contends that it should be entitled to reimbursement of its voluntary settlement payments. (Br. of Appellant, pp. 76–78). The district court correctly rejected this argument. The district court's ruling is faithful to *Winder Lab'ys* and consistent with the majority of jurisdictions around the country. It should be affirmed.

The district court correctly read *Winder Lab'ys'* holding as focused on the basis for reimbursement, not the costs being sought. The Eleventh Circuit framed its holding in *Winder Lab'ys* in unambiguous terms: Georgia law "would not allow an insurer to recoup its expenses based on a reservation of rights letter without any contractual provision allowing for reimbursement." 73 F.4th at 950. The Court's reasoning turned on standard contract law: "[W]hile insurers can certainly contract for a right to

Page 60

reimbursement, they cannot do so in a subsequent reservation of rights after a reimbursement-less bargain has been struck." *Id.*

The *Winder Lab'ys* rationale applies even more so to indemnity. If a unilateral reservation of rights cannot create a contractual right to recoup defense costs—which the insured actually receives and agrees to receive—it follows that it cannot create a contractual right to recoup indemnity payments that go directly to a third party that the insured never "accepts." The reasons *Winder Lab'ys* gave to reject defense-costs recoupment apply with greater force to indemnity.

The Restatement of the Law of Liability Insurance—which the Supreme Court of Georgia has relied upon—buttresses this conclusion. *See GEICO Indem. Co. v. Whiteside*, 857 S.E.2d 654, 663 (Ga. 2021) (citing the Restatement approvingly and siding with the majority of jurisdictions). Section 25(2) is categorical: "[u]nless otherwise stated in an insurance policy or agreed to by the insured, an insurer may not settle a legal action and thereafter demand recoupment of the settlement amount from the insured on the ground that the action was not covered." RESTATEMENT OF THE LAW OF LIAB. INS. § 25(2) (AM. L. INST. 2019). Liberty's policy

contains no reimbursement provision and it never alleges that Red Roof agreed to reimbursement. That should end the analysis.

The Restatement also disposes of Liberty's public policy arguments. Liberty argues a no-recoupment rule discourages insurers from settling when "insurance coverage is uncertain." (Br. of Appellant, p. 63.) Yet Comment c of the Restatement rejects Liberty's exact argument:

> insurers have not developed a regular practice of inserting settlement-recoupment provisions in their policies. Given that such provisions would be enforceable, the absence of such provisions in policies can be taken as evidence that the fairest and most efficient default rule, and the one that is most consistent with the parties' reasonable expectations, is one of no recoupment.

RESTATEMENT OF THE LAW OF LIAB. INS. § 25 cmt. c. Insurers "are in the best position to revise the policy language" as the drafters of policies and allocators of risk, but they have not done so. *Id.* Despite this, Liberty asks this Court to do what it wouldn't. No insurer, including Liberty, should be allowed to retrofit a term it declined to include when drafting its policy.

Liberty also argues a no-recoupment rule allows an insured to "force its insurer into choosing between paying for uncovered claims or facing a possible bad-faith action." (Br. of Appellant, p. 77). Yet an insurer is only exposed to a bad-faith action if it had no basis to withhold

settlement payments. *See Whiteside*, 857 S.E.2d at 663. A no-recoupment rule asks insurers to do no more than what settlement always requires: weigh the cost of paying now against the risk of a later determination. This is not a "Catch-22" but a trade-off that is at the core of all settlement decisions. Liability insurers should not be excluded from this function that they contractually obligated themselves to perform. Indeed, a pro-recoupment rule creates its own moral hazard: insurers with colorable coverage defenses would settle more freely and bargain less hard on settlement amounts, knowing they could claw the payments back from the insured. *See* RESTATEMENT OF THE LAW OF LIAB. INS. § 25 cmt. c.

Unlike reimbursement of defense costs—where the *Winder Lab'ys* decision was arguably in the minority—the majority of state courts have not permitted recoupment of settlement payments. *See* RESTATEMENT OF THE LAW OF LIAB. INS. § 25 cmt. c. Despite Liberty's uncited and unfounded contention that there is a long-standing common-law tradition allowing reimbursement, the Restatement notes "[t]he vast majority of states have not addressed this issue, perhaps 'because until recently few observers would have thought that there could be any right to recoup indemnity payments.'" *Id*.

Liberty offers no Georgia authority to the contrary. Those courts that have reached the question have rejected an unbargained-for right of recoupment. *See, e.g., Am. Fam. Ins. Co. v. Almassud*, 522 F. Supp. 3d 1263 (N.D. Ga. 2021). Liberty's position rests on policy reasoning this Court, multiple other jurisdictions, and the Restatement have evaluated and rejected. For these reasons, Liberty's recoupment claims fail, and the district court's dismissal of Counts X through XVII should be affirmed.

## CONCLUSION

For the foregoing reasons, the Court should affirm the district court's Order dismissing Liberty's claims.

Respectfully submitted, this 26th day of May, 2026.

FELLOWS LABRIOLA LLP

*/s/ Shattuck Ely*
Shattuck Ely
Georgia Bar No. 246944
J. Alexander Prescott
Georgia Bar No. 966471
Jonathan Spratling
Georgia Bar No. 358001

Peachtree Center
Suite 2400, Harris Tower
233 Peachtree Street, N.E.
Atlanta, Georgia 30303-1731
(404) 586-9200

Attorneys for Appellees

Page 64

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

Certificate of Compliance With Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

1.      This Response contains 12,473 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).  Counsel relied on the word count of the word-processing system used to prepare the document pursuant to Fed. R. App. P. 32(g)(1).

2.      This Response complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6), because it has been prepared in a proportionally spaced typeface setting using Microsoft® Word for Mac 2024, Version 16.88 (24081116), in 14-point Century Schoolbook font.

Respectfully submitted, this 26th day of May, 2026.

FELLOWS LABRIOLA LLP

*/s/ Shattuck Ely*
Shattuck Ely

Page 65

## CERTIFICATE OF SERVICE

I hereby certify that this day I have electronically filed the foregoing pleading using the clerk's office ECF system, which will send email notification of the filing to all counsel of record.

This 26th day of May, 2026.

FELLOWS LABRIOLA LLP

*/s/ Shattuck Ely*
Shattuck Ely