No. 25-13187

# In the United States Court of Appeals
# for the Eleventh Circuit

LIBERTY MUTUAL FIRE INSURANCE COMPANY,

Plaintiff-Appellant,

*v.*

RED ROOF INNS, INC.; RED ROOF FRANCHISING, LLC; RRI WEST
MANAGEMENT, LLC; FMW RRI NC, LLC,

Defendants-Appellees,

JANE DOE #1; JANE DOE #2; JANE DOE #3; JANE DOE #4; W.K.; E.H.;
M.M.; R.P.; M.B.; D.P.; A.F.; C.A.; R.K.; K.P.; T.H.; H.B.; AND K.M.,

Nominal Defendants.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA

## REPLY BRIEF FOR APPELLANT

Latasha L. Scott
BUTLER WEIHMULLER
  KATZ CRAIG LLP
400 N. Ashley Drive, Suite 2300
Tampa, FL 33602
(813) 281-1900

Nancy D. Adams
  *Counsel of Record*
Alec J. Zadek
Mitchell J. Clough
MINTZ, LEVIN, COHN, FERRIS,
  GLOVSKY AND POPEO, P.C.
One Financial Center
Boston, MA 02111
(617) 542-6000

JUNE 30, 2026

No. 25-13187, *Liberty Mutual Fire Insurance Co. v. Red Roof Inns, Inc.*

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Eleventh Circuit Rules 26.1-1 through 26.1-3, to Plaintiff-Appellant Liberty Mutual Fire Insurance Company's knowledge, the following persons and entities have an interest in the outcome of this appeal:

Adams, Nancy D.

A.F.[1]

Andersen, Tate, & Carr, P.C.

Baumrind, Michael Rosen

Bendin Sumrall & Ladner, LLC

Birg, Erika C.

Bondurant Mixson & Elmore, LLP

Butler Weihmuller Katz Craig LLP

C.A.

Clough, Mitchell J.

---

[1]    The plaintiffs in the actions underlying this insurance-coverage dispute, who were named as nominal defendants, are identified by their initials or as Jane Doe to protect their identities in a manner consistent with that which was employed at the District Court, because they allege they are the victims of sex trafficking.

No. 25-13187, *Liberty Mutual Fire Insurance Co. v. Red Roof Inns, Inc.*

Doe, Jane #1

Doe, Jane #2

Doe, Jane #3

Doe, Jane #4

D.P.

E.H.

Ely, Shattuck

Fellows LaBriola LLP

Floyd, John Earl

FMW RRI NC, LLC

Gallo-Cook, Alexandra

H.B.

K.M.

K.P.

Liberty Mutual Fire Insurance Company

Liberty Mutual Group Inc.

Liberty Mutual Holding Company, Inc.

LMHC Massachusetts Holdings Inc.

Mesa, Juliana

No. 25-13187, *Liberty Mutual Fire Insurance Co. v. Red Roof Inns, Inc.*

Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.

M.B.

M.M.

Mykkeltvedt, Tiana Scogin

Nelson Mullins Riley & Scarborough LLP

Red Roof Franchising, LLC

Red Roof Inns, Inc.

R.K.

R.P.

RRI West Management, LLC

Rosenzweig, Andrew

Scott, Latasha L.

Seals, Amanda Kay

Spratling, Jonathan

Stoddard, Matthew B.

Swift, Donald L. III

T.H.

The Honorable Leigh Martin May

The Stoddard Firm

No. 25-13187, *Liberty Mutual Fire Insurance Co. v. Red Roof Inns, Inc.*

Varghese, Manoj Sam

W.K.

Zadek, Alec J.

Liberty Mutual Fire Insurance Company is a subsidiary of Liberty Mutual Group Inc.  No publicly traded corporation owns more than 10% of Liberty Mutual Fire Insurance Company's stock.

Liberty Mutual Holding Company Inc. owns 100% of the stock of LMHC Massachusetts Holdings Inc.  LMHC Massachusetts Holdings Inc. owns 100% of Liberty Mutual Group Inc.  Liberty Mutual Group Inc. owns 100% of Liberty Mutual Fire Insurance Company.

/s/ Nancy D. Adams
Nancy D. Adams

C-4 of 4

# TABLE OF CONTENTS

Page

TABLE OF CONTENTS ............................................................i

TABLE OF CITATIONS ........................................................ iii

INTRODUCTION.................................................................1

STANDARD OF REVIEW.....................................................3

ARGUMENT .......................................................................4

I.    Ohio law governs, and Red Roof's contrary argument would make Georgia law apply over every other State's law. ...........................4

II.   Liberty's declaratory-judgment claims are not moot. ....................7

III.  Liberty had no duty to defend Red Roof against the H.B. Lawsuit. ..................................................................8

    A.    The underlying plaintiffs did not allege "bodily injury" caused by an "occurrence"....................................................8

        1.    Passive conduct is not sufficient to violate the TVPRA..............................................................9

        2.    The expectation or design of participating in a venture that sold individuals for sex was that the individuals would be injured...........................................14

        3.    Red Roof's separation-of-insureds argument is both waived and meritless. ................................22

    B.    There is no coverage under Coverage B because H.B. does not allege any separate false imprisonment or detainment.23

    C.    Georgia public policy precludes insurance coverage for participating in sex trafficking. ...........................................27

IV.    Liberty has the right to recoup payments where there is no coverage. ...................................................................................28

CONCLUSION ..................................................................................31

CERTIFICATE OF COMPLIANCE......................................................32

ADDENDUM .....................................................................................33

# TABLE OF CITATIONS

Page(s)

**Cases**

*A.G. v. Northbrook Indus.*,
171 F.4th 1257 (11th Cir. 2026) ...................................................... 9, 10

*Allstate Ins. Co. v. Emp'rs Liab. Assurance Corp.*,
445 F.2d 1278 (5th Cir. 1971) ........................................................... 7

*Allstate Ins. Co. v. Justice*,
493 S.E.2d 532 (Ga. 1997) ............................................................... 18

*Am. Empire Surplus Lines Ins. Co. v. Hathaway Dev. Co.*,
707 S.E.2d 369 (Ga. 2011) ........................................................... 17-18

*Am. Family Mut. Ins. Co. v. Wyndham Hotels & Resorts Inc.*,
No. 26-1611 (7th Cir.) ..................................................................... 21

*Am. Family Mut. Ins. Co. v. Wyndham Hotels & Resorts, Inc.*,
2026 WL 851639 (S.D. Ind. Feb. 25, 2026) ...................................... 22

*Ameritas Variable Life Ins. Co. v. Roach*,
411 F.3d 1328 (11th Cir. 2005) .......................................................... 4

*Bloom v. Richards*,
2 Ohio St. 387 (1853) ......................................................................... 6

*Blue Ridge Ins. Co. v. Jacobsen*,
22 P.3d 313 (Cal. 2001) .................................................................... 29

*Chiquita Brands Int'l v. Nat'l Union Ins. Co.* (*Chiquita I*),
988 N.E.2d 897 (Ohio Ct. App. 2013) ........................... 14, 15, 24, 26

*Cincinnati Ins. Co. v. Magnolia Ests., Inc.*,
648 S.E.2d 498 (Ga. 2007) ............................................................... 16

*Colonial Ins. Co. v. Lumpkin*,
428 S.E.2d 351 (Ga. 1993) ............................................................... 26

*Colonial Penn Ins. Co. v. Hart,*
  291 S.E.2d 410 (Ga. Ct. App. 1982) .................................................... 17

*Cont'l Cas. Co. v. Ala. Emergency Room Admin. Servs.,*
  355 F. App'x 332 (11th Cir. 2009) ........................................................ 4

*Cont'l Cas. Co. v. Winder Lab'ys,*
  73 F.4th 934 (11th Cir. 2023) ............................................................ 29

*Coon v. Med. Ctr., Inc.,*
  797 S.E.2d 828 (Ga. 2017) ............................................................... 5, 6

*Doe #1 v. Red Roof Inns,*
  21 F.4th 714 (11th Cir. 2021) ......................................................... 9, 13

*Doe 1 v. Apple Inc.,*
  96 F.4th 403 (D.C. Cir. 2024) ............................................................ 10

*Edwards v. Sharkey,*
  747 F.2d 684 (11th Cir. 1984) ............................................................. 7

*G.G. v. Salesforce.com, Inc.,*
  76 F.4th 544 (7th Cir. 2023) ........................................................ 11, 12

*G.M. Sign, Inc. v. St. Paul Fire & Marine Ins. Co.,*
  768 F. App'x 982 (11th Cir. 2019) ...................................................... 19

*Ga. Farm Bureau Mut. Ins. Co. v. Hall Cty.,*
  586 S.E.2d 715 (Ga. Ct. App. 2003) .............................................. 21, 24

*John Moriarty & Assocs., Inc. v. Zurich Am. Ins. Co.,*
  207 N.E.3d 542 (Mass. App. Ct. 2023) ............................................... 30

*K.H. v. Riti, Inc.,*
  2024 WL 505063 (11th Cir. Feb. 9, 2024) ............................................ 9

*Kansas v. Nebraska,*
  574 U.S. 445 (2015) ........................................................................... 30

*Managed Care Advisory Grp. v. CIGNA Healthcare, Inc.,*
  939 F.3d 1145 (11th Cir. 2019) ............................................................ 4

*Md. Cas. Co. v. Salon Ave. Suite 2*,
  2014 WL 4925623 (N.D. Ga. Sept. 29, 2014) ..................................... 27

*Meritplan Ins. Co. v. Leverette*,
  552 F. App'x 900 (11th Cir. 2014) .................................................... 15

*Nationwide Prop. & Cas. Co. v. Renaissance Bliss, LLC*,
  823 F. App'x 815 (11th Cir. 2020) ...................................................... 7

*Northfield Ins. Co. v. Northbrook Indus.*,
  176 F.4th 1268 (11th Cir. 2026) ...................................................... 21

*Peerless Indem. Ins. Co. v. Tilma, Inc.*,
  No. 25-1980 (4th Cir.) ..................................................................... 21

*Perry v. State Farm Fire & Cas. Co.*,
  676 S.E.2d 376 (Ga. 2008) .............................................................. 19

*Phila. Indem. Ins. Co. v. Eubanks*,
  927 S.E.2d 518 (Ga. Ct. App. 2026) ................................. 15, 16, 24, 26

*QoS Networks Ltd. v. Warburg Pincus & Co.*,
  669 S.E.2d 536 (Ga. Ct. App. 2008) ................................................. 15

*Red Roof Inns. v. Liberty Mut. Fire Ins. Co.*,
  No. 26-3281 (6th Cir.) ..................................................................... 21

*Ricchio v. Bijal, Inc.*,
  424 F. Supp. 3d 182 (D. Mass. 2019) ............................................... 22

*Roe v. State Farm Fire & Cas. Co.*,
  376 S.E.2d 876 (Ga. 1989) ......................................................... 19, 20

*Rucker v. Columbia Nat. Ins. Co.*,
  307 Ga. App. 444 (2010) ................................................................... 8

*Sierra v. City of Hallandale Beach*,
  904 F.3d 1343 (11th Cir. 2018) ....................................................... 23

*Shaha v. Gentry*,
  859 S.E.2d 567 (Ga. Ct. App. 2021) ................................................. 29

*Smith v. Wade*,
   461 U.S. 30 (1983) .................................................................. 21

*Starr Indemnity & Liability Co. v. Choice Hotels Int'l*,
   2021 WL 2457107 (S.D.N.Y. June 16, 2021) .................................... 22

*Travelers Prop. Cas. Corp. v. Chiquita Brands Int'l* (*Chiquita II*),
   243 N.E.3d 797 (Ohio Ct. App. 2024) ........................................ 8-9, 20

*Twin City Fire Ins. Co. v. Hartman, Simons & Wood, LLP*,
   609 F. App'x 972 (11th Cir. 2015) ............................................... 8

*Wells v. Twenty-First St. Realty Co.*,
   12 F.2d 237 (6th Cir. 1926) ..................................................... 6

*World Harvest Church, Inc. v. Guideone Mut. Ins. Co.*,
   586 F.3d 950 (11th Cir. 2009) ................................................... 8

## Statutes

18 U.S.C. § 1591 ....................................................... 13, 26, 28

\* 18 U.S.C. § 1595 ........................................................... 12

Ala. Code § 1-3-1 ............................................................. 5

Ohio Rev. Code Ann. § 3901.82 ............................................. 6, 30

## Other Authorities

John Mitchell et al., *A Map of the British and French
   Dominions in North America* (1755),
   https://lccn.loc.gov/74693173 ............................................... 5

William E. Chilton, *The Northwest Territory Claim*,
   25 W. VA. LAW QUARTERLY 171, 173 (1918) .................................... 5

Restatement (Third) of Restitution & Unjust Enrichment,
   § 35 & cmt. c. (2011) ........................................................ 30

**INTRODUCTION**

Contrary to Red Roof's repeated suggestions, Red Roof is not being sued because of the traffickers' conduct or because of its constructive knowledge that sex trafficking was occurring at its hotels. Rather, Red Roof is being sued for its own involvement in sex trafficking—its participation in ventures engaged in sex trafficking. This conduct took place with Red Roof's foresight, expectation, and design. The natural and probable consequence of Red Roof's conduct was the rape and sexual assault of the plaintiffs, including the minor H.B. Thus, Liberty's policies do not afford coverage for the plaintiffs' allegations. To avoid this result, Red Roof asks this Court to find that plaintiffs being repeatedly raped and sexually assaulted at their hotel was nothing more than collateral or inconsequential damage. Red Roof is wrong. There is nothing "collateral" or "inconsequential" about the plaintiffs' injuries.

Red Roof suggests that the relief Liberty seeks is both novel and unprecedented. It is wrong here, too. Liberty is applying this Court's interpretation of the TVPRA's "participation in a venture" requirement to the "occurrence" requirement in a general liability policy. As this Court has held, merely renting a hotel room to traffickers coupled with

constructive knowledge of sex-trafficking does not constitute "participation in a venture." The "participation" element requires Red Roof to have shared in legal risk and profits with the plaintiffs' traffickers. The plaintiffs' traffickers used Red Roof's hotels as their base of operation to violate the TVPRA. As such, the injuries to the plaintiffs naturally and expectedly followed from Red Roof's participation in the venture. Whether this Court applies Georgia or Ohio law, the result is the same: the plaintiffs' claims against Red Roof are not covered.

As for the H.B. Lawsuit, Liberty had no duty to defend for three reasons. *First*, the actual or alleged violation of the TVPRA is not an "occurrence" under Coverage A. *Second*, H.B. alleges no false imprisonment separate from her sex trafficking that could implicate Coverage B; any confinement she alleges was inextricably intertwined with and merely part of the uninsured sex trafficking. *Third*, Georgia public policy forbids insuring a party against the consequences of its participation in sex trafficking. Because Liberty had no duty to defend Red Roof, Liberty is entitled to recoup the amounts it paid to defend and settle the uncovered lawsuits.

Beyond that, Red Roof misstates the standard of review and governing law. The district court dismissed Liberty's claims based on its interpretation of the insurance policies, a question of law reviewed *de novo*—not for abuse of discretion. On the merits, Ohio law governs. Red Roof's application of Georgia's presumption-of-identity rule would vitiate the limits imposed by the Georgia Supreme Court because Ohio is not a "common law" state. Separately, by statute, Ohio has repudiated the basis for which Red Roof asserts there is no right to recoupment.

Finally, Liberty's declaratory-judgment claims are not moot. Under Red Roof's theory—that the duty to indemnify is not ripe until the underlying lawsuits resolve, yet moot upon resolution—there is no ability to litigate coverage. According to Red Roof, declaratory-judgment claims are either not ripe or moot. That theory cannot be squared with this Court's precedents.

The judgment should be vacated and the case remanded for further proceedings.

## STANDARD OF REVIEW

Red Roof misstates the standard of review, asserting that dismissal of Liberty's declaratory-judgment claims is reviewed "only for an abuse

of discretion." Opp'n 10. That is true only when a district court dismisses based on the discretionary *Wilton* factors. *See, e.g.*, *Ameritas Variable Life Ins. Co. v. Roach*, 411 F.3d 1328, 1330 (11th Cir. 2005). That standard does not apply where, as here, dismissal depends on the merits of the policies. *See, e.g.*, *Cont'l Cas. Co. v. Ala. Emergency Room Admin. Servs.*, 355 F. App'x 332, 334 (11th Cir. 2009) (interpretation of insurance contract is "question of law reviewed *de novo*" even though "complaint seeks declaratory relief"). In any event, an "error of law is an abuse of discretion *per se*." *Managed Care Advisory Grp. v. CIGNA Healthcare, Inc.*, 939 F.3d 1145, 1153 (11th Cir. 2019).

## ARGUMENT

### I.  Ohio law governs, and Red Roof's contrary argument would make Georgia law apply over every other State's law.

Ohio law governs the interpretation of the Policies. Opening Br. 55. Because Ohio law provides a clear path for Liberty to recover defense and indemnity payments for uncovered claims, Red Roof seeks to apply Georgia law pursuant to Georgia's presumption-of-identity rule. The rule is inapplicable. Ohio is not a common-law state under the presumption-of-identity rule. *See* Opp'n 15-16

- 4 -

Ohio was created from unincorporated territory (not one of the thirteen colonies) and explicitly repudiated the English common law. *See* Opening Br. 57 (citing *Wolfe v. Wolfe*, 350 N.E.2d 413, 418 n.15 (Ohio 1976)).[2/]  According to Red Roof, so long as a state has adopted some common law, or its land was at some point claimed by a colony, the presumption-of-identity rule applies.  Were that true, the limitations drawn by the Georgia Supreme Court would be meaningless.[3/]

Red Roof also argues that because Ohio has at times adopted portions of the common law, it is a sufficiently common law state for the presumption-of-identity rule, citing *Coon v. Med. Ctr., Inc.*, 797 S.E.2d 828, 836 (Ga. 2017) (applying Georgia law over Alabama law).  Opp'n 16. But Alabama adopted the English common law by statute.  *See* Ala. Code § 1-3-1.  Ohio, however, repealed its similar statute and relies on English

---

[2/]    Ohio was not formed from the land of Virginia.  *See* Opp'n 14-15. The claims to the land on which Ohio sits were vigorously disputed in the country's early days.  *See* William E. Chilton, *The Northwest Territory Claim*, 25 W. VA. LAW QUARTERLY 171, 173 (1918) (recounting Virginia's efforts to "assert the claim of Virginia" over the territory).  Virginia ultimately ceded its claim, creating the Northwest Territory.  *See id.* at 180.

[3/]    The colonies claimed all land from "sea to sea" practically, everything in the new United States.  Chilton, *supra*, at 172; Add. at 34, John Mitchell et al., *A Map of the British and French Dominions in North America* (1755), https://lccn.loc.gov/74693173.

common law only as it deems appropriate.  *See, e.g.*, *Wells v. Twenty-First St. Realty Co.*, 12 F.2d 237, 238 (6th Cir. 1926) (Ohio courts "adopt" certain principles of the common law, but discard others).

Expanding *Coon* would also conflict with the basis of the presumption-of-identity rule, which presumes that the common law is "the same in all the American States where it prevails," and there is "only one right construction" of the common law.  *Coon*, 797 S.E.2d at 832, 834. This logic fails with respect to Ohio, because its courts do not interpret the common law.  *See, e.g.*, *Bloom v. Richards*, 2 Ohio St. 387, 390 (1853) ("our courts have not hesitated to modify [English common law] to suit our circumstances, or, if necessary, to wholly depart from it").

Moreover, Red Roof explains that the legal basis for the "no-recoupment" argument is the Restatement of the Law of Liability Insurance upon which Georgia relies.  Opp'n 61-62.  But Ohio enacted a statute explicitly rejecting the Restatement.  *See* Ohio Rev. Code Ann. § 3901.82 (the Restatement "does not constitute the public policy of this state and is not an appropriate subject of notice").

Accordingly, the presumption-of-identity rule does not apply.

## II.    Liberty's declaratory-judgment claims are not moot.

Under either Ohio or Georgia law, Liberty is entitled to recoup its indemnity payments if the Underlying Lawsuits did not allege covered claims and, therefore, there remains a case or controversy. Red Roof does not dispute that under Ohio law, Liberty has the right to recoup both defense and indemnity expenses. *See* Opening Br. 59-60. Since Ohio law applies, Liberty has a live dispute concerning recoupment. Further, even under Georgia law, Liberty has a right to recoup amounts it contributed to settlement. *See infra* at 28-31. Because Liberty has a right to recoup, at a minimum, its indemnity payments, Liberty's declaratory-judgment claims are not moot. *Nationwide Prop. & Cas. Co. v. Renaissance Bliss, LLC*, 823 F. App'x 815, 821 (11th Cir. 2020) (declaratory-relief claims not moot where "district court declared that Nationwide was entitled to reimbursement of [settlement] amount").

This Court has held that a claim for declaratory relief to determine obligations under policies is not mooted by settlement of the underlying lawsuits. *See Edwards v. Sharkey*, 747 F.2d 684, 686 (11th Cir. 1984) (per curiam); *Allstate Ins. Co. v. Emp'rs Liab. Assurance Corp.*, 445 F.2d 1278, 1281 (5th Cir. 1971); *Nationwide Prop. & Cas.*, 823 F. App'x at 821.

Red Roof claims these cases are distinguishable, and this case is instead governed by *Twin City Fire Ins. Co. v. Hartman, Simons & Wood, LLP*, 609 F. App'x 972, 979 (11th Cir. 2015) (per curiam). But even in *Twin City*, the Court remanded in order for the insurer's claims for allocation and recoupment to proceed. 609 F. App'x at 979. Moreover, Red Roof's mootness position is inconsistent with Georgia's preference that insurers defend and seek declaration as to coverage. *See World Harvest Church, Inc. v. Guideone Mut. Ins. Co.*, 586 F.3d 950, 956 n.6 (11th Cir. 2009).

### III. Liberty had no duty to defend Red Roof against the H.B. Lawsuit.

#### A. The underlying plaintiffs did not allege "bodily injury" caused by an "occurrence".

Whether under Georgia or Ohio law, H.B.'s allegations that Red Roof participated in a venture that engaged in sex trafficking do not allege an "occurrence". An "occurrence" is an accident. Under Georgia law, where the insured makes a business decision to engage in specific conduct, that conduct takes place with one's foresight, expectation, and design and, thus, H.B.'s claim was not a covered "occurrence". *See Rucker v. Columbia Nat. Ins. Co.*, 307 Ga. App. 444, 447 (2010). Under Ohio law, when the natural and probable consequence of conduct is harm to another, the resulting harm is not an "occurrence". *Travelers Prop. Cas.*

*Corp. v. Chiquita Brands Int'l* (*Chiquita II*), 243 N.E.3d 797, 808-09 (Ohio Ct. App. 2024).  Because "participation in a venture" requires more than merely renting rooms, careless hotel operations, or passive failure to stop trafficking, the claims against Red Roof necessarily depend on the alleged affirmative conduct facilitating the trafficking venture.  The "bodily injury" resulting from that alleged participation was, therefore, not caused by an "occurrence" under either Georgia or Ohio law.

> **1.    Passive conduct is not sufficient to violate the TVPRA.**

This Court has repeatedly held that alleging participation under the TVPRA requires more than passive nonfeasance.  *See A.G. v. Northbrook Indus.*, 171 F.4th 1257, 1269 (11th Cir. 2026) ("something more" than renting rooms to traffickers is required); *K.H. v. Riti, Inc.*, 2024 WL 505063, at *3 (11th Cir. Feb. 9, 2024) (renting rooms to a sex trafficker not sufficient to participate in a sex-trafficking venture); *Doe #1 v. Red Roof Inns*, 21 F.4th 714, 727 (11th Cir. 2021) ("observing something is not the same as participating in it").

To violate the TVPRA, a defendant must take part in "a common undertaking or enterprise involving risk and potential profit."  *Red Roof Inns*, 21 F.4th at 725.  The "participation" element requires active steps

- 9 -

by the defendant to support the trafficking venture. *Northbrook Indus.*, 171 F.4th at 1270-73. This Court explained that "merely renting a hotel room to traffickers, coupled with constructive or actual knowledge of sex trafficking" is not enough to plead a TVPRA violation. *Id.* at 1269. Likewise, "[a] hotel's general friendliness toward and awareness of sex trafficking" is not sufficient. *Id.* at 1271. This Court found sufficient participation where hotels granted traffickers backdoor access to hotel rooms, provided special cleaning and towel services for rooms used for trafficking, and allowed brazen illicit activity in common spaces. *Id.* at 1270-73. This Court has consistently required "something more than engaging in an ordinary buyer-seller transaction" in furtherance of the venture. *Id.* at 1269; *see also Doe 1 v. Apple Inc.*, 96 F.4th 403, 415-16 (D.C. Cir. 2024).

Red Roof concedes that participation requires affirmative conduct in support of a venture, but notes that this Court "has never held that the defendant must intend or expect harm to the plaintiff." Opp'n 36. This is unsurprising; there is a difference between a liability question and a coverage question. In *Red Roof* and *A.G.*, among other cases, this Court was interpreting the "participation in a venture" element in the

- 10 -

liability context—*i.e.*, what level of conduct amounts to "participation in a venture." To answer that, this Court was not required to analyze whether an insured's "participation in a venture" constitutes an "occurrence". Here, Liberty asks this Court to apply its liability analysis to the coverage question.

Beyond that, Red Roof argues that interpreting "participation" to require something more than passive behavior renders meaningless the requirement that a defendant "knew or should have known" that the venture violated the TVPRA. Not so. For example, in *Salesforce*, the plaintiff alleged that Salesforce and Backpage entered into contracts designed to "facilitate and support" Backpage's "exponential growth." *G.G. v. Salesforce.com, Inc.*, 76 F.4th 544, 549 (7th Cir. 2023). The allegations supporting the participation and knowledge requirements were separate and distinct. The "venture" was Backpage's business itself, including its growth, profitability, and expansion. *Id.* at 554. In contrast, the knowledge requirement was satisfied based on Salesforce's relationship with Backpage; Salesforce either "knew or should have known" that "at least a substantial part of Backpage's business was

illegal sex trafficking." *Id.* at 555. There was little, if any, overlap between the two requirements.

Where a hotel operator is a defendant and sex-trafficking is occurring on-site, establishing that a hotel operator "participated" in a sex-trafficking venture may also demonstrate constructive knowledge that the venture violated the TVPRA. Here, although the underlying plaintiffs allege constructive knowledge, they also allege that Red Roof participated in aspects of the venture that violated the TVPRA. Doc. 79-6, ¶¶ 19, 24-25, 31, 33-34, 42. Thus, contrary to Red Roof's suggestion, the potential overlap does not mean that Liberty is somehow conflating civil and criminal violations of the TVPRA or reading out certain elements. Opp'n 34.

Red Roof also contends that the constructive-knowledge standard of § 1595(a) precludes any expectation of sex-trafficking injuries. *See* Opp'n 36-37. According to Red Roof, because a plaintiff need only prove that a defendant should have known—not that it actually knew—that the venture was engaged in commercial sex of minors or through force, fraud, or coercion, a defendant need not expect injury to the plaintiff. The constructive-knowledge element, however, speaks only to the plaintiff's

- 12 -

burden of proving the requisite level of knowledge that the venture engaged in a violation of § 1591.  *See Red Roof Inns*, 21 F.4th at 725. Where a venture's purpose is the sale of sex, by participating in the venture, a defendant shares in the legal risk of engaging in the illicit activity and the profit earned off the bodies of others.  Naturally, one of those legal risks is that a person sold for sex will seek recompense for the harm caused.

Finally, contrary to Red Roof's contention, H.B. alleged that Red Roof participated in a commercial-sex venture.  *See* Opp'n 38.  H.B. specifically alleged that Red Roof "participated in a venture by associating with [her] sex traffickers, facilitating [her] minor sex trafficking."  Doc. 79-6, ¶ 62.  H.B. further alleged that her traffickers paid the hotel's employees "in exchange for the hotel's facilitation of [her] sex trafficking."  *Id.* ¶ 19.  And, even if those allegations were not specific enough, the only venture alleged was one with H.B.'s sex traffickers, whose only business was sex trafficking.  *See id.* ¶ 62.  Red Roof tellingly does not identify any venture—other than a sex-trafficking venture—in which Red Roof was allegedly engaged.  *See* Opp'n 38.

- 13 -

In sum, H.B. alleged (as she had to) that Red Roof acted volitionally when it participated in a venture with her sex traffickers and thereby facilitated her sex trafficking.

> **2.    The expectation or design of participating in a venture that sold individuals for sex was that the individuals would be injured.**

Red Roof argues that even though it agreed to share in the legal risks and rewards of the commercial sex venture operated out of its hotel with H.B.'s traffickers, it should be entitled to coverage because the harm to H.B. was an accident, "a collateral or unexpected consequence." Opp'n 31. But the natural consequence of participating in a venture engaged in sex trafficking is that people will be sold for commercial sex.

Red Roof does not dispute that, under either Ohio or Georgia law, an "occurrence" requires fortuity. With respect to Ohio law, Red Roof does not dispute that an insured's intent can be inferred. Only addressing *Chiquita I* and *II*, Red Roof states that the cases are factually dissimilar. Opp'n 39-40; Opening Br. 36-37 (citing *Chiquita Brands Int'l v. Nat'l Union Ins. Co.* (*Chiquita I*), 988 N.E.2d 897, 899 (Ohio Ct. App. 2013)). Although the relevant statute here is the TVPRA, and there it was the Anti-Terrorism Act ("ATA"), the result is the same. Here, the

- 14 -

natural and probable consequence of sharing in the risk and reward of sex trafficking is that people will be sold for commercial sex and harmed. There, the natural and probable consequence of supporting terrorism is that people would be harmed. *Chiquita I*, 988 N.E.2d at 901. Red Roof also argues the cases are dissimilar because of a purported intent requirement under the ATA, but those decisions rested on the relationship between the insured's acts and the resulting harm, not any statutory requirement (such as intent). Under Ohio law, the plaintiffs' injuries were not caused by an "occurrence."

As for Georgia law, an injury is not caused by an "occurrence" if that injury was either intended by the insured, *or* was the expected result of the insured's conduct. *See Meritplan Ins. Co. v. Leverette*, 552 F. App'x 900, 901 (11th Cir. 2014) (per curiam). This test applies even when the expected result of the insured's conduct is that a *third party* will inflict injury on the plaintiffs. *See Phila. Indem. Ins. Co. v. Eubanks*, 927 S.E.2d 518, 532 (Ga. Ct. App. 2026).[4] Here, sex trafficking was the natural and

---

[4]    *Eubanks*'s "occurrence" analysis was not dictum, as Red Roof claims. *Compare* Opp'n 32, *with QoS Networks Ltd. v. Warburg Pincus & Co.*, 669 S.E.2d 536, 541 (Ga. Ct. App. 2008) (where decision could rely on only one ground but "actually decides all such points, the case is an authoritative precedent as to every point decided").

expected consequence of Red Roof employees allegedly serving as "lookouts" and renting rooms "on the back side of the hotel." Doc. 79-6, ¶¶ 19, 33, 42.

Turning to *Eubanks*, the plaintiffs alleged they were sexually abused by a third party. 927 S.E.2d at 524. Looking to the allegations of how the insured enabled the third party's abuse, the Court of Appeals concluded that the plaintiffs' "bodily injury" was not caused by an "occurrence" where the insured "knew of the abuse; failed to stop it or warn other students; and concealed the conduct." *Id.* at 532.[5] That was true even where there was no mention that the insured intended the resulting "bodily injury." *See generally id.* Thus, *Eubanks* is directly relevant and provides further support for Liberty's position.

---

[5]    Red Roof claims *Eubanks* is distinguishable because the abuse was perpetrated by the insured's employee. Opp'n 31-33. The court's analysis, however, focused solely on the insured's acts. *See Eubanks*, 927 S.E.2d at 532. Moreover, H.B. alleges that Red Roof's employees actively participated in H.B.'s sex trafficking. Doc. 79-6, ¶¶ 19-20, 33-34, 42. Similarly, *Cincinnati Ins. Co. v. Magnolia Ests., Inc.*, 648 S.E.2d 498, 500 (Ga. 2007), upon which Red Roof relies, concluded there was no evidence the insured-nursing home operator expected one resident to attack another. There were no allegations the insured facilitated the attack, unlike here.

More fundamentally, Red Roof misapprehends Liberty's argument concerning what constitutes an "occurrence". Liberty never argued that "[i]njuries caused by intentional acts are [] categorically uninsurable." *See* Opp'n 27. Rather, the test under Georgia law is whether the alleged injury was either intended by the insured, *or* was the expected result of the insured's volitional acts. Even the cases upon which Red Roof relies— which focused on the expected-or-intended exclusion, not whether an "occurrence" was alleged—confirm that subjective intent to injure is sufficient but not necessary to defeat coverage. In *Colonial Penn*, the insured testified that, although he fired his firearm, he "merely [did so] in order to frighten" the decedent. *Colonial Penn Ins. Co. v. Hart*, 291 S.E.2d 410, 413 (Ga. Ct. App. 1982). The Court of Appeals held that the exclusion did not apply because there was no evidence the insured "intended to cause the bodily injuries *or* that he knew the injuries *were substantially certain to follow* from his actions." *Id.* (emphasis added).

In *American Empire*, the Georgia Supreme Court indeed rejected the argument that intentional acts are categorically uncovered; but it held that a "deliberate act, performed negligently, is an accident if the effect is not the intended *or expected* result." *Am. Empire Surplus Lines*

*Ins. Co. v. Hathaway Dev. Co.*, 707 S.E.2d 369, 372 (Ga. 2011) (emphasis added).  In each of the cases on which Red Roof relies, the harm was neither intended *nor* expected.[6/]

By contrast, H.B.'s injuries from being sex trafficked are the expected result of, and substantially certain to follow from, Red Roof's facilitation of her sex trafficking.  *See* Doc. 79-6, ¶ 62 (alleging Red Roof "facilitat[ed] [H.B.'s] minor sex trafficking").  Tellingly, Red Roof nowhere suggests what would be the expected result of employees serving as lookouts, alerting traffickers to law enforcement, accepting money from traffickers beyond room fees, and renting rooms at the back of the hotel where it would be more difficult to discover the sex-trafficking venture. *Id.* ¶¶ 19-20, 33-34, 42.  Nor does Red Roof explain how sexual assault, molestation, and rape are not substantially certain to follow from participating in a venture with H.B.'s traffickers.

Red Roof's argument appears to be that, even if it acted volitionally when it assisted the traffickers, any injuries were merely collateral or

---

[6/]    Red Roof's gunshot cases, Opp'n 29 n.6, are also not relevant, as they involve scenarios where the resulting injury was not an expected result of the gunshot.  *See, e.g., Allstate Ins. Co. v. Justice*, 493 S.E.2d 532, 534, 535 (Ga. 1997) (stray bullet hitting third party an "unexpected happening").

unexpected consequences.  This defies logic.  Unsurprisingly, this Court has already rejected a similar argument applying Georgia law.  *See G.M. Sign, Inc. v. St. Paul Fire & Marine Ins. Co.*, 768 F. App'x 982, 987 (11th Cir. 2019).  Red Roof argues the insured in *G.M. Sign* intended the specific injury.  Opp'n 30.  Red Roof is wrong.  There, the insured argued (similar to Red Roof here) that, although it intended to send faxes, it did not intend any harm since it mistakenly believed it had consent to do so. *See id.*  This Court held that, because the insured indisputably intended to send the faxes, it necessarily also intended or expected to cause the property damage alleged, the consumption of paper and ink.  *Id.*; *see also Perry v. State Farm Fire & Cas. Co.*, 676 S.E.2d 376, 378 (Ga. 2008) (no occurrence where insured claimed he believed the plaintiff consented to sex acts, because the insured "intended to perform, with foresight, expectation, and design, the specific acts which caused [the plaintiff]'s alleged bodily injuries").

Moreover, even if subjective intent to injure were required (and it is not), Red Roof offers little response to the fact that Georgia law readily imputes such intent where the act is inherently harmful.  *See* Opening Br. 35-36 (citing *Roe v. State Farm Fire & Cas. Co.*, 376 S.E.2d 876, 877

(Ga. 1989)).  Contrary to Red Roof's contention, the insured in *Roe* did not "intend[] the specific injury directly caused by the conduct."  Opp'n 30.  Rather, the insured admitted the act was intentional but "relie[d] on a lack of intent to inflict bodily injury."  *Roe*, 376 S.E.2d at 877.  The Georgia Supreme Court held the insured's protestations that he did not intend the injury were not relevant for coverage purposes.  *Id.*  It held that, in some circumstances, the intentional act and the injury "caused by it are so closely tied as to be virtually inseparable," and "[e]xcept in the strongest of factual situations, intent to commit this act carries with it the intent to inflict the injury."  *Id.*  Here, facilitating a venture that engaged in sex trafficking is "so closely tied as to be virtually inseparable" from the injuries caused by sex trafficking, that subjective intent can be inferred.  *See id.* [7]

H.B. also alleges Red Roof acted with the intent or expectation she would be harmed.  H.B. seeks punitive damages, which under federal law are permitted only where the defendant's actions are "motivated by evil

---

[7]    Red Roof's singular discussion of Ohio law, Opp'n 39-40, is also incorrect on this point.  *Chiquita II* rested on the relationship between the insured's acts and the resulting harm rather than any statutory requirement.  243 N.E.3d at 807.

motive or intent, or . . . involve[] reckless or callous indifference." *Smith v. Wade*, 461 U.S. 30, 56 (1983). Under Georgia law, "by seeking punitive damages, [a plaintiff] has explicitly alleged that the act was intentional or at least evinced an expectation of harm," and thus there is no "occurrence". *Ga. Farm Bureau Mut. Ins. Co. v. Hall Cty.*, 586 S.E.2d 715, 718 (Ga. Ct. App. 2003).

Finally, Red Roof repeatedly places significant weight on the fact that "every court to address beneficiary claims under a CGL policy has found a duty to defend." Opp'n 40. *First*, Red Roof ignores that all but one of the cases on which it relies did not apply Georgia law—a distinction that Red Roof deems relevant for Liberty's cited cases, but not its own. *See* Opp'n 39, 49. *Second*, Red Roof relies on six trial-court opinions—three of which are on appeal, and one of which this Court dismissed on appeal last month.[8] *Third*, Red Roof ignores that one of the cases it cites concluded that a participant-liability claim under the TVPRA does *not* allege an occurrence—though Red Roof cites the case for

---

[8]    *Northfield Ins. Co. v. Northbrook Indus.*, 176 F.4th 1268, 1273, (11th Cir. 2026); *Am. Family Mut. Ins. Co. v. Wyndham Hotels & Resorts Inc.*, No. 26-1611 (7th Cir.); *Red Roof Inns. v. Liberty Mut. Fire Ins. Co.*, No. 26-3281 (6th Cir.); *Peerless Indem. Ins. Co. v. Tilma, Inc.*, No. 25-1980 (4th Cir.).

the conclusions that favor it.  *See Peerless Indem. Ins.*, 2025 WL 2052479, at *5 (applying Virginia law).  *Fourth*, three of the cases implicated Coverage B—and not, as here, Coverage A—where the insurer effectively agreed that the underlying plaintiff had alleged a "personal and advertising injury".[9]

### 3.    Red Roof's separation-of-insureds argument is both waived and meritless.

Red Roof argues for the first time on appeal that allegations that its employees directly participated in H.B.'s sex trafficking—by serving as lookouts and accepting money from H.B.'s traffickers—are not relevant to whether there is insurance coverage for Red Roof by virtue of the Policies' Separation of Insureds Condition.  Because Red Roof never

---

[9]    In *Starr Indemnity & Liability Co. v. Choice Hotels International*, 2021 WL 2457107, at *4 (S.D.N.Y. June 16, 2021), the court examined the applicability of an abuse and molestation exclusion where the insured agreed "personal and advertising injury" was alleged.  *See id.* ("At trial, both parties agreed that, unless an exclusion applies, Starr has a duty to defend . . . .").  In *American Family Mut. Ins. Co. v. Wyndham Hotels & Resorts, Inc.,* 2026 WL 851639, at *4 (S.D. Ind. Feb. 25, 2026), the insurer did not respond to the argument that the plaintiff alleged a "personal and advertising injury", instead focusing on the applicability of an abuse and molestation exclusion.  Similarly, in *Ricchio v. Bijal, Inc.*, 424 F. Supp. 3d 182, 187, 192 (D. Mass. 2019), the insurer argued that trafficking claims only implicated Coverage B and that, under Coverage B, the claims did not arise out of the insured's business and were barred by the "Criminal Acts" exclusion.

raised that argument below, it was waived.  *Sierra v. City of Hallandale Beach*, 904 F.3d 1343, 1348 n.6 (11th Cir. 2018) (appellee waived argument not presented in motion to dismiss).

On the merits, the argument also fails.  The Separation of Insureds Condition, which provides that the insurance potentially afforded applies "[s]eparately to each insured against whom . . . 'suit' is brought," has no relevance here.  *See* Opp'n 42 n.15 (citing Doc. 53-4 at 29).  As an initial matter, the employees are not defendants in the Underlying Lawsuits.  Moreover, this Court has consistently required that plaintiffs plead active conduct to support "participation" under the TVPRA.  *See supra* at 9-10.  Furthermore, Red Roof acknowledges that its employees' conduct is the means by which it is alleged to have participated in the venture.  Opp'n 33, 44.  Thus, the Separation of Insureds provision does not create coverage for Red Roof where none exists.

**B.    There is no coverage under Coverage B because H.B. does not allege any separate false imprisonment or detainment.**

H.B. does not allege false imprisonment or detention arising out of Red Roof's business that is separate from her alleged (uncovered) sex

trafficking.  Therefore, Coverage B is not implicated.  Red Roof's contrary arguments lack merit for four reasons.

*First*, H.B.'s alleged "bodily injury" was caused by her being sex trafficked; not by her being detained or confined.  Red Roof points only to isolated buzzwords that H.B. was "confined," "transport[ed]," or "harbored"—including one allegation that Red Roof acted criminally by harboring H.B.  *See* Opp'n 46 (citing Doc. 79-6 ¶ 81).  But the duty to defend depends not on stray allegations or tacked-on theories, but on the facts alleged in the complaint, read as a whole.  *Eubanks*, 927 S.E.2d at 533 (claims for negligent hiring excluded because, "regardless of how the claim is pled," the claims still arose from the insured's "alleged dishonest and criminal actions and omissions"); *Ga. Farm Bureau Mut. Ins.*, 586 S.E.2d at 718; *Chiquita I*, 988 N.E.2d at 901.  For example, in *Georgia Farm Bureau*, the plaintiff brought an ordinary negligence claim.  586 S.E.2d at 716.  The trial court found a duty to defend because the insured could have been held liable for mere negligence.  *Id.*  The Court of Appeals reversed, holding that the insurer had no duty to defend because, despite the labels, "the only reasonable inference to be drawn from the alleged facts" was that the conduct was not covered.  *Id.* at 717-18.

H.B.'s allegations are not that she was harmed by being confined, but that she was harmed by being harbored *and forced to engage in commercial sex*. Doc. 79-6, ¶¶ 17, 62, 80, 84. Any alleged detention was merely part of the ultimate act of trafficking H.B. for sex. Red Roof cannot manufacture coverage by ignoring these allegations and positing a hypothetical world in which H.B. alleged she was merely detained in the hotel.

*Second*, even if H.B. alleged she was falsely imprisoned, such allegations would be inextricably intertwined with her allegations of sex trafficking and thus not covered.

Red Roof contends that no Georgia court has adopted the inextricably-intertwined doctrine. Opp'n 49. But Red Roof identifies no case rejecting this doctrine. The one case Red Roof relies on, *Evanston Insurance Co. v. Dillard House, Inc.*, offers no support. 2017 WL 3498953 (N.D. Ga. June 28, 2017). There, the court rejected the insurer's argument that all claims hinged on a relationship to alcohol (part of an exclusion) because "[v]arious scenarios could end up being proved . . . wherein the alleged intoxication may or may not be determinative of the [insureds'] duties, breaches, or liabilities." *Id.* at *9. *Evanston* does not

reject the inextricably-intertwined doctrine as a legal matter; it rejects it on the facts alleged. Here, much like a sexual assault claim, there is no scenario in which H.B. could prove she was trafficked for sex *without* proving she was confined.

Red Roof's only response is that a defendant can violate § 1591 without the victim committing a sex act. *See* Opp'n 50 (citing *United States v. Blake*, 868 F.3d 960, 977 (11th Cir. 2017)). That may be true, but H.B. alleged—repeatedly—that she engaged in commercial sex acts. *See* Doc. 79-6, ¶¶ 17, 62, 80, 84. Red Roof cannot manufacture coverage by ignoring the facts alleged. *See Eubanks*, 927 S.E.2d at 533; *Chiquita I*, 988 N.E.2d at 901.

*Third*, any alleged detention does not arise out of Red Roof's business. Red Roof argues that because the alleged detention occurred at its property, then it arose out of its business. *See* Opp'n 51-52. But Georgia courts have held that "arising out of" requires more than being the "mere situs" of the injury. *See, e.g.*, *Colonial Ins. Co. v. Lumpkin*, 428 S.E.2d 351, 352 (Ga. 1993) (accidental shooting that occurred in car did not "aris[e] out of the ownership, maintenance or use" of the vehicle). Coverage B was not intended to cover illegal acts, unrelated to the

insured's legitimate business activities, that happened to occur on the property. *See Md. Cas. Co. v. Salon Ave. Suite 2*, 2014 WL 4925623, at *5 (N.D. Ga. Sept. 29, 2014).

*Fourth*, coverage would be excluded under the Knowing Violation of Rights of Another exclusion. Red Roof does not dispute that H.B. alleges that Red Roof "knew of, condoned, and permitted the widespread . . . sex trafficking at the [hotel], including her minor sex trafficking." Doc. 79-6, ¶ 31. It instead argues that H.B. did not need to plead actual knowledge; yet she did. *Id.* Red Roof also argues that it is not alleged to have caused H.B.'s sex trafficking. But the relevant offense (according to Red Roof) is detention or false imprisonment, not sex trafficking. Opp'n 53. To the extent H.B. alleges such detention, she alleges Red Roof caused it. *See* Doc. ¶ 81 (Red Roof "harbor[ed]" Plaintiff).

### C.    Georgia public policy precludes insurance coverage for participating in sex trafficking.

Red Roof contends that the insuring public should bear the cost of what H.B. alleged was a conscious decision to "condone[] and permit[]" sex trafficking at its hotels. Doc. 79-6, ¶ 31. In support, Red Roof contends it did not act intentionally. As set forth above, Red Roof's intent

to injure can be readily inferred from the nature of its alleged acts and H.B.'s demand for punitive damages.  *See supra* at 18, 20.

Red Roof also claims that its conduct is insurable because it was not "alleged to have violated Section 1591" and thus was not alleged to have committed a crime.  Opp'n 56.  H.B., though, alleges Red Roof violated § 1591 "as parties to the crime, and as co-conspirators, by harboring, . . . Plaintiff . . . [for] sexual servitude."  Doc. 79-6, ¶ 81.

At bottom, Red Roof is alleged to have made a conscious business decision:  It chose to participate in a venture that was engaged in sex trafficking so that it could reap the financial benefits.  To require the insuring public to reimburse Red Roof for that deliberate choice, while allowing Red Roof to retain its ill-gotten gains, is contrary to Georgia (and Ohio) public policy.

## IV.   Liberty has the right to recoup payments where there is no coverage.

Red Roof does not contest that, under Ohio law, Liberty is entitled to recoup defense costs and indemnity payments for uncovered claims. Under Georgia law, Liberty has the right to recoup amounts paid to settle uncovered claims.  Red Roof contends that *Winder Laboratories* applies "even more so to indemnity."  Opp'n 61.  But this Court's rationale in

*Winder Laboratories* rested heavily—if not exclusively—on the breadth of the duty to defend under Georgia law. *See, e.g., Cont'l Cas. Co. v. Winder Lab'ys*, 73 F.4th 934, 949 (11th Cir. 2023) ("deleterious effect . . . on the distinction between the duty to defend and the duty to indemnify"); *id.* at 948 ("The most important consideration . . . is" that "[t]he broad duty to defend is foundational."). Red Roof cherry-picks a single line to suggest the decision rested on contractual principles. Yet that line focuses on what this Court viewed as the limited effect of its decision— not the basis for concluding no right exists in the first place.

Denying insurers a right to recoupment risks stifling settlements and forces insurers to choose between protecting their own rights and those of their insureds. *See Blue Ridge Ins. Co. v. Jacobsen*, 22 P.3d 313, 321 (Cal. 2001). Failing to permit recoupment contradicts Georgia's "policy of 'encouraging . . . settlements.'" *See Shaha v. Gentry*, 859 S.E.2d 567, 569 (Ga. Ct. App. 2021). Red Roof argues this contradiction is of no moment because insurers "should not be excluded from this function that they contractually obligated themselves to perform." Opp'n 63. That, of course, is the point: insurers did not obligate themselves to contribute to settlements that are not covered and should not be forced to fund them.

Red Roof's reliance on § 25 of the Restatement of the Law Liability Insurance is also misplaced.  *See* Opp'n 61-63.  As Justice Scalia warned, "modern Restatements . . . are of questionable value, and must be used with caution. . . .  Over time, the Restatements' authors have abandoned the mission of describing the law, and have chosen instead to set forth their aspirations for what the law ought to be." *Kansas v. Nebraska,* 574 U.S. 445, 475 (2015) (Scalia, J., concurring in part and dissenting in part).  Moreover, Ohio has repudiated the Restatement by statute.  Ohio Rev. Code Ann. § 3901.82.  This position also contrasts with that in the Restatement (Third) of Restitution & Unjust Enrichment, § 35 & cmt. c., at 578 (2011).  *See John Moriarty & Assocs., Inc. v. Zurich Am. Ins. Co.,* 207 N.E.3d 542, 553-54 & n.11 (Mass. App. Ct. 2023) (noting conflict with Restatement's position that an insurer can recover "that part of its outlay that exceeds its policy obligation by a claim in restitution").[10]

In sum, under Ohio law (which applies here), Liberty has the right to seek recoupment for defense and indemnity payments paid for uncovered claims.  As for Georgia, at a minimum, Liberty is entitled to

---

[10]    *John Moriarty* also explains that the Restatement adopted positions that were deemed the "minority" approach.  207 N.E.3d at 553.

recoup the amounts that it paid to settle the Underlying Lawsuits that were not covered.

## CONCLUSION

The judgment should be vacated and the case remanded for further proceedings.

Respectfully submitted,

*/s/ Nancy D. Adams*

Latasha L. Scott
BUTLER WEIHMULLER
  KATZ CRAIG LLP
400 N. Ashley Drive, Suite 2300
Tampa, FL 33602
(813) 281-1900

Nancy D. Adams
  *Counsel of Record*
Alec J. Zadek
Mitchell J. Clough
MINTZ, LEVIN, COHN, FERRIS,
  GLOVSKY AND POPEO, P.C.
One Financial Center
Boston, MA 02111
(617) 542-6000

JUNE 30, 2026

- 31 -

## CERTIFICATE OF COMPLIANCE

I, Nancy D. Adams, a member of the Bar of this Court and counsel for appellant, hereby certify pursuant to Federal Rules of Appellate Procedure 32(a)(5), 32(a)(6), and 32(a)(7) that the attached brief is proportionally spaced, has a typeface of 14 points or more, and contains 6,439 words.

JUNE 30, 2026                    /s/ Nancy D. Adams
                                 Nancy D. Adams

# ADDENDUM

**Statute**                                                                                           **Page**

John Mitchell et al., *A Map of the British and French Dominions in North America* (1755), *available at* https://lccn.loc.gov/74693173 ......... 34

18 U.S.C. § 1591 ............................................................................... 35

18 U.S.C. § 1595 ............................................................................... 38

18 U.S.C. § 1595 (2008) ..................................................................... 39

18 U.S.C. § 1595 (2003) ..................................................................... 40



*Source:* John Mitchell et al., *A Map of the British and French Dominions in North America* (1755), *available at* https://lccn.loc.gov/74693173.

## 18 U.S.C. § 1591
## <u>Sex trafficking of children or by force, fraud, or coercion</u>

(a) Whoever knowingly--

(1) in or affecting interstate or foreign commerce, or within the special maritime and territorial jurisdiction of the United States, recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person; or

(2) benefits, financially or by receiving anything of value, from participation in a venture which has engaged in an act described in violation of paragraph (1),

knowing, or, except where the act constituting the violation of paragraph (1) is advertising, in reckless disregard of the fact, that means of force, threats of force, fraud, coercion described in subsection (e)(2), or any combination of such means will be used to cause the person to engage in a commercial sex act, or that the person has not attained the age of 18 years and will be caused to engage in a commercial sex act, shall be punished as provided in subsection (b).

(b) The punishment for an offense under subsection (a) is--

(1) if the offense was effected by means of force, threats of force, fraud, or coercion described in subsection (e)(2), or by any combination of such means, or if the person recruited, enticed, harbored, transported, provided, obtained, advertised, patronized, or solicited had not attained the age of 14 years at the time of such offense, by a fine under this title and imprisonment for any term of years not less than 15 or for life; or

(2) if the offense was not so effected, and the person recruited, enticed, harbored, transported, provided, obtained, advertised, patronized, or solicited had attained the age of 14 years but had not attained the age of 18 years at the time of such offense, by a fine under this title and imprisonment for not less than 10 years or for life.

(c) In a prosecution under subsection (a)(1) in which the defendant had a reasonable opportunity to observe the person so recruited, enticed, harbored, transported, provided, obtained, maintained, patronized, or solicited, the Government need not prove that the defendant knew, or recklessly disregarded the fact, that the person had not attained the age of 18 years.

(d) Whoever obstructs, attempts to obstruct, or in any way interferes with or prevents the enforcement of this section, shall be fined under this title, imprisoned for a term not to exceed 25 years, or both.

(e) In this section:

> (1) The term "abuse or threatened abuse of law or legal process" means the use or threatened use of a law or legal process, whether administrative, civil, or criminal, in any manner or for any purpose for which the law was not designed, in order to exert pressure on another person to cause that person to take some action or refrain from taking some action.

> (2) The term "coercion" means--

>> (A) threats of serious harm to or physical restraint against any person;

>> (B) any scheme, plan, or pattern intended to cause a person to believe that failure to perform an act would result in serious harm to or physical restraint against any person; or

>> (C) the abuse or threatened abuse of law or the legal process.

> (3) The term "commercial sex act" means any sex act, on account of which anything of value is given to or received by any person.

> (4) The term "participation in a venture" means knowingly assisting, supporting, or facilitating a violation of subsection (a)(1).

> (5) The term "serious harm" means any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same

background and in the same circumstances to perform or to continue performing commercial sexual activity in order to avoid incurring that harm.

(6) The term "venture" means any group of two or more individuals associated in fact, whether or not a legal entity.

## 18 U.S.C. § 1595
## <u>Civil remedy</u>

(a) An individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator (or whoever knowingly benefits, or attempts or conspires to benefit, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter) in an appropriate district court of the United States and may recover damages and reasonable attorneys fees.

(b)

(1) Any civil action filed under subsection (a) shall be stayed during the pendency of any criminal action arising out of the same occurrence in which the claimant is the victim.

(2) In this subsection, a "criminal action" includes investigation and prosecution and is pending until final adjudication in the trial court.

(c) No action may be maintained under subsection (a) unless it is commenced not later than the later of--

(1) 10 years after the cause of action arose; or

(2) 10 years after the victim reaches 18 years of age, if the victim was a minor at the time of the alleged offense.

(d) In any case in which the attorney general of a State has reason to believe that an interest of the residents of that State has been or is threatened or adversely affected by any person who violates section 1591, the attorney general of the State, as parens patriae, may bring a civil action against such person on behalf of the residents of the State in an appropriate district court of the United States to obtain appropriate relief.

## 18 U.S.C. § 1595 (2008)
### Civil remedy

(a) An individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator (or whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter) in an appropriate district court of the United States and may recover damages and reasonable attorneys fees.

(b)

(1) Any civil action filed under this section shall be stayed during the pendency of any criminal action arising out of the same occurrence in which the claimant is the victim.

(2) In this subsection, a "criminal action" includes investigation and prosecution and is pending until final adjudication in the trial court.

(c) No action may be maintained under this section unless it is commenced not later than 10 years after the cause of action arose.

## 18 U.S.C. § 1595 (2003)
### Civil remedy

(a) An individual who is a victim of a violation of section 1589, 1590, or 1591 of this chapter may bring a civil action against the perpetrator in an appropriate district court of the United States and may recover damages and reasonable attorneys fees.

(b)

(1) Any civil action filed under this section shall be stayed during the pendency of any criminal action arising out of the same occurrence in which the claimant is the victim.

(2) In this subsection, a "criminal action" includes investigation and prosecution and is pending until final adjudication in the trial court.